## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

IN RE:

CAH ACQUISITION COMPANY #1, LLC, d/b/a
WASHINGTON COUNTY COMMUNITY HOSPITAL,

THOMAS W. WALDREP, JR., as Litigation Trustee,

Plaintiff,

v.

PAUL NUSBAUM, STEVE WHITE, JORGE A. PEREZ,

Defendants.

CASE NO. 19-00730-JNC

CHAPTER 11

Adv. Pro. No. __

## COMPLAINT

Thomas W. Waldrep, Jr., in his capacity as Litigation Trustee in the above-captioned case, complains against Defendants Paul Nusbaum, Steve White, and Jorge A. Perez as follows:

## NATURE OF THE ACTION

1. Defendants aided and orchestrated two coordinated schemes to generate fraudulent reimbursements for laboratory tests at a number of rural hospitals located in multiple states. The schemes–which generated massive amounts in fraudulent billings–defrauded third-party payors, private insurers, patients, and ultimately hospitals, like the above-captioned Debtor, which were utilized as instrumentalities in those schemes.

2. The schemes, in essence, were straightforward: Defendants caused the hospitals to enter into arrangements with third-party laboratory testing companies. Pursuant to those arrangements, the laboratory testing companies obtained samples from patients throughout the country, none of whom had received treatment from the hospitals or had any connection to the

1

hospitals whatsoever. The parties would then bill those tests to private insurers as if they had been conducted at the hospitals themselves for patients of those hospitals. Doing so allowed the hospitals to charge private insurers higher, in-network reimbursements rates for procedures that were, in reality, out-of-network and should have been reimbursed, if at all, at much lower rates.

3.      As stated, in addition to defrauding private insurers, the schemes also constituted a fraud on the hospitals that Defendants were purporting to serve.  Rather than turning the proceeds of the schemes over to the hospitals, Defendants and their cohorts pocketed much of the ill-gotten gains while exposing the hospitals to massive liability and jeopardizing their relationships with the private insurers on whose reimbursements the hospitals depended to maintain their operations.  In the process, Defendants—who were owners and managers of the Debtor and its associated hospitals and/or controlled the Debtor and its associated hospitals— committed glaring, fundamental breaches of their most basic fiduciary duties.

4.      Ultimately, the schemes destroyed the hospitals, the Debtor being no exception. When it was uncovered, the private insurers targeted by the scheme began heavily scrutinizing the hospitals' claims and, in some instances, stopped doing business with the hospitals entirely. The Debtor and its affiliated hospitals were forced to file for bankruptcy, and some have ceased operation.  As a result, rural communities have been deprived of the health care services, and associated jobs, that they desperately need–all stemming from the callous greed of those like the Defendants that sought to profit off the Debtors' precarious economic status.

5.      The Litigation Trustee thus brings this adversary proceeding, which asserts claims for breach of fiduciary duty, fraudulent transfer, conversion, and aiding and abetting conversion to rectify the harm that Defendants caused the Debtor's business.

## JURISDICTION AND VENUE

6.     This Adversary Proceeding arises from and relates to the above-captioned bankruptcy case (the "Bankruptcy Case").

7.     This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157(b)(2) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     This is both a core and non-core proceeding pursuant to 28 U.S.C. § 157.

9.     The Plaintiff consents to this Court determining the cause and entering final judgment thereon.

## THE PARTIES

10.     Plaintiff, Thomas W. Waldrep Jr., is the Litigation Trustee of CAH Acquisition Company #1, LLC ("CAH 1," and together with its affiliates in jointly administered cases proceeding before the United States Bankruptcy Court for the Eastern District of North Carolina, the "CAH Hospitals").

11.     On information and belief, Defendant White is a citizen and domiciliary of West Virginia.

12.     On information and belief, Defendant Nusbaum is a citizen and domiciliary of West Virginia.

13.     On information and belief, Defendant Perez is a citizen and domiciliary of Florida.

3

## FACTUAL BACKGROUND

### I.    Critical Access Hospitals and the Debtors

14.    The Balanced Budget Act of 1997, Pub. Law. 105-33, created a new category of hospitals, known as critical access hospitals ("CAH").  Hospitals qualify for the CAH program by meeting certain regulatory requirements promulgated by the Centers for Medicare & Medicaid Services ("CMS"), including that the hospital: (1) is located in a rural area; (2) provides 24-hour emergency services seven days a week; (3) has 25 or fewer inpatient beds also used for swing bed services; and (4) has an annual average acute inpatient length stay of 96 hours or fewer.

15.    Congress created the CAH program to address a string of rural hospital closures and a concern about the ongoing financial viability of rural hospitals. The program is designed to ensure the continued viability of rural hospitals, which provide life-saving medical treatment and needed jobs to underserved communities.

16.    To further that goal, CAHs are reimbursed by insurance companies at much higher rates than other hospitals—typically 101 percent of reasonable costs—for most inpatient and outpatient services, including certain laboratory testing procedures.

17.    The Debtor and its affiliates, certain of which are also debtors before this Court, owned and operated a number of for-profit, critical access hospitals (collectively, the "Hospitals") that provided acute care, swing bed, emergency medicine, imaging, rehabilitation, laboratory, and related outpatient ancillary services in small rural areas in North Carolina, Kansas, Missouri, and Oklahoma.  Each of the Hospitals is classified as a CAH, or was classified as a CAH before it ceased operations.

4

18.     In addition to their status as CAHs for purposes of federal reimbursements, each of the Hospitals entered into contractual arrangements with certain private insurers (the "Private Insurers"), pursuant to which the Hospitals would be designated as "in-network" providers. In-network providers are reimbursed for qualifying medical services and qualifying patients at higher rates than other, "out-of-network" providers.

## II.   The Billing Schemes

19.     At all relevant times, Defendants Nusbaum and White were co-owners of HMC/CAH Consolidated, Inc. ("HMC/CAH").

20.     HMC/CAH owned 100% of the member and shareholder interests in the Debtor and its associated hospitals.

21.     Through HMC/CAH, Defendants Nusbaum and White were in a position of superiority over, and exercised control over, the Debtor and its associated hospitals.

22.     In or about late 2015, Defendants Nusbaum and White directed the Debtor and certain affiliated hospitals to enter into the first of two billing schemes—aimed at enriching themselves at the expense of the government, private insurers, and, ultimately, the Hospitals themselves (the "Verifi Scheme"). The Verifi Scheme sought to take advantage of the higher reimbursement rates that the Hospitals received from the Private Insurers in light of their status as "in-network" providers.

23.     In furtherance of that scheme, in or around June 2016, Defendants Nusbaum and White directed Debtor Washington County Hospital to enter into an arrangement with a hospital laboratory management company, LGMG, LLC, d/b/a Verifi Labs ("Verifi"), to dramatically increase the billings that the Hospitals would generate for performing certain laboratory tests, including urine analysis and blood testing to detect the presence of alcohol or illegal drugs.

24.    Under the scheme, Verifi would work with medical providers throughout the country to collect patient samples for urine analysis and blood testing. Virtually all those patients had not received treatment at any of the Hospitals and had never visited any of the Hospitals.  In many instances, those patients did not even reside in a state where any of the Hospitals were located.

25.    After the tests were performed, claims for reimbursement would be submitted to the Private Insurers under the Hospitals' billing credentials, even though in many cases: (1) the Hospitals had not performed the tests; and (2) the patients whose blood or urine was tested did not receive treatment and had no connection to the Hospitals.

26.    Submitting the tests under the Hospitals' billing credentials allowed the Hospitals to claim reimbursement for "in-network" services at the higher rates afforded CAHs—rates that would not have been available had the tests been submitted under the billing credentials of the laboratories where the tests were actually performed.

27.    The Verifi Scheme enabled the Hospitals to immediately and dramatically increase the claims they submitted to the Private Insurers for reimbursement and associated revenue.

28.    In particular, Washington County Hospital's monthly lab department revenue went from $116,325.00 in July 2016 to more than $580,000 the following month, then more than $1.2 million by January 2017.

29.    In the following months of the Verifi Scheme (February 2017 – July 2017), Debtor Washington County Hospital, a rural hospital with only 25 beds, recognized monthly revenue of $853,994.57, $1,256,093.56, $1,311,199.34, $1,185,032.94, $2,120,012.94 and

6

$1,023,015.81 (respectively) for lab worked allegedly performed by the hospital – most of which was actually performed by Verifi.

30.    Upon information and belief, the Debtor was insolvent on the date that the Verifi Scheme began and remained insolvent from that date through the filing of these chapter 11 cases.

31.    At all times, Defendants Nusbaum and White were aware of the Verifi Scheme, as well as the fact that the Verifi Scheme would permit the Hospitals to seek in-network reimbursement for laboratory tests that otherwise would not have qualified for in-network reimbursement.

32.    Indeed, Defendants Nusbaum and White were the driving force behind the implementation of the Verifi Scheme at Washington. Defendants Nusbaum and White used their control over Washington County Hospital and other related Hospitals, including Debtor I-70, to cause them to enter into arrangements with Verifi to process laboratory tests.

33.    To this end, in or around September of 2016, Defendants Nusbaum and White were actively pushing for the Debtors to engage in an additional lab scheme with Dr. Michael Murphy—the same Michael Murphy that orchestrated the lab scheme detailed in UnitedHealthCare Insurance v. Michael Murphy, M.D. et al., Case No. 5:18-CV-347, filed in the United States District Court for the Western District of Texas.

34.    Defendants Nusbaum and White were also well aware, prior to its inception, that the Verifi Scheme was not a legitimate method of generating revenue, but, instead, constituted illegal fraud.  On multiple occasions, outside legal counsel for Defendants Nusbaum and White and various corporate entities owned and operated by the Defendants advised that billing schemes, like the Verifi Scheme, violated state and federal law.

7

35.     Nevertheless, Defendants Nusbaum and White continued to rebuff the expert legal guidance that they were provided regarding the illicit nature of their actions.

36.     Unfortunately for Defendants Nusbaum and White, as the volume of the Hospitals' reimbursements skyrocketed (though the money ended up in the pockets of the Defendants Nusbaum and White and their co-conspirators), the Hospitals began facing increasing scrutiny from the Private Insurers.

37.     Certain of the Private Insurers began requiring additional documentation and/or additional review before approving claims relating to laboratory testing.  This increased scrutiny impeded the Hospitals' ability to carry out their day-to-day functions, including providing care and obtaining reimbursement for legitimate patients and legitimate medical treatment.

38.     Along these lines, on March 14, 2017, Terry Amstutz, the Chief Executive Officer for Washington County Hospital, wrote Nusbaum and others informing them that Aetna would no longer reimburse Washington County Hospital for its "outreach" labs performed by Verifi Labs.   In particular, Aetna advised that the submitted lab claims were "improper" and "constitute[d] a pattern of abusive billing and [gave] rise to a reasonable suspicion of fraud."

39.     Defendants Nusbaum and White were undeterred.  To the contrary, their principal concern—as detailed in a comprehensive memorandum prepared by Nusbaum—was that the vast majority of the illicit gains were going to Verifi Labs and their former colleague, James Shaffer, while their own management fees (through ownership of Rural County Hospitals of America) were not getting paid.

40.     Indeed, in an attempt to avoid heightened scrutiny, while at the same time lining their own pockets, Defendants Nusbaum and White had already conspired to use their control over the Debtors to place them into a new lab scheme that, in part, would allow Defendants

8

Nusbaum and White and their accomplices to spread out the illicit billing among even more Hospitals, and thereby allay increasing suspicion.

### III.    Defendants Effect a Coup and Bring in EmpowerHMS

41.    By late 2016, Defendants Nusbaum and White had already begun a campaign to switch horses and join forces with Defendant Perez and EmpowerHMS to utilize the Debtor (and other Hospitals) in a massive fraudulent billing scheme (the "Empower Scheme", collectively with the Verifi Scheme, the "Billing Schemes").

42.    Defendants Nusbaum and White, however, faced resistance from co-owners of HMC/CAH.

43.    On March 5, 2017, Defendant White wrote an email to Kimberly Spies and Jim Shaffer of HMC/CAH, defending the desire to engage Empower and Mr. Perez for purposes of expanding their lab billing scheme to all of the Hospitals and, purportedly, curing the legal deficiencies of their existing program—such as the fact that most of the existing "outreach" lab work under the Verifi Scheme was coming from halfway across the country, rather than from within the states in which the Debtors reside (or even states adjacent thereto)—stating:

> Verifi does not have the ability to provide the volume of specimens in order to expand the program to all of the HMC hospitals.  More importantly, the future long term success of hospital outreach laboratory efforts will be assured if specimen collections are obtained from individuals who reside in the state where the hospitals are located or from individuals in adjacent states…[Empower] was one of only two companies that had the ability to send specimens to our hospitals from instate individuals and more importantly provided all lab testing/analysis of the specimens onsite at HMC hospitals to assure that the proposed effort is 100% compliant with all applicable federal, state and third party payer requirements.

44.    Upon information and belief, Defendant White knew that the proposed effort was not completely compliant with all applicable federal, state, and third party payer requirements at the time that he sent the March 5, 2017 email.

45.     Upon further information and belief, Defendant White wrote the March 5, 2017 email to Ms. Spies and Mr. Shaffer, despite knowing that it was false, for the purpose of inducing Ms. Spies and Mr. Shaffer to approve the engagement of Empower and Defendant Perez for Defendants' personal benefit.

46.     On or about March 6, 2017, Defendants Nusbaum and White presented the Empower Scheme at a HMC/CAH Board Meeting, attended by Defendant Perez, where they reiterated the false statements contained in Defendant White's March 5, 2017 email.

47.     The HMC/CAH Board, however, did not vote in favor of the proposal.  Rather, the Board voted to take the proposed laboratory testing program under advisement for further due diligence.

48.     Faced with the dissent to the expansion of the ongoing illicit scheme to the remaining Hospitals, Defendants Nusbaum and White effected a coup.  While the meeting remained ongoing, Defendants provided written notice that Health Acquisition Company, LLC ("HAC" a special purpose entity formed by the Defendants for their ownership in HMC/CAH) was exercising its option to acquire 80% of the member/shareholder interests in the Debtors (and related Hospitals).

49.     In furtherance of this coup, on or about March 29, 2017, Defendants Nusbaum and White executed a so-called Conversion Agreement, whereby the Debtors' former corporate parent "sold" 80% of its ownership interests in the Debtors (and related Hospitals) to HAC in exchange for a release of outstanding debt owed to HAC under a prior loan agreement.

50.     At the same time, Defendants Nusbaum and White used their control to bring in Defendant Perez, EmpowerHMS, and the Perez Group to implement the Empower Scheme.

10

Immediately thereafter, on April 20, 2017, Defendants Nusbaum and White sold Defendant Perez (along with Ricardo Perez and Carlos Perez) 50% of HAC.

51.    The Empower Scheme, amazingly, was even worse for the Hospitals.  At least under the Verifi Scheme, some revenue was running through the Debtor and its affiliated hospitals—though the vast majority was immediately transferred to Verifi and other scheme participants, like the Defendants.

52.    Under the Empower Scheme, however, Empower H.I.S. (an Empower affiliate), in dereliction of the Defendants Nusbaum and White's fiduciary duties, was granted complete control over the operations of each of the Hospitals, including control over their bank accounts, billing systems, and their rights to submit claims to insurance companies with which the Hospitals had in-network contracts.  Along these lines, on April 20, 2017, Defendants Nusbaum and White bestowed Defendant Perez with the title of Primary Manager of HAC, and on August 3, 2017, as reflected in corporate minutes signed by Nusbaum, Defendants Nusbaum and White agreed that Defendant Perez would "be authorized to act on behalf of HAC and any/all of the individual hospital entities … on all matters relating to bank accounts and lending matters including relationships with all banks and government entities."

53.    Likewise, as part of the Empower Scheme, Defendants authorized Empower H.I.S. to install software at both the CAH Hospitals and the third-party laboratories participating in the Empower Scheme. The software enabled their laboratories to transmit patient billing information and associated data by wire to Empower in Miami, Florida, for the purpose of submitting insurance claims to insurers and other third-party payors.

54.    In doing so, Empower was able to pick and choose which Debtor to utilize for purposes of submitting its fraudulent laboratory billings.  Along those same lines, rather than

11

revenue initially running to the Hospitals that had any involvement in the related lab work (even if just for billing), the money was placed into a central slush fund maintained by EmpowerHMS. Upon information and belief, Defendant Perez would then cause Empower to make distributions from that account to himself and its other owners as well other entities and individuals involved in the Empower Scheme. By doing so, the majority of the revenue never even passed through the Debtor and its affiliated hospitals' financial records, only receiving what Defendant Perez and Empower chose to share.

55.     In concert with the Empower Scheme, the Defendants, in their capacity as owners, managers, and/or controllers of the Debtor and its affiliated hospitals, approved this structure. In doing so, the Defendants approved tens of millions of dollars in distributions and transfers to Empower and other scheme participants.

56.     Moreover, though providing Empower with free rein over the Debtor and its affiliated hospitals' books, records, and billing systems, Defendant Nusbaum remained heavily involved in the day-to-day operation of the scheme. Indeed, Nusbaum acted as a Senior Leader of the Debtor and its affiliated hospitals' Operation Leadership and attended weekly meetings with Empower addressing financial decisions, including, without limitation, relating to the Empower Scheme.

## IV.   The Billing Schemes Unravel

57.     In August 2017, the Office of the Missouri State Auditor issued an audit report regarding one of the Hospitals involved in the Empower Scheme, Putnam County Hospital, in Unionville, Missouri (not one of the CAH Hospitals). A copy of the State Auditor's report is attached hereto as Exhibit A.

12

58.    The State Auditor found that Putnam County Hospital had seen a "significant increase of questionable revenues from laboratory billings of health insurance companies" arising from "out-of-state patients for lab work not conducted in Putnam County."

59.    The State Auditor noted that hospital officials "have not provided sufficient support to justify why such activity is being billed through the hospital." The State Auditor further noted that at least one private insurance company was no longer paying any claims for the hospital as a result of the Empower Scheme, and that "[c]ontinued use of such questionable laboratory billings could leave the hospital at risk if such activity is deemed to be inappropriate by the insurance companies billed . . . ."

60.    The State Auditor determined that the billings generated by Putnam County Hospital alone exceeded $90 million between December 2016 and May 2017, as compared to $12.7 million for all of fiscal year 2015, and $7.5 million for all of fiscal year 2016.

61.    The State Auditor noted that, while billings had exploded, little of that money was actually going to Putnam County Hospital.  Instead, 80 percent of the new revenues were disbursed to the laboratory companies (including those owned and operated by Defendant Perez), with an additional 6 percent going to the billing company and another portion going to out-of-state phlebotomists.

62.    Following the State Auditor's report, the Private Insurers filed lawsuits seeking to recover the amounts they paid the Debtor and the Hospitals for the fraudulent claims.

63.    Some of the Private Insurers also terminated their relationships with the Hospitals, thereby depriving the Hospitals of a needed source of revenue. For example, in February 2018, Blue Cross Blue Shield of Oklahoma ("BCBS") announced that four Hospitals participating in the Empower Billing Scheme would no longer be a part of BCBS of Oklahoma's network.

13

64.     The uncovering of the Empower Scheme also drew the attention of the federal government. On June 17, 2020, the United States Department of Justice indicted a number of participants in the Empower Scheme, including Defendant Perez, for conspiracy, wire fraud, health care fraud, and money laundering, in a case captioned <u>United States v. Jorge Perez, et al.</u>, 3:20-cr-86 (M.D. Fla.), relating to a similar scheme at a Florida hospital.

## V.     **The Debtors' Bankruptcies**

65.     Ultimately, the Debtors' participation in the Billing Schemes doomed the Debtor and its affiliated hospitals' businesses.  On February 19, 2019 (the "<u>Petition Date</u>"), Washington County, North Carolina, Medline Industries, Inc., and Dr. Robert Venable (collectively, the "<u>Petitioning Creditors</u>") filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against one of the CAH Hospitals, CAH Acquisition Company #1, LLC ("<u>CAH 1</u>," Case No. 19-00730).

66.     On March 15, 2019, CAH 1's bankruptcy case was converted from Chapter 7 to Chapter 11, and the Litigation Trustee was appointed as the Chapter 11 Trustee for CAH 1 pursuant to Section 1104 of the Bankruptcy Code.

67.     In March and April 2019, six of CAH 1's affiliates, CAH Acquisition Company 2, LLC ("<u>CAH 2</u>,"Case No. 19-01230), CAH Acquisition Company 3, LLC ("<u>CAH 3</u>," Case No. 19-01180), CAH Acquisition Company 6, LLC ("<u>CAH 6</u>," Case No. 01300), CAH Acquisition Company 7, LLC ("<u>CAH 7</u>," Case No. 19-01298), CAH Acquisition Company 12, LLC ("<u>CAH 12</u>," Case No. 19-01697), and CAH Acquisition Company 16, LLC ("<u>CAH 16</u>," Case No. 19-01227), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "<u>Bankruptcy Cases</u>").

68.    On October 19, 2020, the Court entered an Order of Conversion in which CAH 6 was converted from a case under Chapter 11 to a Chapter 7 Case.

69.    On that same date, the Court confirmed CAH 1's Amended Chapter 11 Plan of Orderly Liquidation (the "Washington Plan").  The Effective Date (as defined in the Washington Plan) occurred on November 3, 2020.

70.    On December 7, 2020, the Court confirmed Chapter 11 plans for each of CAH 2, CAH 3, CAH 7, CAH 12 and CAH 16.  The Effective Dates for each such plan (as defined in the respective plans) was: (i) December 22, 2020 for CAH 7 and CAH 12; and (ii) February 20, 2021 for CAH 2, CAH 3 and CAH 16.  The Effective Date of each such plan converted those Chapter 11 estates into litigation trusts (each a "Litigation Trust," and altogether, the "Litigation Trusts").

71.    Plaintiff is the Litigation Trustee under each of the above-mentioned plans, vested with the authority to pursue all claims on behalf of the Debtors' estates.

72.    On January 5, 2021, the Court entered an order extending the time for Plaintiff to pursue claims on behalf of the Debtor and its affiliated hospitals' estates to and including March 1, 2022.

**COUNT I**
**(BREACH OF DUTY OF CARE AND LOYALTY)**
**(DEFENDANTS NUSBAUM AND WHITE)**

73.    The Litigation Trustee realleges and incorporates paragraphs 1 through 72 as though set forth fully herein.

74.    Defendants Nusbaum and White were 50% owners of HMC/CAH, the entity that itself owned the Debtor and the Hospitals up and through March 29, 2017.

75.     Defendants Nusbaum and White were 50% owners of HAC, the entity that owned the Debtor and the Hospitals following March 29, 2017.

76.     Upon information and belief, Defendant Nusbaum served as a manager of the Debtor and the Hospitals from March 29, 2017 through at least June 2018.

77.     Given their corporate positions, active management, position of superiority over the Debtor, and control over the Debtor and the Hospitals through their ownership of HMC/CAH, Defendants Nusbaum and White owed the Debtor statutory and fiduciary duties, including duties of care and loyalty.

78.     Given their corporate positions and active management, position of superiority over the Debtor, and control over the Debtor through their ownership of HMC/CAH, Defendants Nusbaum and White owed fiduciary duties, including duties of care and loyalty, to the Debtor's creditors.

79.     The duty of care requires a fiduciary to exercise the care which an ordinary and prudent person would use in similar circumstances.  Among other things, the duty of care requires a fiduciary to refrain from taking steps that the fiduciary knows or should know would expose the entity to civil or criminal liability.

80.     The duty of loyalty requires a fiduciary to refrain from placing his or her own personal pecuniary interest above the interest of the entity as a whole.  A fiduciary must deal openly and honestly with the entity and is prohibited from usurping the entity's benefits or opportunities.

81.     Defendants Nusbaum and White breached their duties of care by:

       a.  Causing or permitting the Debtor and/or the CAH Hospitals to enter into both the Verifi Scheme and the Empower Scheme, thereby exposing the

Debtor to civil and criminal liability, jeopardizing the Debtor's relationships with third-party payors, and threatening their continued financial viability.

b.  Causing or permitting the Debtor to make exorbitant distributions and/or dividends to themselves and/or Empower at a time when the Debtor was insolvent and/or which rendered the Debtor insolvent.

c.  Failing to ensure that the Debtor's financial statements, including without limitation federally mandated cost reports, accurately represented the Debtor's financial conditions.  Indeed, Defendants Nusbaum and White effectively "handed over the keys" to Empower, allowing it access and control over the Debtor's electronic billing system, thereby frustrating the ability of the Debtor to accurately track billings, revenue, and income associated with the Billing Schemes.

d.  Failing to be active monitors of the Debtor's corporate performance and the effects of the distributions made as part of the Billing Schemes.

82.    Defendants Nusbaum and White breached their duties of loyalty by:

a.  Causing the Debtor to enter into the Billing Schemes for Defendants Nusbaum and White's pecuniary gain despite their knowledge that the Billing Schemes were unlawful and would expose the Debtor to civil and criminal liability, could result in third-party payors terminating their relationships with the Debtor, and could threaten its continued financial viability.

17

b. Usurping the Debtor's opportunities for their own benefit. In particular, even though the supposed purpose of the Billing Schemes was to increase the Debtor's revenues, Defendants Nusbaum and White instead misappropriated the money for their own benefit.

83. It is evident from the foregoing allegations that, at all relevant times, Defendants Nusbaum and White repeatedly and deliberately decided to elevate their individual interests over the interests of the Debtor and its creditors.

84. As a direct and proximate result of Defendants Nusbaum and White's breaches of their fiduciary duties, the Debtor's business was destroyed, impairing creditors and imperiling the ongoing necessity of medical care for at risk locations.

85. Defendants Nusbaum and White's behavior constitutes gross negligence.

86. Defendants Nusbaum and White's behavior was extreme and outrageous, justifying the imposition of punitive damages.

87. The Debtor has suffered damages in an amount to be proven at trial, but no less than $10 million.

Wherefore, the Litigation Trustee requests entry of a final judgment for the benefit of the Litigation Trust against Defendants Nusbaum and White for breach of fiduciary duty and awarding the Litigation Trust damages of no less than $10 million, awarding attorneys' fees and costs, punitive damages, and granting such further relief as is just and appropriate.

## COUNT II
## (BREACH OF FIDUCIARY DUTY)
## (DEFENDANT PEREZ)

88. The Litigation Trustee realleges and incorporates paragraphs 1 through 72 as though set forth fully herein.

18

89.    On April 20, 2017, Defendant Perez was appointed as the Primary Manager of HAC. On information and belief, Defendant Perez remained in that role at all relevant times.

90.    Given his role as the Primary Manager of HAC, which gave him active management and control over the Debtor and the Hospitals, Defendant Perez owed the Debtor and the Hospitals statutory and fiduciary duties, including duties of care and loyalty.

91.    Given his role as the Primary Manager of HAC, which gave him active management and control over the Debtor and the Hospitals at times they were insolvent, Defendant Perez owed fiduciary duties, including duties of care and loyalty, to the Debtor's creditors.

92.    The duty of care requires a fiduciary to exercise the care which an ordinary and prudent person would use in similar circumstances.  Among other things, the duty of care requires a fiduciary to refrain from taking steps that the fiduciary knows or should know would expose the entity to civil or criminal liability.

93.    The duty of loyalty requires a fiduciary to refrain from placing his or her own personal pecuniary interest above the interest of the entity as a whole.  A fiduciary must deal openly and honestly with the entity and is prohibited from usurping the entity's benefits or opportunities.

94.    Defendant Perez breached his duty of care by:

    a.    Causing or permitting the Debtor and/or the CAH Hospitals to enter into the Empower Scheme, thereby exposing the Debtor to civil and criminal liability, jeopardizing the Debtor's relationships with third-party payors, and threatening their continued financial viability.

19

    b.   Causing or permitting the Debtor to make exorbitant distributions and/or dividends to Empower, and through Empower, to himself, at a time when the Debtor was insolvent and/or which rendered the Debtor insolvent.

    c.   Failing to ensure that the Debtor's financial statements, including without limitation federally mandated cost reports, accurately represented the Debtor's financial conditions.

95.    Defendant Perez breached his duty of loyalty by:

    a.   Causing the Debtor to enter into the Empower Scheme for his own pecuniary gain despite knowledge that the Empower Scheme was unlawful and would expose the Debtor to civil and criminal liability, could result in third-party payors terminating their relationships with the Debtor, and could threaten its continued financial viability.

    b.   Usurping the Debtor's opportunities for his own benefit. In particular, even though the supposed purpose of the Empower Scheme was to increase the Debtor's revenues, Defendant Perez instead misappropriated the money for his own benefit.

96.    It is evident from the foregoing allegations that, at all relevant times, Defendant Perez repeatedly and deliberately decided to elevate his individual interests over the interests of the Debtor and its creditors.

97.    As a direct and proximate result of Defendant Perez's breaches of his fiduciary duties, the Debtor's business was destroyed, impairing creditors and imperiling the ongoing necessity of medical care for at risk locations.

98.    Defendant Perez's behavior constitutes gross negligence.

20

99.     Defendant Perez's behavior was extreme and outrageous, justifying the imposition of punitive damages.

100.     The Debtor has suffered damages in an amount to be proven at trial, but no less than $10 million.

Wherefore, the Litigation Trustee requests entry of a final judgment for the benefit of the Litigation Trust against Defendant Perez for breach of fiduciary duty and awarding the Litigation Trust damages of no less than $10 million, awarding attorneys' fees and costs, punitive damages, and granting such further relief as is just and appropriate.

## COUNT III
## (CONSTRUCTIVE FRAUDULENT TRANSFER)
## (ALL DEFENDANTS)

101.     The Litigation Trustee realleges and incorporates paragraphs 1 through 72 as though set forth fully herein.

102.     In their capacity as owners and managers of the Debtor and the Hospitals, Defendants approved millions in distributions to EmpowerHMS and to themselves and/or businesses that they controlled.

103.     Upon information and belief, EmpowerHMS transferred funds received on account of the Empower Scheme to the Defendants, either directly or through entities controlled by the Defendants, in furtherance of the Empower Scheme.

104.     Upon information and belief, EmpowerHMS transferred funds received on account of the Empower Scheme to bank accounts held and controlled by HAC, including but not limited to, those listed in Exhibit B, attached hereto and incorporated herein, to HAC's Operating Account, US Bank Account ending in 8759.

21

105.    Upon information and belief, Defendants Nusbaum and White, as 50% owners of HAC, indirectly received funds transferred by EmpowerHMS to bank accounts held and controlled by HAC, including but not limited to, HAC's Operating Account, US Bank Account ending in 8759.

106.    Defendants caused the Debtor to make the distributions in connection with, and in furtherance of, the Billing Schemes (the "Insider Distributions").

107.    The Insider Distributions were made without fair consideration.

108.    The Insider Distributions were made for less than reasonably equivalent value.

109.    The Insider Distributions were made while the Debtor had unreasonably small capital.

110.    The Insider Distributions were made while the Debtor intended to incur or believed they would incur debts beyond their ability to pay such debts as they matured.

111.    The Insider Distributions were made in connection with the Billing Schemes and outside the course of ordinary business.

112.    The Insider Distributions are avoidable N.C. Gen. Stat. § 39-23.5 and 11 U.S.C. §§ 544 and 548.

113.    The Litigation Trustee may recover the Insider Distributions pursuant to 11 U.SC. § 550.

Wherefore, the Litigation Trustee requests entry of a final judgment avoiding the Insider Distributions and a judgment for the benefit of the Litigation Trust against the Defendants for the improper distributions and payments arising out of the Billing Schemes, awarding attorneys' fees and costs, and granting such further relief as is just and appropriate.

## COUNT IV
## (ACTUAL FRAUDULENT TRANSFER)

114.    The Litigation Trustee realleges and incorporates paragraphs 1 through 72 as though set forth fully herein.

115.    In their capacity as owners and managing managers of the Debtor and the Hospitals, Defendants approved millions in distributions to EmpowerHMS and to themselves and/or businesses which they controlled.

116.    Upon information and belief, EmpowerHMS transferred funds received on account of the Empower Scheme to the Defendants, either directly or through entities controlled by the Defendants, in furtherance of the Empower Scheme.

117.    Upon information and belief, EmpowerHMS transferred funds received on account of the Empower Scheme to bank accounts held and controlled by HAC, including but not limited to, those listed in Exhibit B, attached hereto and incorporated herein, to HAC's Operating Account, US Bank Account Number 1-455-9286-8759.

118.    Upon information and belief, Defendants Nusbaum and White, as 50% owners of HAC, indirectly received funds transferred by EmpowerHMS to bank accounts held and controlled by HAC, including but not limited to, HAC's Operating Account, US Bank Account Number 1-455-9286-8759.

119.    Defendants caused the Debtor to make the distributions in connection with, and in furtherance of, the Billing Schemes (the "Insider Distributions").

120.    The Insider Distributions were made to insiders of the Debtor.

121.    The Insider Distributions rendered the Debtor insolvent.

122.    The Insider Distributions were made without fair consideration.

123.    The Insider Distributions were made for less than reasonably equivalent value.

23

124.     The Insider Distributions were made while the Debtor had unreasonably small capital.

125.     The Insider Distributions were made while the Debtor intended to incur or believed they would incur debts beyond their ability to pay such debts as they matured.

126.     The Insider Distributions were made in connection with the Billing Schemes and outside the course of ordinary business.

127.     The Insider Distributions were made for purposes of hindering and/or defrauding the Debtor's creditors.

128.     The Insider Distributions are avoidable pursuant to N.C. Gen. Stat. § 39-23.4 and 11 U.S.C. §§ 544 and 548.

129.     The Litigation Trustee may recover the Insider Distributions pursuant to 11 U.S.C. § 550.

Wherefore, the Litigation Trustee requests entry of a final judgment avoiding the Insider Distributions and a judgment for the benefit of the Litigation Trust against the Defendants for the improper distributions and payments arising out of the Billing Schemes, awarding attorneys' fees and costs, and granting such further relief as is just and appropriate.

**COUNT V**
**(CONVERSION)**
**(AGAINST DEFENDANT PEREZ)**

130.     The Litigation Trustee realleges and incorporates paragraphs 1 through 72 as though set forth fully herein.

131.     Through the Empower Scheme, the Debtor and its associated Hospitals generated millions of dollars in billings for laboratory testing.

24

132.    The Debtor and its associated Hospitals submitted those billings to private insurers through reimbursement.

133.    As the entities invoicing private insurers for those billings, the Debtor had immediate ownership and right of possession of the money private insurers paid to Empower in connection with those billings.

134.    The private insurers reimbursed the Debtor and its associated Hospitals electronically. Those electronic transfers can be identified by the specific source, specific amount, and specific destination of the funds in question.

135.    Through his ownership and control of Empower, Defendant Perez caused the money received from private insurers in connection with the Empower Scheme to be deposited into a central fund owned and controlled by Empower, rather than in the accounts of the Debtor or its associated Hospitals.

136.    Defendant Perez then wrongfully converted those funds for his own benefit by causing Empower to distribute the money to himself and the other owners of Empower.

137.    As a result of Defendant Perez's actions, the Debtor and its associated Hospitals never received the majority of the reimbursements generated by the Empower Scheme.

138.    As a direct and proximate result of Defendant Perez's wrongful conversion of the reimbursements, the Debtor suffered losses in an amount to be proven at trial but not less than $10,000,000.00.

Wherefore, the Litigation Trustee requests entry of a final judgment for the benefit of the Litigation Trust against Defendant Perez for conversion and awarding the Litigation Trust damages of no less than $10,000,000, and granting such further relief as is just and appropriate.

## COUNT VI
## (AIDING AND ABETTING CONVERSION)
## (AGAINST DEFENDANTS NUSBAUM AND WHITE)

139.    The Litigation Trustee realleges and incorporates paragraphs 1 through 72 as though set forth fully herein.

140.    Through the Empower Scheme, the Debtor and its associated Hospitals generated millions of dollars in billings for laboratory testing.

141.    The Debtor and its associated Hospitals submitted those billings to private insurers through reimbursement.

142.    As the entities invoicing private insurers for those billings, the Debtor had immediate ownership and right of possession of the money private insurers paid to Empower in connection with those billings.

143.    The private insurers reimbursed the Debtor and its associated Hospitals electronically. Those electronic transfers can be identified by the specific source, specific amount, and specific destination of the funds in question.

144.    Through his ownership and control of Empower, Defendant Perez caused the money received from private insurers in connection with the Empower Scheme to be deposited into a central fund owned and controlled by Empower, rather than in the accounts of the Debtor or its associated Hospitals.

145.    Defendant Perez then wrongfully converted those funds for his own benefit by causing Empower to distribute the money to himself and the other owners of Empower.

146.    At all relevant times, Defendants Nusbaum and White were aware that, as part of the Empower Scheme, Defendant Perez was wrongfully converting funds belonging to the Debtor for his own benefit.

26

147.    Defendants Nusbaum and White actively and substantially assisted Defendant Perez in his wrongful conversion of the Debtor's money by, among other things: approving the Empower Scheme; authorizing Empower H.I.S. to install software at the CAH Hospitals and third-party laboratories permitting the laboratories to transmit patient billing information and associated data by wire to Empower in Miami, Florida, for the purpose of submitting insurance claims; failing to ensure that funds earned from billings associated with the Empower Scheme went to the Debtor rather than Mr. Perez; and failing to ensure that reimbursement from private insurers were reflected in the Debtors' books and records.

148.    As a result of Defendants Nusbaum and White's aiding and abetting of Defendant Perez's wrongful conversion, the Debtor and its associated Hospitals never received the majority of the reimbursements generated by the Empower Scheme.

149.    As a direct and proximate result of Defendants Nusbaum and White's aiding and abetting of Defendant Perez's wrongful conversion of the reimbursements, the Debtor suffered losses in an amount to be proven at trial but not less than $10,000,000.00.

Wherefore, the Litigation Trustee requests entry of a final judgment for the benefit of the Litigation Trust against Defendants Nusbaum and White for aiding and abetting conversion and awarding the Litigation Trust damages of no less than $10,000,000, and granting such further relief as is just and appropriate.

Respectfully submitted, this the 6th day of August, 2021.

/s/  Micah E. Marcus
Micah E. Marcus (*pro hac vice pending*)
Christopher Allen (*pro hac vice pending*)
McDONALD HOPKINS LLC
300 North LaSalle Street, Suite 1400

27

Chicago, Illinois 60654
Telephone:  (312) 280-0111
Facsimile:  (312) 280-8232
mmarcus@mcdonaldhopkins.com
callen@mcdonaldhopkins.com

Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
James D. Wall (NC Bar No. 17947)
J. Dennis Bailey (NC Bar No. 12847)
James C. Lanik (NC State Bar No. 30454)
Jennifer B. Lyday (NC Bar No. 39871)
WALDREP WALL BABCOCK & BAILEY PLLC
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
Telefax: 336-717-1340
Email: notice@waldrepwall.com

*Attorneys for the Litigation Trustee*

<u>Exhibit A</u>



Office of Missouri State Auditor

# Nicole Galloway, CPA

# Putnam County Memorial Hospital

Report No. 2017-074

August 2017

auditor.mo.gov

**Nicole Galloway, CPA**
Missouri State Auditor

# CITIZENS SUMMARY

## Findings in the audit of Putnam County Memorial Hospital

| | |
|---|---|
| **Background** | In September 2016, the State Auditor's Office announced a series of audits of county hospitals to focus on financial and operating best practices for acute care facilities that are critical to individuals who live and work in the surrounding communities. |

The Putnam County Memorial Hospital opened in 1963 with the first patient admitted in October of that year. The hospital was designated as a critical access hospital (CAH) in the 1990s, which is a designation designed to reduce the financial vulnerability of rural hospitals and improve access to healthcare by keeping essential services in rural communities. The hospital is one of 36 CAHs in Missouri and is licensed for 15 acute care beds.

On November 29, 2016, the hospital's Board of Trustees (Board) entered into a lease agreement, for operating the hospital, with Hospital Partners, Inc. As part of this lease agreement, the Board is transferring operational ownership, via an official Change of Ownership process through the state of Missouri, and transferring the hospital's Medicare and Medicaid provider numbers to that entity. However, as of August 1, 2017, the Department of Health and Senior Services had yet to receive a change of ownership request.

**Lack of Board Oversight**

The Board did not perform sufficient due diligence over the process of awarding management contracts. In addition, the Board did not adequately document how decisions related to the hiring of management companies were made or retain sufficient documentation to show they conferred with legal counsel prior to entering into the contracts. The Board did not ensure personnel were in place to provide oversight of management company activities, and did not provide sufficient direct oversight of the compensation paid to the companies, including salaries paid to executive administration personnel. The Board has not provided appropriate oversight of laboratory contracts entered into by the new CEO/management company President. As a result, the hospital is incurring unnecessary payroll costs, and is involved in questionable laboratory billing practices.

The Board did not provide sufficient oversight to be aware the CEO entered the hospital into a verbal agreement for a $500,000 loan. The Board does not have adequate procedures in place to provide sufficient oversight and ensure all travel reimbursements are reasonable and proper. Additionally, the hospital did not properly report all employee's wages earned to the state and federal government and reimbursed questionable expenses. The Board did not receive or request sufficient documentation from the previous management company prior to approving the addition of an inpatient psychiatric unit in March 2012, did not approve the management contracts put in place to run the unit, and did not provide any ongoing oversight or monitoring of the unit until its closure in December 2015.

Immediately upon signing the current management contract with the hospital, the CEO and his associates began billing significant amounts of out-of-state lab activity through the hospital. In the event the insurance companies being billed for this activity determine it is not legitimate, or

|  | question the propriety of the hospital having out-of-state phlebotomists on its payroll, the Board and the hospital could potentially be held liable. |
|---|---|
| **Financial Condition** | The hospital is in extremely poor financial condition. The hospital's financial condition has steadily declined since we reported similar concerns in our 2 year-end December 31, 2011, audit report of Putnam County. In addition, several prior financial statement audit reports, including the audit report for the year ended June 30, 2014, identified a going concern issue with the hospital (conditions and events given rise to substantial doubt about the entity's ability to continue). The hospital has high levels of uncollectable accounts receivable, while at the same time experiencing high accounts payable balances. |
| **Computer Security** | The hospital does not store copies of backup data at an off-site location. |

> In the areas audited, the overall performance of this entity was **Poor**.*

*The rating(s) cover only audited areas and do not reflect an opinion on the overall operation of the entity. Within that context, the rating scale indicates the following:

**Excellent:**   The audit results indicate this entity is very well managed.  The report contains no findings.  In addition, if applicable, prior recommendations have been implemented.

**Good:**   The audit results indicate this entity is well managed.  The report contains few findings, and the entity has indicated most or all recommendations have already been, or will be, implemented.  In addition, if applicable, many of the prior recommendations have been implemented.

**Fair:**   The audit results indicate this entity needs to improve operations in several areas.  The report contains several findings, or one or more findings that require management's immediate attention, and/or the entity has indicated several recommendations will not be implemented.  In addition, if applicable, several prior recommendations have not been implemented.

**Poor:**   The audit results indicate this entity needs to significantly improve operations.  The report contains numerous findings that require management's immediate attention, and/or the entity has indicated most recommendations will not be implemented.  In addition, if applicable, most prior recommendations have not been implemented.

**All reports are available on our Web site:  auditor.mo.gov**

# Putnam County Memorial Hospital
# Table of Contents

State Auditor's Report ..................................................................................... 2

Introduction

Background ................................................................................................4

Scope and Methodology ...........................................................................6

Management Advisory Report - State Auditor's Findings

1. Lack of Board Oversight .....................................................................7
2. Financial Condition ..........................................................................18
3. Computer Security ............................................................................22

Organization and Statistical Information .................................................23

Appendixes

A   Statement of Revenues, Expenses, and Changes in Net Assests, Year Ended June 30, 2016 ...........................................................24
B   Questionable Travel Expenses ...........................................................25
C   Critical Access Hospital Average Comparison ..................................26
D   Auditee Responses .............................................................................27



# NICOLE GALLOWAY, CPA
**Missouri State Auditor**

Honorable Eric Greitens, Governor
    and
Putnam County Memorial Hospital Board
    and
Putnam County Commission
Unionville, Missouri

We have audited certain operations of the Putnam County Memorial Hospital in fulfillment of our duties under Chapter 29, RSMo. This audit is included in a series of rural health care audits, which focus on financial and operating best practices at various acute care facilities that are critical to their local community. The objectives of our audit were to:

1.     Evaluate internal controls over significant management and financial functions as they relate to the financial condition of the care facility.

2.     Evaluate compliance with certain legal provisions as they relate to the financial condition of the care facility.

3.     Evaluate the economy and efficiency of certain management practices and operations, including certain financial transactions, as they relate to the financial condition of the care facility.

We conducted our audit in accordance with the standards applicable to performance audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform our audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides such a basis.

The accompanying Organization and Statistical Information is presented for informational purposes. This information was obtained from the hospital's management and was not subjected to the procedures applied in our audit.

For the areas audited, we identified (1) deficiencies in internal controls, (2) noncompliance with legal provisions, and (3) the need for improvement in certain management practices and procedures. The accompanying Management Advisory Report presents our findings arising from our audit of the Putnam County Memorial Hospital.

Nicole R. Galloway, CPA
State Auditor

The following auditors participated in the preparation of this report:

Director of Audits:     Robert E. Showers, CPA, CGAP
Audit Managers:        Corey McComas, M.Acct, CPA
                       Travis Owens, MBA, CPA, CFE, CGAP
In-Charge Auditor:     Matthew Schulenberg, CFE
Audit Staff:           Alex Bruner, MBA
                       Samantha Sieg

3

# Putnam County Memorial Hospital
# Introduction

## Background

Putnam County Memorial Hospital began with the development of a hospital committee appointed by the local Rotary Club and Lions Club. On July 30, 1957, voters approved a $225,000 bond issue for the construction of the hospital. In late 1960, Putnam County received a $250,000 federal grant, which was later increased by $9,500. The hospital opened in 1963 with the first patient admitted in October of that year.

In June 1967, Putnam County voters approved a property tax levy of $0.20 per $100 assessed valuation for maintenance of the hospital. In 1999, voters approved an increase in the property tax levy to $0.4775 per $100 assessed valuation. In addition, in 2000, the Putnam County Memorial Hospital Board of Trustees (Board) placed a 1/2 cent sales tax with a 5 year expiring term on the ballot. Voter approved establishment of that sales tax and have subsequently voted to renew the tax in 2005, 2010, and 2015. Absent additional renewals the sales tax will expire on March 31, 2021.

The hospital was designated as a critical access hospital (CAH) in the 1990s. The CAH designation was created by Congress in the 1997 Balanced Budget Act in response to hospital closures in the late 1980s and early 1990s. The designation is given by the Centers for Medicare and Medicaid Services (CMS) to certain rural hospitals meeting specific criteria. The primary eligibility requirements for CAH designation are the hospital must (1) have 25 or fewer acute care inpatient beds, (2) be located more than 35 miles from another hospital, (3) maintain an annual average length of stay of 96 hours or less for acute care patients, and (4) provide 24/7 emergency care services. The CAH designation is designed to reduce the financial vulnerability of rural hospitals and improve access to healthcare by keeping essential services in rural communities. The hospital is one of 36 CAHs in Missouri and is licensed for 15 acute care beds.

In August 2006, the Board issued revenue bonds with a principal amount of $7,700,000 to finance improvements to the hospital. These bonds were payable solely from the net revenues of the hospital. The bond covenant required the hospital to (1) maintain a debt service coverage rate of 1.25,[1] (2) maintain a minimum level of 33 days of expenses in hospital bank accounts, and (3) have less than 90 percent of accounts payable outstanding for a period of 60 days or less and the remaining 10 percent of accounts payable outstanding for a period of 90 days or less. In 2011, the hospital could no longer maintain the required debt service coverage, liquidity, and outstanding accounts payable limits under the bond covenants. In March 2012, the hospital's Operating Fund balance fell to approximately $8,000

---

[1] The debt service coverage rate is a ratio of cash flow available to pay current debt obligations.



Putnam County Memorial Hospital
Introduction

and the hospital had to use debt service reserve funds to meet debt obligation due in 2011 and 2012.

In August 2012, voters approved issuance of General Obligation (GO) Bonds by Putnam County totaling $7,630,000 to refinance the revenue bonds and renovate a portion of the hospital as a specialized geriatric care ward. The county issued the bonds in October 2012. A GO bond is a municipal bond backed by the credit and taxing power of the issuing jurisdiction. The county is guaranteeing the bonds and would become liable if the hospital cannot meet payment obligations. With the use of the GO bond proceeds, the hospital opened a 10 bed inpatient psychiatric facility in January 2013.

In April 2012, the Board contracted with Practice Plus, Inc. (Practice Plus), a medical consulting firm, to provide management services to the hospital. Practice Plus provided the day-to-day management and operations of the hospital. The company also provided key members of the hospital's administration, with Cindy Cummings becoming the hospital's Chief Executive Officer (CEO) and Jerry Cummings becoming the hospital's Chief Operating Officer (COO). Practice Plus brought new primary care physicians and specialists, re-established a physical therapy program at the hospital, and started the Senior Life Solutions program. The Senior Life Solutions program offered an intensive, comprehensive, multi-disciplinary outpatient treatment program for persons aged 60 and older, focusing on depression and behavioral disorders. Practice Plus continued to provide management services to the hospital until the CEO and COO resigned at the Board's request on December 8, 2015.

On December 9, 2015, the Board formed an in-house Executive Committee[2] to provide the day-to-day management services for the hospital. On December 31, 2015, the Executive Committee closed the operations of the inpatient psychiatric facility due to the negative effect on the hospital's financial condition. The Executive Committee provided management services to the hospital until September 2016 when the Board entered into a management services contract with Hospital Partners, Inc. (Hospital Partners). Hospital Partners provides the day-to-day management and operational decisions of the hospital. The President of Hospital Partners, David Byrns, was named the CEO of the hospital on September 13, 2016.

---

[2] The Executive Committee was made up of the following hospital employees: Nathan Baughman, Health Insurance Portability and Accountability Officer; Gayle Pickens, Director of Nursing; Susan Daniels, Chief Financial Officer; Richard Morrow, Financial Business Advisor; Debbie Douglas, Director of Human Resources; and Dr. Dawn Fairley, Chief Medical Officer.



Putnam County Memorial Hospital
Introduction

On November 29, 2016, the Board entered into a lease agreement, for operating the hospital, with Hospital Partners. As part of this lease agreement, the Board is transferring operational ownership, via an official Change of Ownership (CHOW) process through the state of Missouri, and transferring the hospital's Medicare and Medicaid provider numbers to Hospital Partners. Once the CHOW is finalized, Hospital Partners will begin making a monthly lease payment of $20,000 to the Board; $18,000 of this monthly payment will be paid to the Board and is to be escrowed by the Board and used for capital purposes, while $2,000 of this monthly payment will be paid to the Putnam County Commission and is to be escrowed by the County Commission up to a cap of $50,000 and used for future maintenance expenses in case the hospital closes. The CEO indicated the CHOW was signed and submitted to CMS and the Missouri Department of Health and Senior Services (DHSS) on April 30, 2017; however, DHSS personnel indicated as of August 1, 2017, the department had not received it.

## Scope and Methodology

The scope of our audit included, but was not necessarily limited to, the hospital's fiscal year ending June 30, 2016.

We reviewed management contracts between the hospital and Practice Plus, as well as Hospital Partners. Our review of these contracts covered the Board's oversight of them, including the performance of background checks of officials and companies hired and documentation of how and why decisions relating to the hiring of a specific management company occurred. In addition, we also reviewed payroll records and expenditure documentation of the hospital. Our review of payroll records included a review of salaries paid to all employees, and a review of W-2 forms to evaluate the accuracy of the information reported and the appropriateness of applicable withholdings. Our review of expenditure documentation included a review of expenditures made to management companies and other various entities, as well as a review of reimbursements made to administrative personnel.

Our methodology also included conducting interviews with appropriate hospital personnel and reviewing Board meeting minutes and other pertinent documents.

We obtained an understanding of the internal controls that are significant within the context of the audit objectives and assessed whether such controls have been properly designed and placed in operation. We also obtained an understanding of legal provisions that are significant within the context of the audit objectives, and we assessed risk that illegal acts, including fraud, and violation of applicable contract or other legal provisions could occur. Based on that risk assessment, we designed and performed procedures to provide reasonable assurance of detecting instance of noncompliance significant to those provisions.

6

# Putnam County Memorial Hospital
## Management Advisory Report
## State Auditor's Findings

## 1. Lack of Board Oversight

The Board does not provide sufficient oversight over activities of the hospital, did not perform sufficient due diligence over the awarding and development of management contracts, and did not ensure personnel were in place to monitor the activities of contracted management companies. As a result, (1) excessive compensation has been paid to management company officials, (2) loans to the hospital occurred without the Board's knowledge and without the Board agreeing to loan terms, (3) questionable employee reimbursements occurred, (4) employee wages earned were not always properly reported to the state and federal government, (5) significant decisions related to the offering of services have been made without adequate information being provided to the Board, and (6) out-of-state employees have been placed on the hospital's payroll.

### 1.1 Management contracts

The Board did not perform sufficient due diligence over the process of awarding management contracts. In addition, the Board did not adequately document how decisions related to the hiring of management companies were made or retain sufficient documentation to show discussions with legal counsel occurred prior to entering into the contracts.

**Proposals not formally requested, procured, or analyzed**

The Board entered into management services contracts in April 2012 with Practice Plus, Inc. (Practice Plus), and again in September 2016 with Hospital Partners, Inc. (Hospital Partners). The Board entered into both contracts without requesting formal bids or proposals for such services. Based on conversations with Board members and a review of meeting minutes, all discussions related to the management services contracts were informal in nature, with little specific information documented, and no critical evaluation of the contract proposed. The Board did not receive official proposals or projected financial results prior to awarding either contract. Board members indicated they conducted background checks and reference checks for the management companies; however, no documentation was retained of work performed and the extent of the reviews may have been basic internet searches. A review of the Board minutes indicates (1) approximately 8 hours of discussion time over approximately 2 months led to the decision to enter into the agreement with Practice Plus and (2) approximately 3 hours of discussion time over approximately 11 days led to the decision to enter into the agreement with Hospital Partners. Board minutes did not document what, if any, documents or presentations the Board received from the prospective management companies or how or what led to the decision to enter into agreements with these firms.

Board members indicated they discussed with other entities the possibility of providing management services to the hospital prior to entering into these agreements; however, no other firms ultimately expressed interest in managing the hospital. Any specific discussions or proposals from these other entities were not documented.



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

Formally requesting management proposals, contracts, and projected financial results for analysis is critical for determining what operations are in the best interest of the hospital. By not documenting all reviews performed and discussion held, in detail, the Board is unable to support the management decisions made.

**Lack of adequate documentation to support contract reviews**

The Board could not provide adequate documentation to show discussions with legal counsel occurred prior to entering into the management contract with Hospital Partners. The Board signed the agreement without adequate legal counsel input despite the County Commission's offer to pay for legal services and despite the contract being drafted by the entity being contracted with. A local attorney told audit staff he read the proposed agreement in September 2016 at the request of the Board; however, he received no compensation for those services and could not provide specific details on what services the Board requested. In addition, the Board provided us limited correspondence between the County Commission's attorney and Hospital Partners that indicated an attorney acting as an agent for the County Commission reviewed the agreement.

As a result of inadequate legal review, the management contract between the Board and Hospital Partners includes an indemnity clause stating "Putnam County Memorial Hospital shall at all times indemnify and hold harmless Hospital Partners, its officers and directors, from and against any and all claims, losses, liabilities, actions, management and proceedings, and expenses, (including reasonable attorney fees) arising out of Hospital Partner's management and operation of the Facility during the term of the agreement to the extent that there are operating funds available to provide for same." Such a clause leaves the Board and the hospital potentially liable for any fraudulent or negligent activity of the contractor, which would be unusual for a contract of this nature. The contract also omits basic financial terms defining how much the contractor is to be compensated. See additional information regarding management fees incurred at MAR finding number 1.2.

Article VI, Sections 23 and 25, of the Missouri Constitution does not permit local governments to grant public money to benefit private individuals, corporations, or associations. The indemnity clause in the management agreement between the hospital and Hospital Partners requires the Board to extend public money for the actions of Hospital Partners. By indemnifying the management services contractor, the hospital is extending public funds to cover costs associated with mismanagement or fraudulent actions, if they occur. In addition, by not defining the financial terms of the contract, the Board entered into an agreement with unknown financial impact.



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

| | |
|---|---|
| **1.2 Oversight of management compensation** | The Board did not ensure personnel were in place to provide oversight of management company activities, and did not provide sufficient direct oversight of the compensation paid to management companies, including salaries paid to executive administration personnel. The process to award raises to management companies and executive administrative personnel is not formalized as part of the management contract. As a result, administrators received raises without clear justification, and in the case of Hospital Partners, payments of salaries and management fees occurred without Board approval. |
| **Practice Plus raises** | The Board approved significant salary increases to the Practice Plus Chief Executive Officer (CEO) and Chief Operations Officer (COO) without any predetermined, objective performance measurement criteria, and did so during a significant financial shortfall (see MAR finding number 2). In December 2014, the Board approved 53 percent and 60 percent pay increases for the CEO and COO, respectively. The combined annual salary paid to these two positions increased by approximately $128,000, with salaries of the CEO and COO increasing to $208,132 and $148,108, respectively. |
| | Board members indicated they based the decision to provide these raises on documentation provided by the CEO and COO indicating salaries of comparable positions at peer hospitals. The Board did not have any defined measurable performance standards or goals outlined to base the decision. By granting a significant increase in the contracted salaries paid to these officials during a time of extreme financial distress, the Board further harmed the hospital's financial position. |
| **Hospital Partners compensation and fees** | The new CEO, who is also the President of the management company, approved his own salary, and paid his own management company management and accounting fees not specified in the management contract. The management services contract with Hospital Partners does not contain any compensation terms for the CEO, who also serves as the President of Hospital Partners, or contain a specific management fee structure for work performed. However, the contract does state "the consideration given and paid for the services to be provided by Hospital Partners is the agreement by Putnam County Memorial Hospital to enter into a future lease agreement with Hospital Partners." As a result, any payments made to the management company and management company officials would not be in accordance with the management contract. In addition, the Board did not ensure other hospital officials not associated with the contractor monitored the activity of the management company. |
| | After the management services contract was signed, the new CEO approved his own annual salary of $160,000. Over the next 5 months, the CEO directed the hospital's human resources personnel to increase his annual |



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

salary to $180,000, and eventually to an annual salary of $200,000. Board members indicated they were aware the CEO may be included in the hospital's payroll and thus receive an annual salary; however, the Board Chairman indicated a salary amount for the CEO was not discussed and approved by the Board prior to March 2017, when we discussed this issue with the Board.

In addition to the $200,000 annual salary being paid to the CEO, the CEO also directed hospital staff to pay management and accounting fees totaling $360,000 from September 2016 through February 2017 to Hospital Partners, none of which were outlined and defined in the management services contract. Minutes for the September 12, 2016, Board meeting show the Board was informed by the CEO that the hospital would not be required to pay management fees. However, the hospital has made monthly payments to Hospital Partners of $50,000 for management fees, and $20,000 for accounting fees every month since the management agreement was signed. Board members indicated they were not aware the hospital was making these payments. The Board approves the check register, which includes these expenditures, at each monthly Board meeting; however, Board members do not review these expenditures in detail during their approval process. The only documentation to support these expenditures is a check request form used by the hospital to process payments, most of which were approved only by the CEO, stating only the amount to be paid to Hospital Partners. The new CEO told us the monthly fees were deemed necessary by Hospital Partners for the purpose of managing and operating of the facility.

Ensuring contracts contain adequate and clearly detailed consideration will help the Board comply with all contract terms and provisions. Placing personnel at the appropriate level of the organization to adequately segregate accounting duties and monitor the activity of the management company would have provided the Board with some assurance contract terms were being complied with and hospital assets were protected. In the absence of the appropriate personnel in place within the organization, active oversight by the Board is essential to ensure the assets of the hospital are secure.

## 1.3 Laboratory contracts and questionable laboratory billings

The Board has not provided appropriate oversight of laboratory contracts entered into by the CEO/management company President. As a result, the hospital is incurring unnecessary payroll costs, and is involved in questionable laboratory billing practices.



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

| Laboratory contract and payroll costs | In October 2016, the hospital contracted with Hospital Laboratory Partners, LLC[3] (Hospital Lab Partners) to operate all clinical and operational aspects of a clinical laboratory on behalf of the hospital. The Board did not formally approve the contract, did not provide any oversight of the terms of the contract, and was not aware of any of the contract's terms or the hospital's obligations to the contractor. Due to this lack of oversight, beginning in November 2016, the CEO added payroll expenses of approximately $68,000 per month for 33 phlebotomists to facilitate laboratory activity, in violation of the contract's terms. The hospital's laboratory contract specifically states such expenses are the responsibility of the laboratory contractor. The Board did not approve the addition of these positions. |
|---|---|

The contract with Hospital Lab Partners states the contractor "shall provide all personnel, equipment, supplies, and management support necessary for the comprehensive operation of the hospital's clinical laboratory." The Board was aware the hospital employed the phlebotomists, but did not provide specific approval. The CEO stated these phlebotomists were hired by the hospital to provide pre-laboratory services related to the clinical lab and, by law, had to be employees of the hospital; however, he could not provide documentation to the specific law referenced in his response. Board members indicated they were not aware the contract with Hospital Lab Partners requiring the contractor to provide all personnel for the lab. Oversight by the Board of significant contracts is necessary to ensure the financial best interests of the hospital are served.

As a result of our inquiries about the phlebotomist payroll expenses, the CEO stated Hospital Lab Partners had reimbursed the hospital for the costs. However, in verifying this information the CEO was able to only provide documentation of a journal entry on the hospital's financial system, but could not provide evidence that a check was deposited or monies wired into the hospital's bank account.

**Questionable laboratory billing practices**

The hospital's laboratory contract with Hospital Lab Partners has resulted in a significant increase of questionable revenues from laboratory billings of health insurance companies. Based on our review of hospital accounts, the vast majority of laboratory billings are for out-of-state lab activity for individuals who are not patients of hospital physicians.

The laboratory contract states the hospital will bill all lab tests through the hospital and the hospital will then pay Hospital Lab Partners 80 percent of lab revenues for managing and providing operational support of the lab. From November 2016 through February 2017 the hospital paid Hospital Lab

---

[3] Hospital Lab Partners was incorporated in Florida on October 13, 2016, and entered into the Putnam County Hospital laboratory contract on October 20, 2016.



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

Partners $19.8 million for laboratory billings received. However, as of January 23, 2017, the hospital's Unionville, Missouri lab had not begun processing tests, according to discussions with the CEO, but billings for the lab had begun immediately upon Hospital Partners signing the management agreement with the Board. Our review of lab billings received by the hospital indicate the originating activity is for out-of-state patients for lab work not conducted in Putnam County. Hospital officials have not provided sufficient support to justify why such activity is being billed through the hospital. The Board and the CEO have stated the lab is now open but cannot tell us the specific date that occurred.

During the audit, the State Auditor's Office was contacted by the fraud examiner of a private insurance company in Florida that had recently denied claims of approximately $700,000 from the hospital due to the excessive cost of the claims, a lack of documentation to support the claims, and indications the billings may be fraudulent. This individual referred us to a fraud investigator for a second, much larger, private insurance company who stated payments of up to $4.3 million in what the company considered fraudulent claims had been paid to the hospital in recent months. Based on this information, the second insurance company is no longer paying any claims from the hospital because the billings submitted are pass-through billings, which are indicative of a fraud scheme. Continued use of such questionable laboratory billings could leave the hospital at risk if such activity is deemed to be inappropriate by the insurance companies billed, or if these insurance companies seek reimbursement for questionable amounts billed.

**Laboratory subcontractors**

In addition to the lab management fees paid to Hospital Lab Partners, the hospital also paid approximately $10.6 million in lab management fees to other subcontracted laboratories from November 2016 through February 2017. These payments occurred without adequate supporting documentation. The only documentation to support the lab management fee expenditures were email messages from a business associate of the CEO stating the amount to be paid to the entity. According to the CEO, these entities are subcontractors of Hospital Lab Partners, so the hospital does not have contracts with them. Board members indicate they were not familiar with these entities, did not know the purpose of these payments, or the payments occurred. Without adequate documentation to support the expenditures there is no assurance the payments are for legitimate hospital business.

**Questionable use of phlebotomy services**

The employment of 33 primarily out-of-state phlebotomists to perform pre-laboratory services throughout the country is a questionable practice, and could put the hospital at risk. Based on documentation provided by hospital personnel, the phlebotomists on the payroll work out of various medical



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

practices throughout the country. Table 1, summarizes the number of phlebotomists that are employed by the hospital and what states they work.

Table 1: Number of phlebotomists employed, by state

| Resident State | Number of Employees |
|---|---|
| Alabama | 1 |
| Arizona | 1 |
| Arkansas | 3 |
| California | 2 |
| Georgia | 4 |
| Kentucky | 3 |
| Louisiana | 3 |
| Missouri | 2 |
| Oklahoma | 2 |
| Tennessee | 5 |
| Texas | 7 |

Source: Putnam County Memorial Hospital personnel records

In June 2014, the United States Department of Health and Human Services, Office of Inspector General, issued a fraud alert[4] which addressed compensation paid by laboratories to referring physicians and physician group practices for blood specimen collection, processing, and packaging, and for submitting patient data to a registry or database. This memorandum also refers to a number of other guidance documents and advisory opinions previously issued on the general subject matter, and discusses the federal anti-kickback statute,[5] which was established to protect patients from inappropriate medical referrals or recommendations by health care professionals who may be unduly influenced by financial incentives. It is unclear why the CEO placed staff from 33 different medical practices on the hospital's payroll, however, such practices may not be legitimate, and could put the hospital at risk if questioned.

## 1.4 Loan agreement

The Board did not provide sufficient oversight to be aware the CEO entered the hospital into a verbal loan agreement with Hospital Partners and Empower Investment Group. The agreement provided the hospital with a $500,000 loan at an 8 percent interest rate. According to the CEO, the loan was for payroll and other financial obligations of the hospital. The Board was unaware the hospital received the loan, and therefore, did not approve it or enter into a written agreement with Hospital Partners or Empower Investment Group. This condition occurred, in part, because personnel, such

---

[4] Special Fraud Alert: Laboratory Payments to Referring Physicians, June 25, 2014, Department of Health and Human Services, Office of Inspector General.
[5] 42 U.S.C. § 1320a-7b



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

as a Controller, were not in place at the appropriate level of the organization to monitor the activity of the management company and the Board did not provide sufficient oversight to identify the loan payments. Based on our observation of Board meetings and inquiries of the Board Chairman, loan payments were included in monthly expenditure reports approved by the Board but members did not inquire about the payments or their purpose.

Ensuring personnel are in place at the appropriate level of the organization to monitor the activity of a contracted management company would provide the Board assurance hospital expenditures are appropriate. In the absence of personnel providing such oversight, the Board's review of hospital activity must be extensive. As a result of the Board's lack of oversight, the hospital was not in compliance with Section 432.070, RSMo, which requires contracts for political subdivisions to be in writing. Written contracts are necessary to ensure all parties are aware of their duties and responsibilities, help protect against unauthorized payments, and ensure all debt accrued is properly managed. Written contracts should specify the services to be rendered, the manner and amount of compensation to be paid, and should be signed by all vested parties. Adequate Board oversight of hospital expenditures is essential to ensure hospital resources are being used in a responsible manner.

## 1.5 Questionable travel reimbursements and unreported compensation

The Board does not have adequate procedures in place to provide sufficient oversight and ensure all travel reimbursements are reasonable and proper. Additionally, the hospital does not properly report all employee's wages earned to the state and federal government. We identified the following questionable expenditures:

### CEO travel reimbursements

From September 2016 through February 2017, the hospital reimbursed the CEO approximately $19,700 for travel expenses. However, the management agreement between the hospital and Hospital Partners is silent as to travel expense reimbursement for the CEO. The Board or another independent party does not review the travel expenses claimed to ensure they are reasonable and proper, and during the period reviewed, the CEO was responsible for approving his own expense account. The Board reviews the check register during the monthly board meeting; however, Board members indicated they do not review the detail of the expenditures and checks have already been issued by the time they review the register.

Our review of travel expenses reimbursed to the CEO noted approximately $5,300 in questionable expenditures. For example, the CEO was reimbursed for meals while in his home state of Florida, alcohol, cigarettes, prescription medication, cell phone and cell phone accessories, a laptop computer, household goods, personal items (i.e., razors, skin care products, etc.), car washes, key fob for a personal vehicle, golf in Florida, and luggage. Supporting documentation for one expense, in the amount of $231, was not

14



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

submitted with the CEO's expense report, but the CEO was still reimbursed for the expense. See Appendix B for a listing of these questionable reimbursed expenses.

CEO reportable wages

The hospital did not properly report the CEO's wages earned to the state and federal government. From September 10 to November 4, 2016, state income taxes totaling $1,029 were withheld from the CEO's paycheck. During the pay period ending November 18, 2016, the CEO was refunded $1,029 for the state income taxes previously withheld from his paycheck and did not have state income tax withheld from subsequent paychecks. A review of the CEO's 2016 calendar year W-2 form determined the hospital did not report its state tax ID number, state wages earned or state income tax withheld on it.

Section 143.041, RSMo, states a tax is imposed for every taxable year on income of every nonresident which is derived from sources within the state. While the CEO is a resident of Florida, all income earned within Missouri is reportable and taxable within the state. Similarly, Chapter 143.191, RSMo, includes requirements for employers to report wages and withholding of state income taxes. By not reporting $50,154 in compensation the CEO earned in Missouri, the state did not collect approximately $2,784 in income taxes. Table 2 shows the salary paid to and taxes withheld from the CEO's paycheck.

Table 2: CEO Salary and Taxes Withheld

| Pay Period | Gross Salary | Net Salary | State Taxes | Federal Taxes | Other |
|---|---|---|---|---|---|
| 09/10/2016 - 09/23/2016 | $ 2,461.54 | 1,949.73 | (86.00) | (237.50) | (188.31) |
| 09/24/2016 - 10/07/2016 | 6,153.85 | 4,331.00 | (299.00) | (1,053.08) | (470.77) |
| 10/08/2016 - 10/21/2016 | 6,153.85 | 4,331.00 | (299.00) | (1,053.08) | (470.77) |
| 10/22/2016 - 11/04/2016 | 6,923.08 | 4,789.87 | (345.00) | (1,258.60) | (529.61) |
| 11/05/2016 - 11/18/2016 | 6,923.08 | 6,163.87 | 1,029.00 | (1,258.60) | (529.61) |
| 11/19/2016 - 12/02/2016 | 6,923.08 | 5,134.87 | 0.00 | (1,258.60) | (529.61) |
| 12/03/2016 - 12/16/2016 | 6,923.08 | 5,134.87 | 0.00 | (1,258.60) | (529.61) |
| 12/17/2016 - 12/30/2016 | 7,692.31 | 5,629.87 | 0.00 | (1,473.98) | (588.46) |
| | $ 50,153.87 | 37,465.08 | 0.00 | (8,852.04) | (3,836.75) |

Source: Putnam County Memorial Hospital payroll records

In addition to unreported state wages, the hospital did not properly report some taxable mileage reimbursements on the CEO's calendar year 2016 W-2 form. Included in the reimbursement for travel expenses to the CEO was $2,907 for mileage reimbursements. The hospital reimbursed the CEO for mileage at a rate of 57.5 cents per mile; however, the Internal Revenue Service (IRS) reimbursement for business miles driven was 54 cents per mile in 2016. The CEO provides beginning and ending odometer readings

15



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

on each expense report; however, the mileage is not distinguished between business and personal. From September 29, 2016 to January 10, 2017 the hospital reimbursed $2,907 to the CEO for mileage, while the mileage reimbursement at the IRS rate during this time period totaled $2,730, a difference of $177. The reimbursement amount in excess of the IRS standard rate is considered taxable income, but was not included as wages earned on the CEO's W-2 form. Table 3 depicts mileage reimbursed to the CEO, as well as a comparison of the rate reimbursed as compared to the IRS rate.

Table 3: CEO Mileage Reimbursement

| Expense Period | Mileage | Hospital Rate | Reimbursement Amount | IRS Rate | IRS Amount | Difference |
|---|---|---|---|---|---|---|
| 09/29/2016 - 10/12/2016 | 370 | .575 | $   212.75 | .54 | $   199.80 | $   12.95 |
| 10/13/2016 - 10/27/2016 | 1,136 | .575 | 653.20 | .54 | 613.44 | 39.76 |
| 10/28/2016 - 11/15/2016 | 1,076 | .575 | 618.70 | .54 | 581.04 | 37.66 |
| 11/16/2016 - 12/14/2016 | 1,176 | .575 | 676.20 | .54 | 635.04 | 41.16 |
| 12/15/2016 - 01/10/2017 | 1,298 | .575 | 746.35 | .54 | 700.92 | 45.43 |
| | 5,056 | | $ 2,907.20 | | $ 2,730.24 | $ 176.96 |

After reviewing a draft version of this report, the CEO filed amended state withholding monthly reports for the period September 2016 through May 2017 and paid state income tax withholdings of about $6,400 to the Missouri Department of Revenue. Additionally, the hospital ceased making individual expense reimbursements to the CEO as of January 10, 2017, and approved a flat daily per diem rate of $100 for travel expenses incurred while the CEO is in travel status for the hospital.

## 1.6 Inpatient psychiatric care unit

The Board did not receive or request sufficient documentation from Practice Plus prior to approving the addition of an inpatient psychiatric unit in March 2012, did not approve the management contracts put in place to run the unit, and did not provide any ongoing oversight or monitoring of the unit until its closure in December 2015. The hospital invested approximately $625,000 in the construction and renovation of the unit with operational costs estimated to be at least $2.5 million annually.

Prior to the approval of the psychiatric unit, Board minutes indicate the Board received estimates of what such a unit could generate. The Board minutes did not include any of the provided information, nor did the Board retain this information. In July 2012 the Board received information on the estimated operating costs of the unit, but did not receive information on estimated revenues. There is no documentation of final financial projections for the unit and no documentation of the Board asking for additional information prior to the opening of the unit in December 2012.



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

In addition, based on a review of Board minutes and discussions with the Board, the Board did not request or receive any information related to the performance of the psychiatric unit until after it closed in December 2015. Based on our review of limited information provided to the Board, the unit resulted in an operational loss of approximately $1.5 million for the 2 calendar years preceding its closure.

The addition of such a unit represented a significant investment for the hospital, particularly in light of the hospital's financial condition. A thorough cost analysis and review by the Board prior to making such a decision would help ensure an investment of this nature is in the best interests of the hospital. Providing the appropriate level of due diligence prior to approving such actions, as well as monitoring the ongoing performance of the unit, is the Board's responsibility.

## 1.7 Conclusions

Immediately upon signing the management contract with the hospital, the CEO and his associates began billing significant amounts of out-of-state lab activity through the hospital. Deposits into the hospital's bank accounts for the months of December 2016 through May 2017, totaled approximately $92 million. For perspective, annual hospital revenues were $12.7 million and $7.5 million for fiscal years 2015 and 2016, respectively. Approximately 80 percent of the new revenue generated from lab activity is disbursed to the laboratory companies, with an additional 6 percent going to the billing company, and another portion going towards payroll costs for out-of-state phlebotomists. The CEO has business relationships with the billing company as well as several of the subcontractor laboratories, and the laboratory company receiving millions of dollars from the hospital was incorporated a week after the initial management contract. In the event the insurance companies being billed for this activity determine this activity is not legitimate, or question the propriety of the hospital having out-of-state phlebotomists on its payroll, the Board and the hospital could be held liable. This potential is increased due to the unusual indemnity clause Hospital Partners included in the management contract. Additional oversight by the Board is necessary to ensure the actions of the management company are in the best interests of the hospital.

## Recommendations

The Board:

1.1    Establish procedures to provide sufficient due diligence over the awarding of contracts. The Board should also document how and why final decisions are made in order to support the decision made was in the best interest of the hospital. In addition, the Board should ensure legal counsel perform a formal, documented review prior to entering into future contracts in order to ensure the contracts do not include broad indemnity clauses.



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

1.2    Establish procedures to ensure sufficient oversight of contracts is performed and provide direct oversight of the compensation paid to management companies and executive administration personnel.

1.3    Recover payments made to laboratory-related staff and ensure laboratory contract terms are followed going forward, and provide additional oversight of laboratory activity to ensure activity being billed is appropriate.

1.4    Ensure proper agreements are entered into for all loans received by the hospital.

1.5    Establish procedures to provide sufficient oversight to ensure expense reimbursements are reasonable and proper, and to ensure sufficient documentation supports all expenditures. In addition, the Board should ensure procedures are established to properly report wages earned for all employees to the state and federal government.

1.6    Establish procedures to perform a through cost-benefit analysis when making significant operational decisions of the hospital, including ensuring all documentation is thoroughly reviewed and all reviews and discussions are documented.

1.7    Evaluate payments made to Hospital Partners and the CEO, and take action to recover any questionable or inappropriate payments, and reevaluate the Board's existing relationship with this entity.

### Auditee's Response

The Putnam County Memorial Hospital Board of Trustees failed to provide a complete response to the audit findings. See Appendix D for the Board's partial response.

## 2. Financial Condition

The hospital is in extremely poor financial condition. The hospital is audited separately from the county, with the last financial statement audit report issued for the year ended June 30, 2014. According to discussions with the hospital's Controller, accounting firms have been unwilling to perform a financial statement audit of the hospital in subsequent years due to a lack of resources for payment.

The hospital's financial condition has steadily declined since we reported similar concerns in our 2 year-end December 31, 2011, audit report of Putnam County.[6] In addition, several prior financial statement audit reports, including the audit report for the year ended June 30, 2014, identified a

---

[6] Report No. 2012-058, *Putnam County*, issued in June 2012.



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

going concern issue with the hospital (conditions and events given rise to substantial doubt about the entity's ability to continue).

As indicated in Table 4, the hospital's audited and unaudited financial information indicate net position has been consistently negative and has continued to worsen since the year ended June 30, 2013. Net position is the difference between what is owned (assets) and what is owed (liabilities) and it represents the measure of net worth. The hospital's net position has decreased each year due to growth in liabilities far exceeding growth in assets.

Table 4: Assets, Liabilities, and Net Position

|  | | Fiscal Year Ended June 30, | | | |
|  | | 2016 (unaudited) | 2015 (unaudited) | 2014 (audited) | 2013 (audited) |
|---|---|---|---|---|---|
| Assets | $ | 10,012,137 | 11,916,645 | 11,874,360 | 9,474,860 |
| Liabilities | | (16,060,912) | (14,430,364) | (13,443,996) | (10,972,160) |
| Net Position | $ | (6,048,775) | (2,513,719) | (1,569,636) | (1,497,300) |

In addition, as shown in Table 5, the hospital has continued to operate at a deficit since at least the year ended June 30, 2013, with expenses exceeding revenues each year. The annual operating losses have become increasingly more severe over time, as indicated by the $3.6 million operating loss for the year ended June 30, 2016, which is more than four times the operating loss of approximately $900,000 in fiscal year 2013.

Table 5: Revenues, Expenses, Operating Losses, and Changes in Net Position

|  | | Fiscal Year Ended June 30, | | | |
|  | | 2016 (unaudited) | 2015 (unaudited) | 2014 (audited) | 2013 (audited) |
|---|---|---|---|---|---|
| Operating revenue | $ | 7,509,123 | 12,660,860 | 13,269,489 | 8,296,867 |
| Operating expense | | (11,090,700) | (14,206,449) | (14,034,529) | (9,175,408) |
| Operating Loss | | (3,581,577) | (1,545,589) | (765,040) | (878,541) |
| Non-operating revenue | | 297,476 | 601,506 | 692,704 | 595,531 |
| Change in Net Position | $ | (3,284,101) | (944,083) | (72,336) | (283,010) |

For the year ended June 30, 2016, actual revenues totaled $7.5 million, or approximately 49 percent of the $15.2 million budgeted revenues. In addition, although the hospital expended only $11.1 million of the $15.4 million expenditure budget, actual expenditures exceeded actual revenues by approximately $3.6 million.

Also, the hospital's financial report indicates operating cash totaled $251,966 per the balance sheet as of June 30, 2016, with total operating expenditures of approximately $11 million for the year ended June 30, 2016.

19



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

The hospital's operating cash balance was sufficient to cover only 8.3 days of operating expense.

As the hospital's financial condition continued to worsen, hospital management began using tax anticipation notes and promissory notes to obtain funding to pay hospital expenses. From 2011 to 2015, hospital management financed funding of $1,410,000 through various tax anticipation notes and promissory notes.

**Accounts receivable and accounts payable**

The hospital has high levels of uncollectable accounts receivable, while at the same time experiencing high accounts payable balances. As of June 2016, accounts receivable totaled approximately $5.5 million, of which 76 percent, or approximately $4.2 million, remained uncollected after 120 days. Accounts receivable that remain outstanding for long periods of time are less likely to be collected. According to the hospital's current financial report, nearly $3.6 million of the accounts receivable are likely uncollectable. These uncollectable amounts represent care provided to patients for which the hospital received no compensation.

In addition, the Board meeting minutes indicated the hospital was extremely behind in making payments to vendors. As of June 2016, the hospital calculated it took, on average, 379 days to make payments to vendors and current accounts payable totaled approximately $7.9 million.

After Hospital Partners began providing management services for the administration of the hospital in September 2016, the hospital entered into settlement agreements with its delinquent account vendors. On August 31, 2016, accounts payable totaled approximately $5.6 million. However, as of November 30, 2016, accounts payable had been reduced to approximately $4.2 million because of settlements with vendors. As of March 31, 2017, the hospital has been meeting the obligations of the settlement agreements.

**Statewide performance comparison**

We obtained statewide hospital data from the Missouri Department of Health and Senior Services to evaluate the performance of the hospital relative to statewide averages of other critical access hospitals (CAH). Our analysis determined that despite an occupancy rate of 37.5 percent, which is higher than the statewide CAH average of 32.2 percent, the hospital generates revenues per bed and governmental revenues per Medicare discharge at a significantly lower rate than other peer hospitals. The low governmental revenue per Medicare discharge becomes especially relevant considering the hospital generates significantly more revenue from Medicare and Medicaid sources than the statewide CAH average. The reasons for the low revenue per bed, and low governmental revenues per Medicare discharge are beyond the scope of our audit; however, additional investigation is warranted and could help improve the financial condition of



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

the hospital. See Table 6 for comparative data for 2015 (most recent year available), and Appendix C for additional comparative data.

Table 6: CAH Average Comparison for Fiscal Year Ended June 30, 2015

|  |  | Putnam County Memorial Hospital | CAH Statewide Average |
|---|---|---|---|
| Revenues Per Bed | $ | 489,702 | 892,973 |
| Payroll Expense Per Bed | $ | 222,201 | 378,908 |
| Medicare Revenues Per Medicare Discharge | $ | 41,651 | 54,421 |

CPA audits and cost reports

The hospital did not receive an independent CPA audit for fiscal year 2015 or 2016. In addition, the hospital did not submit required annual cost reports to the Centers for Medicare and Medicaid Services (CMS) during this time period. The purpose of these reports is to ensure the hospital has been sufficiently reimbursed by Medicare during the year. Based on the results of the cost report, the hospital would either owe CMS for overpayments received or be owed due to inadequate reimbursements. Cost report results are used to set the hospital's reimbursement rate for the following year. The CEO indicated an outside company has been hired to prepare the hospital's cost reports for fiscal year 2015 and 2016.

The lack of an independent CPA audit limits the reliability of financial information available to the Board for budgeting and planning purposes. In addition, the untimely completion and submission of cost reports to CMS can present significant potential liabilities to the hospital. The Board should ensure cost reports are timely completed and submitted to CMS in the future. In addition, the Board should ensure independent CPA audits are performed on an annual basis.

Conclusion

The financial condition of the hospital needs to be addressed immediately by the Board to ensure the continued access to healthcare for the citizens of Putnam County. While the Board has taken some action to address accounts receivable, accounts payable, cash flow and other concerns, the efforts have not resulted in the significant improvement or stabilization of the hospital's serious financial condition. Based on our review of peer hospital data, a review of governmental billing procedures is necessary to ensure revenues are maximized.

# Recommendation

The Board better monitor the financial condition of the hospital and continue to explore all options to improve the hospital's financial condition, including a review of federal billing procedures, to ensure the healthcare needs of Putnam County citizens continue to be met.

# Auditee's Response

The Putnam County Memorial Hospital Board of Trustees failed to provide a complete response to the audit findings. See Appendix D for the Board's partial response.



Putnam County Memorial Hospital
Management Advisory Report - State Auditor's Findings

## 3.  Computer Security

The hospital does not store copies of backup data at an offsite location. The hospital backs up file server data (i.e., information and documents used on a daily basis by various departments within the hospital), to a separate server, on an hourly basis; however, the data is not periodically transferred to an secure offsite location. Not storing backup data offsite leaves it susceptible to the same damage as the original data.

A minimal level of backup information, together with records of the backup copies and documented restoration procedures, should be stored at a secure offsite location on a regular and timely basis. By not doing this, critical data may not be available for restoring systems following a disaster or other disruptive incident.

### Recommendation

The Board ensure backups of the hospital's electronic data are stored at a secure offsite location on a regular and timely basis.

### Auditee's Response

The Putnam County Memorial Hospital Board of Trustees failed to provide a complete response to the audit findings. See Appendix D for the Board's partial response.

# Putnam County Memorial Hospital
# Organization and Statistical Information

Putnam County Memorial Hospital is headed by a five-member board. Each member is voted to a 5-year term. As of June 30, 2016, the Putnam County Memorial Hospital Board of Trustees (Board) consisted of the following members:

| Member | Term Expires |
| --- | --- |
| Howard Luscan, Chairman | April 2017 |
| Dave Schultz, Vice Chairman (1) | April 2020 |
| Pula McCormack, Secretary/Treasurer (2) | April 2021 |
| Joe Ream, Trustee | April 2017 |
| Vacant (3) | April 2017 |

(1)   Dave Schultz resigned from the Board on March 27, 2017. Linda Valentine was elected by write-in vote at the April 4, 2017 election and was sworn in on April 20, 2017.

(2)   Pula McCormack resigned from the Board on September 26, 2016. Kelly Busker was appointed by the County Commission on November 28, 2016, and was sworn in on the same day.

(3)   Greg Fleshman resigned from the Board on April 11, 2016, thus leaving a vacant position at June 30, 2016. Frank Shekleton was appointed by the County Commission to the vacant position on September 26, 2016, and was sworn in on October 6, 2016. Frank resigned from the Board on January 23, 2017.

The hospital provides medical services, such as cardiac rehabilitation, emergency services, inpatient care, laboratory services, occupational therapy, outpatient care and service, physical therapy, and radiology services, in Putnam County. The hospital also has one rural health clinic.

Cindy Cummings served as CEO of the hospital from April 11, 2012 until December 8, 2015. The hospital was without a CEO from December 8, 2015 until September 12, 2016, when the Board entered into a management agreement with Hospital Partners, Inc. and David Byrns became CEO.

At June 30, 2016, the hospital employed 79 full-time employees, 9 part-time employees, and 24 as needed employees.

Appendix A

# Putnam County Memorial Hospita
# Statement of Revenues, Expenses, and Changes in Net Assets

This appendix documents Putnam County Memorial Hospital's unaudited financial statement for the fiscal year ended June 30, 2016.

| Revenues | | |
|---|---|---|
| Operating Revenues | | |
| Inpatient | $ | 3,111,975 |
| Outpatient | | 9,108,755 |
| Family Clinic | | 433,328 |
| Rural Health Clinic | | 623,770 |
| Behavioral Health Unit | | 1,882,528 |
| | | 15,160,356 |
| Contractual Adjustments | | |
| Medicare | | 3,938,842 |
| Medicaid | | 681,871 |
| Commercial | | 1,945,909 |
| Rural Health Clinic & Family Clinic | | 315,078 |
| Charity Accounts | | 25,043 |
| Provision for Uncollectible | | 1,754,679 |
| | | 8,661,422 |
| Net Patient Service Revenue | | 6,498,934 |
| Other Operating Revenues | | 1,010,189 |
| Total | $ | 7,509,123 |
| Expenses | | |
| Operating Expenses | | |
| Salaries and Wages | $ | 4,854,016 |
| Employee Benefits | | 805,578 |
| Interest Income | | 437,370 |
| Contract Labor | | 1,019,200 |
| Medical Professional Fees | | 576,698 |
| Other Professional Fees | | 454,367 |
| Supplies and Other | | 1,672,751 |
| Administrative Services | | 372,123 |
| Depreciation and Amortization | | 898,597 |
| Total Operating Expenses | | 11,090,700 |
| Operating Income (Loss) | | (3,581,577) |
| Non-operating Income (Expenses) | | |
| Investment Income | | 1,595 |
| Noncapital Grants and Gifts | | 137,884 |
| Property and Sales Tax Revenue | | 618,423 |
| Loss on Sale of Capital Assets | | (460,426) |
| Total Non-operating Income | | 297,476 |
| Increase (Decrease) In Net Assets | | (3,284,101) |
| Net Assets (Deficit), Beginning of Year | | (2,764,674) |
| Net Assets (Deficit), End of Year | $ | (6,048,775) |

Source: Putnam County Memorial Hospital's unaudited income statement for fiscal year 2016.

Appendix B

# Putnam County Memorial Hospital
## Questionable Travel Expenses

This appendix documents the questionable expenditures by category to the 38 vendors the CEO had expenditures to and was reimbursed for by the hospital from September 29, 2016 to January 10, 2017. The listing is as of January 10, 2017.

| Vendor | Meals in Home State of Florida | Alcohol/Tobacco (Cigarettes) | Golf in Florida | Personal Items | Electronics | Unknown | Total |
|---|---|---|---|---|---|---|---|
| America Landslide Lounge | $ 0.00 | 10.38 | 0.00 | 0.00 | 0.00 | 0.00 | 10.38 |
| Best Buy | 0.00 | 0.00 | 0.00 | 0.00 | 695.32 | 0.00 | 695.32 |
| Bonefish Mac's | 545.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 545.00 |
| Buddy's Place | 0.00 | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 20.00 |
| Casey's General Store | 0.00 | 1,130.61 | 0.00 | 27.39 | 0.00 | 0.00 | 1,158.00 |
| City of Pompano Golf Course | 0.00 | 0.00 | 130.00 | 0.00 | 0.00 | 0.00 | 130.00 |
| CJ's Convenience Store | 0.00 | 50.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00 |
| Dick's Sporting Goods | 0.00 | 0.00 | 0.00 | 190.79 | 0.00 | 0.00 | 190.79 |
| Fleur Car Wash | 0.00 | 0.00 | 0.00 | 10.00 | 0.00 | 0.00 | 10.00 |
| Galuppis | 129.00 | 24.12 | 0.00 | 0.00 | 0.00 | 0.00 | 153.12 |
| Great American Bagel | 6.88 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.88 |
| Hudson News | 7.58 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00 | 9.58 |
| Hy Vee | 0.00 | 83.90 | 0.00 | 38.60 | 0.00 | 0.00 | 122.50 |
| Jack Nicklaus Golden Bear Grill | 37.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 37.00 |
| Kaluz Restaurant | 270.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 270.00 |
| Kwik Stop (Florida) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 348.49 | 348.49 |
| Kwik Zone | 0.00 | 0.00 | 0.00 | 8.70 | 0.00 | 0.00 | 8.70 |
| Lito's Surf and Turf | 283.85 | 88.15 | 0.00 | 0.00 | 0.00 | 0.00 | 372.00 |
| Mad Meatball | 0.00 | 18.50 | 0.00 | 0.00 | 0.00 | 0.00 | 18.50 |
| Marlee's Diner | 60.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 60.00 |
| Mike's Metro Lock and Safe | 0.00 | 0.00 | 0.00 | 265.00 | 0.00 | 0.00 | 265.00 |
| News 2U | 0.00 | 0.00 | 0.00 | 1.07 | 0.00 | 0.00 | 1.07 |
| One to One Pharmacy | 0.00 | 0.00 | 0.00 | 9.99 | 0.00 | 0.00 | 9.99 |
| Owl Pharmacy | 0.00 | 0.00 | 0.00 | 26.41 | 0.00 | 0.00 | 26.41 |
| Paradies Airport Shops | 13.77 | 0.00 | 0.00 | 6.65 | 0.00 | 0.00 | 20.42 |
| Phillips Famous Seafood | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Plane Box Food Company | 2.49 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.49 |
| Pour Boy II | 0.00 | 69.46 | 0.00 | 0.00 | 0.00 | 0.00 | 69.46 |
| Prairie Tap Room | 0.00 | 7.99 | 0.00 | 0.00 | 0.00 | 0.00 | 7.99 |
| Quik Trip | 0.00 | 0.00 | 0.00 | 3.00 | 0.00 | 126.42 | 129.42 |
| Shell | 0.00 | 70.25 | 0.00 | 0.00 | 0.00 | 0.00 | 70.25 |
| Sicilian Oven | 50.88 | 0.00 | 0.00 | 2.88 | 0.00 | 0.00 | 53.76 |
| Sprint | 0.00 | 0.00 | 0.00 | 0.00 | 329.33 | 0.00 | 329.33 |
| Square View Inn | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Staples | 0.00 | 0.00 | 0.00 | 120.82 | 0.00 | 0.00 | 120.82 |
| The Continental | 0.00 | 2.75 | 0.00 | 0.00 | 0.00 | 0.00 | 2.75 |
| Toot-Toot Restaurant | 0.00 | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 |
| Walmart | 0.00 | 0.00 | 0.00 | 13.18 | 0.00 | 0.00 | 13.18 |
| | $ 1,406.45 | 1,581.11 | 130.00 | 726.48 | 1,024.65 | 474.91 | 5,343.60 |

Appendix C

# Putnam County Memorial Hospital
## Critical Access Hospital Average Comparison

This appendix compares Putnam County Memorial Hospital's revenues per bed, payroll expense per bed, Medicare governmental revenues per Medicare discharge, occupancy rate, and federal revenues as a percent of total revenues to the CAH statewide average for fiscal years 2013, 2014, and 2015.

Data provided by the Missouri Department of Health and Senior Services indicates that as of May 4, 2017, there are 36 CAHs in Missouri. The CAH designation was created by Congress in the 1997 Balanced Budget Act in response to hospital closures in the late 1980s and early 1990s. The designation is given by the Centers for Medicare and Medicaid Services to certain rural hospitals meeting specific criteria. The primary eligibility requirements for CAH designation are the hospital must (1) have 25 or fewer acute care inpatient beds, (2) be located more than 35 miles from another hospital, (3) maintain an annual average length of stay of 96 hours or less for acute care patients, and (4) provide 24/7 emergency care services. Some benefits of hospitals obtaining the CAH status include (1) cost-based reimbursement from Medicare (as of January 1, 2004, CAHs are eligible for allowable costs plus 1% reimbursement); (2) required networking with an acute care hospital, which can provide support to the CAH and allow for transfer of more acute patients; (3) flexible staffing and services; (4) capital improvement costs included in allowable costs for determining Medicare reimbursement; and (5) access to educational resources and technical assistance and/or grants.

| | 2015 | | | 2014 | | | 2013 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Putnam County Memorial Hospital | CAH Statewide Average | Percent of CAH Statewide Average | Putnam County Memorial Hospital | CAH Statewide Average | Percent of CAH Statewide Average | Putnam County Memorial Hospital | CAH Statewide Average | Percent of CAH Statewide Average |
| Revenues Per Bed [1] | $489,702 | 892,973 | 54.8% | 512,930 | 843,668 | 60.8% | 539,221 | 778,522 | 69.3% |
| Payroll Expense Per Bed [2] | $222,201 | 378,908 | 58.6% | 210,551 | 364,963 | 57.7% | 198,137 | 328,062 | 60.4% |
| Medicare Governmental Revenues Per Medicare Discharge [3] | $41,651 | 54,421 | 76.5% | 43,659 | 54,768 | 79.7% | 43,160 | 45,647 | 94.6% |
| Occupancy Rate [4] | 37.5% | 32.2% | | 37.6% | 32.0% | | 21.2% | 31.1% | |
| Federal Revenues as a Percent of Total Revenues [5] | 74.7% | 59.7% | | 79.3% | 63.5% | | 76.5% | 60.7% | |

Source: Missouri Department of Health and Senior Services and SAO calculations

[1] Revenues per bed = (total net patient revenue / number of staffed beds).

[2] Payroll expense per bed = (total payroll expenses / number of staffed beds).

[3] Medicare governmental revenues per Medicare discharge = (total Medicare governmental revenues / number of Medicare discharges).

[4] Occupancy rate = (inpatient days * 100) / (licensed bed capacity * 365).

[5] Federal revenues as a percent of total revenues = (Medicare revenues + Medicaid revenues) / (Medicare revenues + Medicaid revenues + total non-government revenues).

Appendix D
# Putnam County Memorial Hospital
# Auditee Responses

The Putnam County Memorial Hospital Board of Trustees was provided a draft report for official comment on May 25, 2017. After providing responses to each recommendation on June 16, 2017, the Board's legal counsel requested to withdraw the responses in a phone conversation during the last week of June. The Board formally withdrew its formal response on July 13, 2017. We asked the Board to provide new responses by July 17, 2017. On that date, the Board's legal counsel provided the attached management responses that did not address all recommendations in the report. The correspondence also included a request for an extension to provide additional responses. We agreed to this request and asked for any additions or changes to the responses by July 24, 2017. On that date, the Board's legal counsel did not provide additional responses, but requested an extension to the due date. We agreed to extend the due date to July 31, 2017. Again, no additional responses were provided by the revised deadline.

Section 29.200.12, RSMo requires the State Auditor's Office to provide 30 days for audit responses, and government auditing standards require responsible officials receive a "reasonable period of time" to provide responses. The Board has been provided a "reasonable period of time" for responses, and more than twice as much time as required by state law. Therefore, the audit is being released with the Board's partial responses provided on July 17, 2017.

27



Putnam County Memorial Hospital
Auditee Responses



### DETAILED RESPONSE TO STATE AUDITOR'S FINDINGS

The transmittal correspondence ("Correspondence") pertaining to the Draft Audit Report ("Draft") states the objectives of the audit were to:

1.  Evaluate internal controls over significant management and financial functions as they relate to the financial condition of the care facility.

2.  Evaluate compliance with certain legal provisions as they relate to the financial condition of the care facility.

3.  Evaluate the economy and efficiency of certain management practices and operations, including certain financial transactions, as they relate to the financial condition of the care facility.

The Correspondence stated she conducted the audit in accordance with the standards applicable to performance audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. That those standards required that she plan and perform her audit to obtain sufficient, appropriate evidence to provide a reasonable basis for her findings and conclusions based on her audit objectives. And finally that she believes that the evidence obtained provides such a basis.

Putnam County Memorial Hospital ("PCMH") notes however that although the objective of determining or evaluating the effectiveness of a program is discussed within the *Government Auditing Standards* ("GAS"), (*See Chapter 2 Standards for Use and Application of GAGAS*) cited by the Auditor's team, the Audit did not include in its list of objectives the objective to determine or evaluate the effectiveness of the PCMH. Nor did it identify any other context in which the identified Objectives are to be viewed.

Nor does the Audit identify, let alone with any specificity, the source of alleged evidence of many of its conclusions; therefore it is impossible to determine the "appropriateness" of that evidence" therefore puts in doubt the existence of a "reasonable basis" for the Drafts findings and conclusions.

Below we will identify, as best we can, those conclusions reached by the Auditor's team of most concern to the PCMH's.

## 1.    LACK OF BOARD OVERSIGHT.

In Section 1, page 7, the Draft alleges that the Board:
- does not provide sufficient oversight over activities of the hospital,

- did not perform sufficient due diligence over the awarding and development of management contracts, and

- did not ensure personnel were in place to monitor the activities of contracted management companies.

WA 9927758.1

28



Putnam County Memorial Hospital
Auditee Responses

Such allegations are made without reference to any legal authority, including but not limited to any statutory provision with which the PCMH was not in compliance in reference to §205.160 to 205.340 RSMo that authorizes the establishment of County Hospitals and their respective Boards, or any properly promulgated rules or regulations passed or adopted by the Missouri General Assembly, or the State of Missouri's Auditor ("Auditor"), or any Ordinance or Resolution passed or adopted by the Putnam County Commission ("County"), or any bylaw of the Board of Trustees of the PMCH ("Board") in regard to oversight responsibilities of the Board.

In fact, Missouri statutes provide that the board of hospital trustees shall make and adopt such bylaws, rules and regulations for its own guidance and for the government of the hospital *as may be deemed expedient for the economic and equitable conduct thereof*, not inconsistent with §205.160 to 205.340 RSMo, and the ordinances of the city or town wherein such public hospital is located. §205.190 RSMo. The Auditor's team has failed to identify how or to what extent the Board acted contrary to, or inconsistent with §205.160 to 205.340 RSMo.

Nor did the Draft identify any industry standards in regard to the duties of the Board of Trustees of a County Hospital in the State of Missouri, or any other private or public hospital industry standard.

The Draft further states that as a result of the above lack of oversight:

(1)     Excessive compensation has been paid to management company officials,

(2)     Loans to the hospital occurred without the Board's knowledge and without the Board agreeing to loan terms,

(3)     Questionable employee reimbursements have occurred,

(4)     Employee's wages earned were not properly reported to the state and federal government,

(5)     Significant decisions related to the offering of services have been made without adequate information being provided to the Board, and

(6)     Out-of-state employees have been placed on the hospital payroll.

Such allegations are made without reference to any legal authority, including but not limited to any statutory provision with which the PCMH was not in compliance in reference to §205.160 to 205.340 RSMo that authorizes the establishment of County Hospitals and their respective Boards, or any properly promulgated rules or regulations passed or adopted by the Missouri General Assembly, or the Auditor, or any Ordinance or Resolution passed or adopted by the County, or any bylaw of the Board in regard to oversight responsibilities of the Board.

In fact, Missouri statutes provide that the board of hospital trustees shall make and adopt such bylaws, rules and regulations for its own guidance and for the government of the hospital *as may be deemed expedient for the economic and equitable conduct thereof*, not inconsistent with §205.160 to 205.340 RSMo, and the ordinances of the city or town wherein such public hospital is located. §205.190

2

WA 9927758.1

29



Putnam County Memorial Hospital
Auditee Responses

RSMo. The Draft fails to identify how or to what extent the Board acted contrary to, or inconsistent with §205.160 to 205.340 RSMo.

Nor did the Draft identify any industry standards in regard to the duties of the Board of Trustees of a County Hospital in the State of Missouri, or any other private or public hospital industry standard.

## 1.1    MANAGEMENT CONTRACTS:

### a.    Proposals not formally requested, procured, or analyzed.

The Draft alleges the "...Board did not perform sufficient due diligence over the process of awarding management contracts."

However, in spite of the standards expressed within the GAS, the Draft fails to identify the Authority upon which such allegation is based or to provide "sufficient, appropriate evidence to provide a reasonable basis for her findings and conclusion."

Once again, such allegations are made without reference to any legal authority, including but not limited to any statutory provision with which the PCMH was not in compliance in reference to §205.160 to 205.340 RSMo that authorizes the establishment of County Hospitals and their respective Boards, or any properly promulgated rules or regulations passed or adopted by the Missouri General Assembly, or the Auditor, or any Ordinance or Resolution passed or adopted by the County, or any bylaw of the Board in regard to oversight responsibilities of the Board.

Again, Missouri statutes provide that the board of hospital trustees shall make and adopt such bylaws, rules and regulations for its own guidance and for the government of the hospital *as may be deemed expedient for the economic and equitable conduct thereof*, not inconsistent with §205.160 to 205.340 RSMo, and the ordinances of the city or town wherein such public hospital is located. §205.190 RSMo. The Auditor's team has failed to identify how or to what extent the Board acted contrary to, or inconsistent with §205.160 to 205.340 RSMo.

Nor did the Draft identify any Industry standards in regard to the duties of the Board of Trustees of a County Hospital in the State of Missouri, or any other private or public hospital industry standard.

The Draft further alleges the Board did not adequately document how decisions related to the hiring of management companies were made or retain sufficient documentation to show they conferred with legal counsel prior to entering into management contracts.

The Draft fails to state upon what standards the Auditor's team relied in drawing such conclusions. Are such standards available to the Board and/or the County for review? Were such industry standards offered or made available to the County, the Board or the Management Company? The Draft fails to identify what would constitute "adequate" documentation or what constitutes "retention of sufficient documentation to show they conferred with legal counsel prior to entering into management contracts".

The finding and conclusion that the Board failed to retain "...sufficient documentation to show they conferred with legal counsel prior to entering into management contracts" and then turn such documentation over to the Auditor's team could be interpreted by the Auditor, the Auditor's team or

3

WA 9927758.1



Putnam County Memorial Hospital
Auditee Responses

other third parties, as a waiver of the Attorney-client Privilege enjoyed by the Board and the County, as well as, a waiver of the Confidentiality of Work Product of their Counsel. To force the Board or the County to waive their Attorney Client Privilege would be inappropriate. The Draft fails to cite any legal authority the Auditor has to order, or to directly or indirectly intimidate, the PCMH to waive its attorney client privileged and confidential communications.

A most important question for the Auditor's team is why they gave little weight to the fact that the Board indicated to the Auditor's team that the Board discussed with other entities the possibility of providing management services to the hospital prior to entering into both of the agreements; however, no other firms ultimately expressed interest in managing the hospital.

The Draft provides no evidence, let alone "sufficient appropriate evidence," as to why they question the credibility of the Board or the County. The Auditor's team fails to cite any statutory or regulatory provision that defines what constitutes "formal bids" or requirement that "formal bids or proposals for such services" be requested.

The Draft also fails to identify any Industry standard in regard to the duties of the Board of Trustees of a County Hospital in the State of Missouri, or any other private or public hospital industry standard, that would define or articulate the appropriate process for hiring a management company to operate the PCMH based upon the facts and issues relevant to PCMH.

The Draft states that "Based on conversations with Board members and a review of meeting minutes, all discussions related to the management services contracts were informal in nature, with little specific information documented, and no critical evaluation of the contract being proposed."

In regard to "appropriate evidence" as required by GAS, the Draft fails to provide any documentation, transcription or recording of said interviews of Board members, or which Board members were interviewed, when and for how long. The Draft fails to define what constitutes "formal or informal contractual discussions." It fails to identify the specific information requested, let alone required. The Draft fails to cite any statute, rule or industry standard that would delineate information the Board or County was required to seek and document.

The Draft fails to define what constitutes a "critical evaluation of the contract being proposed" and fails to cite any standards, guidelines, statute or rule upon which they base your conclusion.

The Board and/or County had engaged in long discussions with Blessing Hospital. However when Blessing Hospital decided not to enter into an agreement, time was of the essence. Three other companies were contacted, but once they learned of PCMH's financial condition, Hospital Partners, Inc. was the only one who agreed to meet with the Board. The Board and the County felt PMCH was within days of closing and had already stopped many of its services. To fail to expedite the process would have meant termination of services to the patients and citizens PCMH serves.

### b. Contract not reviewed by legal counsel

The statement "Contract not reviewed by legal counsel" highlighted in the margin of the Draft is not true, as proven by the content of the Draft itself. While the headline highlighted in the margin states that the Contract was not reviewed by legal counsel, the text of the draft states:

4

WA 9927758.1



Putnam County Memorial Hospital
Auditee Responses

The Board could not provide *adequate* documentation to show they conferred with legal counsel prior to entering into the management contract with Hospital Partners. The Board signed the agreement without *adequate* legal counsel input despite the County Commission's offer to pay for legal services and despite the contract being drafted by the entity being contracted with. *A local attorney confirmed to our auditors that he read the proposed agreement around September 2016*; however, no compensation was paid for those services and the attorney could not provide specific details on what services the Board requested. In addition, the Board provided limited correspondence between the County Commission's attorney and Hospital Partners which indicated an attorney acting as an agent for the County Commission reviewed the agreement. *(Emphasis added)*

Again to allege or infer inappropriate conduct by the Board because they "...[did] not <u>provide</u> <u>adequate</u> documentation to show they conferred with legal counsel prior to entering into management contracts", or that *"the attorney could not provide specific details on what services the Board requested"*, and that *"the Board provided limited correspondence between the County Commission's attorney and Hospital Partners which indicated an attorney acting as an agent for the County Commission reviewed the agreement"*, and to ignore the fact that *"A local attorney confirmed to our auditors that he read the proposed agreement around September 2016"*, could be interpreted by the Auditor, the Auditor's team or other third parties, as and inappropriate conduct on their part in seeking to force or intimidate the Board or the County to waive their Attorney Client Confidentiality and Privilege. Any compliance with such request could be interpreted by a third party as a waiver of the Attorney-client Privilege enjoyed by the Board and the County, as well as, a waiver of the Confidentiality of Work Product of their Counsel.

The Draft fails to cite any legal authority they had or have to request the PCMH or the County to waive their attorney client privileged and confidential communications. *(Emphasis added)*

As such, any direct or indirect allegation, any direct or indirect inference of a lack of "adequate" or "sufficient" legal advice should be deleted from any final Audit and redacted from any drafts retained by the Auditor's Office.

In regard to specific provisions of the contract, the Draft fails to cite any statutory authority or case law that would support their allegation that PCMH extended "...public funds to cover costs associate with mismanagement or fraudulent actions" and is silent as to the impact of the protections of sovereign immunity and §105.711 RSMo, upon the scenario presented by the Auditor's team.

## 1.2   OVERSIGHT OF MANAGEMENT COMPENSATION:

### a.   Practice Plus raises; Hospital Partners compensation and fees.

The Draft alleges:

"The Board did not ensure personnel were in place to provide oversight of management company activities, and did not provide sufficient direct oversight of the compensation paid to management companies, including salaries paid to executive administration personnel. The process to award raises to management companies and executive administrative personnel is not formalized as part of the management

5

WA 9927758.1



Putnam County Memorial Hospital
Auditee Responses

contract. As a result, administrators received raises without clear justification, and in the case of Hospital Partners, payments of salaries and management fees occurred without Board approval....

Board members indicated they based the decision to provide these raises on documentation provided by the CEO and COO indicating salaries of comparable positions at peer hospitals. The Board did not have any defined measurable performance standards or goals outlined to base the decision. By granting a significant increase in the contracted salaries paid to these officials during a time of extreme financial distress, the Board further harmed the hospital's financial position."

Such allegations are made without reference to any legal authority, including but not limited to any statutory provision with which the PCMH was not in compliance in reference to §205.160 to 205.340 RSMo that authorizes the establishment of County Hospitals and their respective Boards, or any properly promulgated rules or regulations passed or adopted by the Missouri General Assembly, or the Auditor, or any Ordinance or Resolution passed or adopted by the County, or any bylaw of the Board in regard to oversight responsibilities of the Board.

In fact, Missouri statutes provide that the board of hospital trustees shall make and adopt such bylaws, rules and regulations for its own guidance and for the government of the hospital *as may be deemed expedient for the economic and equitable conduct thereof*, not inconsistent with §205.160 to 205.340 RSMo, and the ordinances of the city or town wherein such public hospital is located. §205.190 RSMo. The Draft has failed to identify how or to what extent the Board acted contrary to, or inconsistent with §205.160 to 205.340 RSMo.

Nor did the Draft identify any Industry standards in regard to the duties of the Board of Trustees of a County Hospital in the State of Missouri, or any other private or public hospital industry standard.

In regard to the Practice Plus compensation issues and terms of the Hospital Partners contract, additional time to review is needed before PCMH can adequately comment on the Draft's statements and conclusions, as PCMH has just recently retained Mr. Joe Bednar as legal counsel for representation of PCMH as to any issues arising out of or related to the Draft, and he requests additional time to supplement this portion of the PCMH response.

## 1.3   LABORATORY CONTRACTS AND QUESTIONABLE LABORATORY BILLINGS:

The Draft alleges:

The Board has not provided appropriate oversight of laboratory contracts entered into by the new CEO/management company President. As a result, the hospital is incurring unnecessary payroll costs, and is involved in questionable laboratory billing practices.

Such allegations are made without reference to any legal authority, including but not limited to any statutory provision with which the PCMH was not in compliance in reference to §205.160 to 205.340 RSMo that authorizes the establishment of County Hospitals and their respective Boards, or any properly promulgated rules or regulations passed or adopted by the Missouri General Assembly, or the Auditor, or any Ordinance or Resolution passed or adopted by the County, or any bylaw of the Board in regard to oversight responsibilities of the Board.

WA 9927758.1



Putnam County Memorial Hospital
Auditee Responses

In fact, Missouri statutes provide that the board of hospital trustees shall make and adopt such bylaws, rules and regulations for its own guidance and for the government of the hospital *as may be deemed expedient for the economic and equitable conduct thereof*, not inconsistent with §205.160 to 205.340 RSMo, and the ordinances of the city or town wherein such public hospital is located. §205.190 RSMo. The Draft has failed to identify how or to what extent the Board acted contrary to, or inconsistent with §205.160 to 205.340 RSMo.

Nor did the Draft identify any industry standards in regard to the duties of the Board of Trustees of a County Hospital in the State of Missouri, or any other private or public hospital industry standard.

### a.   Laboratory contract and payroll costs.

The Draft alleges:

In October 2016, the hospital contracted with Hospital Laboratory Partners, LLC3 (Hospital Lab Partners) to operate all clinical and operational aspects of a clinical laboratory on behalf of the hospital. The Board did not formally approve the contract, did not provide any oversight of the terms of the contract, and was not aware of any of the contract's terms or the hospital's obligations to the contractor. Due to this lack of oversight, beginning in November 2016 the CEO added payroll expenses of approximately $68,000 per month for 33 phlebotomists to facilitate laboratory activity, in violation of the contract's terms. The hospital's laboratory contract specifically states such expenses are the responsibility of the laboratory contractor. The Board did not approve the addition of these positions....

Oversight by the Board of significant contracts is necessary to ensure the financial best interests of the hospital are served.

Such allegations are made without reference to any legal authority, including but not limited to any statutory provision with which the PCMH was not in compliance in reference to §205.160 to 205.340 RSMo that authorizes the establishment of County Hospitals and their respective Boards, or any properly promulgated rules or regulations passed or adopted by the Missouri General Assembly, or the Auditor, or any Ordinance or Resolution passed or adopted by the County, or any bylaw of the Board in regard to oversight responsibilities of the Board.

In fact, Missouri statutes provide that the board of hospital trustees shall make and adopt such bylaws, rules and regulations for its own guidance and for the government of the hospital *as may be deemed expedient for the economic and equitable conduct thereof*, not inconsistent with §205.160 to 205.340 RSMo, and the ordinances of the city or town wherein such public hospital is located. §205.190 RSMo. The Draft has failed to identify how or to what extent the Board acted contrary to, or inconsistent with §205.160 to 205.340 RSMo.

Nor did the Draft identify any industry standards in regard to the duties of the Board of Trustees of a County Hospital in the State of Missouri, or any other private or public hospital industry standard.

### b.   Questionable laboratory billing practices.

The Draft alleges:

7



Putnam County Memorial Hospital
Auditee Responses

The hospital's laboratory contract with Hospital Lab Partners has resulted in a significant increase of questionable revenues from laboratory billings of health insurance companies.

The Draft does not offer any, let alone sufficient, appropriate evidence that the revenue increase is unlawful, or inappropriate, or inconsistent with §205.160 to 205.340 RSMo, and the ordinances of the County. §205.190 RSMo, and therefore until the Auditor's team can produce such appropriate evidence to PCMH, any such allegations or inferences should be deleted from the report.

In regard to the hospital's laboratory contract with Hospital Lab Partners, the issues and terms of the contract, more review is needed before PCMH can adequately comment on the Draft audit in regard to questionable billing practices, as PCMH has just recently retained Mr. Joe Bednar as legal counsel for representation of PCMH as to any issues arising out of or related to the Draft Auditor's Report, and the Auditor's team has not been able to provide any details as to the claim, including the name of the person making the claim, the actual facts supporting the claim, or the companies making the claim. Without such information it is impossible to provide an adequate response to an allegation based upon double or triple hearsay.

### c.    Laboratory subcontractors.

As previously stated, Missouri statutes provide that the board of hospital trustees shall make and adopt such bylaws, rules and regulations for its own guidance and for the government of the hospital *as may be deemed expedient for the economic and equitable conduct thereof,* not inconsistent with §205.160 to 205.340 RSMo, and the ordinances of the city or town wherein such public hospital is located. §205.190 RSMo. The Draft fails to identify how, or to what extent, the Board is acting, or has acted, contrary to §205.160 to 205.340 RSMo.

Nor did the Draft identify any industry standards in regard to the duties of the Board of Trustees of a County Hospital in the State of Missouri, or any other private or public hospital industry standard.

In regard to the hospital's laboratory contract with Hospital Lab Partners issues and terms of the contract and those arising out of the contract, more review is needed before PCMH can adequately comment on the Draft audit, as PCMH has just recently retained Mr. Joe Bednar as legal counsel for representation of PCMH as to any issues arising out of or related to the Draft Auditor's Report.

It is noted that the Draft has not offered any appropriate evidence that the payments made were not for legitimate hospital business, and therefore until the Auditor's team can produce such proof to PCMH, any such allegations or inferences should be deleted from the report.

### d.    Questionable use of phlebotomy services.

As previously stated, Missouri statutes provide that the board of hospital trustees shall make and adopt such bylaws, rules and regulations for its own guidance and for the government of the hospital *as may be deemed expedient for the economic and equitable conduct thereof,* not inconsistent with §205.160 to 205.340 RSMo, and the ordinances of the city or town wherein such public hospital is located. §205.190 RSMo. The Draft has failed to identify how, or to what extent, the Board of PCMH is acting, or has acted, contrary to §205.160 to 205.340 RSMo.

8

WA 9927758.1



Putnam County Memorial Hospital
Auditee Responses

Nor did the Draft identify any Industry standards in regard to the duties of the Board of Trustees of a County Hospital in the State of Missouri, or any other private or public hospital industry standard.

In regard to the hospital's laboratory contract with Hospital Lab Partners issues and terms of the contract and those arising out of the contract, including but not limited to the staffing issues, more review is needed before PCMH can adequately comment on the Draft audit, as PCMH has just recently retained Mr. Joe Bednar as legal counsel for representation of PCMH as to any issues arising out of or related to the Draft Auditor's Report.

It is noted that the Draft has not offered any appropriate evidence that the staffing decisions made were not for legitimate hospital business, and therefore until the Auditor's team can produce such proof to PCMH, any such allegations or inferences should be deleted from the report.

## 1.4    LOAN AGREEMENT:

The Auditor's team alleges:

The Board did not provide sufficient oversight to be aware the CEO entered the hospital into a verbal loan agreement with Hospital Partners and Empower Investment Group.

As previously stated, Missouri statutes provide that the board of hospital trustees shall make and adopt such bylaws, rules and regulations for its own guidance and for the government of the hospital *as may be deemed expedient for the economic and equitable conduct thereof*, not inconsistent with §205.160 to 205.340 RSMo, and the ordinances of the city or town wherein such public hospital is located. §205.190 RSMo. The Auditor's team has failed to identify how or to what extent the Board of PCMH is acting, or has acted, contrary to §205.160 to 205.340 RSMo.

Nor did the Draft identify any industry standards in regard to the duties of the Board of Trustees of a County Hospital in the State of Missouri, or any other private or public hospital industry standard.

In regard to the Hospital Partners contract, the issues and terms of the contract and those arising out of the contract, including but not limited to the loan agreement, more review is needed before PCMH can adequately comment on the Draft, as PCMH has just recently retained Mr. Joe Bednar as legal counsel for representation of PCMH as to any issues arising out of or related to the Draft Auditor's Report.

In addition the Auditor's team alleges:

As a result of the Board's lack of oversight, the hospital was not in compliance with Section 432.070, RSMo, which requires contracts for political subdivisions to be in writing.

The Auditor's team fails to offer any legal support that the PCMH, or its Board is a political subdivision.

## 1.4    Questionable travel reimbursements and unreported compensation:
The Auditor's team alleges:

9

WA 9927758.1



Putnam County Memorial Hospital
Auditee Responses

The Board does not have adequate procedures in place to provide sufficient oversight and ensure all travel reimbursements are reasonable and proper. Additionally, the hospital does not properly report all employee's wages earned to the state and federal government.

As previously stated, Missouri statutes provide that the board of hospital trustees shall make and adopt such bylaws, rules and regulations for its own guidance and for the government of the hospital *as may be deemed expedient for the economic and equitable conduct thereof*, not inconsistent with §205.160 to 205.340 RSMo, and the ordinances of the city or town wherein such public hospital is located. §205.190 RSMo. The Auditor's team has failed to identify how or to what extent the Board of PCMH is acting, or has acted, contrary to §205.160 to 205.340 RSMo.

Nor did the Auditor's team identify any industry standards in regard to the duties of the Board of Trustees of a County Hospital in the State of Missouri, or any other private or public hospital industry standard.

In regard to the Hospital Partners contract, the issues and terms of the contract and those arising out of the contract, including but not limited to the compensation and travel reimbursements, more review is needed before PCMH can adequately comment on the Draft, as PCMH has just recently retained Mr. Joe Bednar as legal counsel for representation of PCMH as to any issues arising out of or related to the Draft Auditor's Report.

WA 9927758.1



Putnam County Memorial Hospital
Auditee Responses

## Auditor's Comment

The audit documents significant issues requiring the immediate action of the Board. However, the above responses primarily attempt to deflect the Board's responsibility and discount the areas of concern by attempting to discredit the audit work performed. The responses further show a lack of understanding of government auditing standards and demonstrate the Board's clear lack of understanding of its oversight responsibility regarding the hospital. The response states the audit fails to identify how the Board's actions were contrary to or inconsistent with state law, however, audit standards do not require auditors prove mismanagement is not in accordance with law; only that a condition is significant in relation to the subject matter. As required by government auditing standards, the audit provides sufficient, appropriate evidence of mismanagement, including the cause and effect of such action, and provides a reasonable basis to support its findings, conclusions, and recommendations.

# EXHIBIT B

**Transfers to Health Acquisition Company's Operating Account from January 1, 2018, through June 30, 2018**

**(US Bank Account Number ending in 8759)**

| Date | Originating Account Number | Originating Account Name | Amount Transferred |
|------|---------------------------|--------------------------|--------------------|
| 1/9/2018 | US Bank ending in 9904 | HMC/CAH Consolidated Inc. Operating Account | $ 155,537.22 |
| 1/11/2018 | US Bank ending in 9904 | HMC/CAH Consolidated Inc. Operating Account | $ 139,628.72 |
| 1/11/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 232,890.49 |
| 1/12/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 314,667.85 |
| 1/16/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 89,779.31 |
| 1/17/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 130,614.20 |
| 1/18/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 222,554.27 |
| 1/19/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 233,757.01 |
| 1/22/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 80,000.00 |
| 1/23/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 210,463.47 |
| 1/24/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 87,063.68 |
| 1/25/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 497,609.96 |
| 1/26/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 261,694.21 |
| 1/29/2018 | US Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 26,118.40 |
| 1/29/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 60,000.00 |
| 1/30/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 220,000.00 |
| 1/31/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 128,319.99 |
| 2/1/2018 | US Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 4,853.16 |
| 2/1/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 336,637.30 |
| 2/2/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 83,628.29 |
| 2/2/2018 | US Bank ending in 9904 | HMC/CAH Consolidated Inc. Operating Account | $ 150,000.00 |
| 2/5/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 130,707.45 |
| 2/6/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 280,000.00 |

| Date | Originating Account Number | Originating Account Name | Amount Transferred |
|---|---|---|---|
| 2/7/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 4,853.41 |
| 2/7/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 140,000.00 |
| 2/8/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 2,414.14 |
| 2/8/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 197,491.67 |
| 2/9/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 219,060.74 |
| 2/13/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 420,000.00 |
| 2/14/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 5,906.79 |
| 2/14/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 170,000.00 |
| 2/15/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 3,677.89 |
| 2/15/2018 | US  Bank  ending  in  8272 | CAH # 16 Haskell Hospital Account | $ 50,000.00 |
| 2/15/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 250,000.00 |
| 2/16/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 209,412.37 |
| 2/20/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 149,411.61 |
| 2/20/2018 | US  Bank  ending  in  6215 | HMC/CAH Consolidated Inc. Benefits Account | $ 200,000.00 |
| 2/21/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 271,739.84 |
| 2/22/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 4,454.33 |
| 2/22/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 491,913.52 |
| 2/23/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 308,891.35 |
| 2/26/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 213,786.40 |
| 2/27/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 111,640.08 |
| 2/28/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 4,839.93 |
| 2/28/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 92,562.67 |
| 3/1/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 298,901.33 |
| 3/2/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 260,099.09 |
| 3/5/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 75,098.97 |
| 3/6/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 195,973.65 |
| 3/7/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 5,203.37 |
| 3/7/2018 | US  Bank  ending  in  9904 | HMC/CAH Consolidated Inc. Operating Account | $ 309,614.29 |

| Date | Originating Account Number | Originating Account Name | Amount Transferred |
|---|---|---|---|
| 3/8/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 408,336.06 |
| 3/9/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 283,029.40 |
| 3/12/2021 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 447,674.00 |
| 3/13/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 232,325.57 |
| 3/14/2018 | US Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 5,947.80 |
| 3/14/2018 | US Bank ending in 6215 | HMC/CAH Consolidated Inc. Benefits Account | $ 124,000.00 |
| 3/14/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 124,718.54 |
| 3/15/2018 | US Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 825.65 |
| 3/15/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 251,005.19 |
| 3/16/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 129,407.54 |
| 3/19/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 140,738.60 |
| 3/20/2018 | US Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 1,094.44 |
| 3/20/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 50,000.00 |
| 3/21/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 190,000.00 |
| 3/22/2018 | US Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 4,258.05 |
| 3/22/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 303,427.49 |
| 3/23/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 206,207.71 |
| 3/26/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 334,252.57 |
| 3/27/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 75,226.14 |
| 3/28/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 89,541.70 |
| 3/29/2018 | US Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 6,155.51 |
| 3/29/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 205,429.55 |
| 4/2/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 140,432.96 |
| 4/3/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 42,263.27 |
| 4/4/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 395,230.88 |
| 4/5/2018 | US Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 5,121.78 |
| 4/5/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 383,593.37 |
| 4/6/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 137,257.04 |

| Date | Originating Account Number | Originating Account Name | Amount Transferred |
|---|---|---|---|
| 4/9/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 211,555.90 |
| 4/10/2018 | US  Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 914.42 |
| 4/10/2018 | US  Bank ending in 8272 | CAH # 16 Haskell Hospital Account | $ 35,538.55 |
| 4/10/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 98,129.16 |
| 4/10/2018 | US  Bank ending in 9904 | HMC/CAH Consolidated Inc. Operating Account | $ 195,944.88 |
| 4/11/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 67,034.59 |
| 4/12/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 3,738.55 |
| 4/12/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 210,000.00 |
| 4/13/2018 | US  Bank ending in 6215 | HMC/CAH Consolidated Inc. Benefits Account | $ 75,000.00 |
| 4/13/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 102,078.48 |
| 4/16/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 101,898.38 |
| 4/17/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 46,949.12 |
| 4/18/2018 | US  Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 6,547.36 |
| 4/18/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 182,689.38 |
| 4/19/2018 | US  Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 1,244.40 |
| 4/19/2018 | US  Bank ending in 9904 | HMC/CAH Consolidated Inc. Operating Account | $ 143,755.18 |
| 4/19/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 190,000.00 |
| 4/20/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 130,000.00 |
| 4/23/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 349,649.56 |
| 4/24/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 94,074.19 |
| 4/25/2018 | US  Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 3,341.26 |
| 4/25/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 256,661.45 |
| 4/26/2018 | US  Bank ending in 6215 | HMC/CAH Consolidated Inc. Benefits Account | $ 190,000.00 |
| 4/26/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 479,648.20 |
| 4/30/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 386,005.62 |
| 5/1/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 96,522.83 |
| 5/2/2018 | US  Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 7,718.52 |
| 5/2/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 149,491.76 |

| Date | Originating Account Number | Originating Account Name | Amount Transferred |
|------|---------------------------|------------------------|--------------------|
| 5/3/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 194,304.18 |
| 5/4/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 184,695.54 |
| 5/4/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 1069.65 |
| 5/7/2018 | US  Bank  ending  in  7256 | EmpowerHMS Account | $ 176,000.00 |
| 5/7/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 355,642.67 |
| 5/8/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 305.56 |
| 5/8/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 180,000.00 |
| 5/9/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 143,997.04 |
| 5/10/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 5,271.25 |
| 5/10/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 219,999.96 |
| 5/11/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 62,816.42 |
| 5/14/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 151.60 |
| 5/14/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 85,159.55 |
| 5/15/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 152.75 |
| 5/15/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 47,824.64 |
| 5/16/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 105,171.11 |
| 5/17/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 3,912.39 |
| 5/17/2018 | US  Bank  ending  in  7256 | EmpowerHMS Account | $ 60,000.00 |
| 5/17/2018 | US  Bank  ending  in  9904 | HMC/CAH Consolidated Inc. Operating Account | $ 74,000.00 |
| 5/17/2018 | US  Bank  ending  in  8272 | CAH # 16 Haskell Hospital Account | $ 150,000.00 |
| 5/17/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 217,742.35 |
| 5/18/2018 | US  Bank  ending  in  7256 | EmpowerHMS Account | $ 117,000.00 |
| 5/18/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 185,250.97 |
| 5/21/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 565,736.99 |
| 5/22/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 153,844.82 |
| 5/23/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 1,485,879.72 |
| 5/24/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 5,319.64 |
| 5/25/2018 | US  Bank ending in 3754 | HMC Lead Lockbox Account | $ 234,867.37 |

| Date | Originating Account Number | Originating Account Name | Amount Transferred |
|------|----------------------------|-------------------------|--------------------|
| 5/25/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 102,836.37 |
| 5/29/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 107,519.57 |
| 5/30/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 208,748.95 |
| 5/31/2018 | US Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 4,502.36 |
| 5/31/2018 | US Bank ending in 9904 | HMC/CAH Consolidated Inc. Operating Account | $ 85,000.00 |
| 5/31/2018 | US Bank ending in 9904 | HMC/CAH Consolidated Inc. Operating Account | $ 178,889.62 |
| 5/31/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 279,991.70 |
| 6/1/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 36,203.34 |
| 6/1/2018 | US Bank ending in 8272 | CAH # 16 Haskell Hospital Account | $ 100,000.00 |
| 6/4/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 710,247.09 |
| 6/5/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 98,714.62 |
| 6/6/2018 | US Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 2,582.55 |
| 6/6/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 118,721.25 |
| 6/6/2018 | US Bank ending in 7256 | EmpowerHMS Account | $ 150,000.00 |
| 6/7/2018 | US Bank ending in 8272 | CAH # 16 Haskell Hospital Account | $ 50,000.00 |
| 6/7/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 313,111.66 |
| 6/8/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 67,651.55 |
| 6/11/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 255,077.87 |
| 6/12/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 122,433.04 |
| 6/13/2018 | US Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 4,681.43 |
| 6/13/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 50,000.00 |
| 6/14/2018 | US Bank ending in 6215 | HMC/CAH Consolidated Inc. Benefits Account | $ 100,000.00 |
| 6/14/2018 | US Bank ending in 9904 | HMC/CAH Consolidated Inc. Operating Account | $ 191,309.29 |
| 6/14/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 228,908.82 |
| 6/15/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 90,683.09 |
| 6/18/2018 | US Bank ending in 4817 | CAH #12 Fairfax Hospital Account | $ 1,544.62 |
| 6/18/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 176,459.16 |
| 6/19/2018 | US Bank ending in 3754 | HMC Lead Lockbox Account | $ 95,887.86 |

| Date | Originating Account Number | Originating Account Name | Amount Transferred |
|---|---|---|---|
| 6/20/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 88,281.73 |
| 6/21/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 3,570.92 |
| 6/21/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 224,325.51 |
| 6/22/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 120,223.20 |
| 6/25/2018 | US  Bank  ending  in  6215 | HMC/CAH Consolidated Inc. Benefits Account | $ 150,000.00 |
| 6/25/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 157,587.10 |
| 6/26/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 115,712.00 |
| 6/27/2018 | US  Bank  ending  in  4817 | CAH #12 Fairfax Hospital Account | $ 3,833.42 |
| 6/27/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 119,182.34 |
| 6/28/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 212,594.50 |
| 6/29/2018 | US  Bank  ending  in  3754 | HMC Lead Lockbox Account | $ 138,388.03 |