**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| CAH ACQUISITION COMPANY #1, LLC, | ) | Case No. 19-00730-5-JNC |
| d/b/a WASHINGTON COUNTY | ) | Chapter 11 |
| COMMUNITY HOSPITAL, | ) | |
| | ) | |
| THOMAS W. WALDREP, JR., as Litigation | ) | |
| Trustee, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 21-00078-5-JNC |
| | ) | |
| PAUL NUSBAUM, STEVE WHITE, and | ) | |
| JORGE A. PEREZ, | ) | |
| | ) | |
|     Defendants. | ) | |
| In re: | ) | |
| | ) | |
| CAH ACQUISITION COMPANY #2, LLC, | ) | Case No. 19-01230-5-JNC |
| d/b/a OSWEGO COMMUNITY HOSPITAL, | ) | Chapter 11 |
| | ) | |
| THOMAS W. WALDREP, JR., as Litigation | ) | |
| Trustee, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 21-00079-5-JNC |
| | ) | |
| PAUL NUSBAUM, STEVE WHITE, and | ) | |
| JORGE A. PEREZ, | ) | |
| | ) | |
|     Defendants. | ) | |
| In re: | ) | |
| | ) | |
| CAH ACQUISITION COMPANY #3, LLC, | ) | Case No. 19-01180-5-JNC |
| d/b/a HORTON COMMUNITY HOSPITAL, | ) | Chapter 11 |

| | | |
|---|---|---|
| THOMAS W. WALDREP, JR., as Litigation Trustee, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Adv. Pro. No. 21-00080-5-JNC |
| PAUL NUSBAUM, STEVE WHITE, and JORGE A. PEREZ, | ) ) ) ) | |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| In re: | ) ) | |
| CAH ACQUISITION COMPANY 6, LLC, d/b/a I-70 HOSPITAL, | ) ) ) | Case No. 19-01300-5-JNC Chapter 7 |

| | | |
|---|---|---|
| THOMAS W. WALDREP, JR., as Chapter 7 Trustee, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Adv. Pro. No. 21-00081-5-JNC |
| PAUL NUSBAUM, STEVE WHITE, and JORGE A. PEREZ, | ) ) ) ) | |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| In re: | ) ) | |
| CAH ACQUISITION COMPANY 7, LLC, d/b/a PRAGUE COMMUNITY HOSPITAL, | ) ) ) | Case No. 19-01298-5-JNC Chapter 11 |

| | | |
|---|---|---|
| THOMAS W. WALDREP, JR., as Litigation Trustee, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Adv. Pro. No. 21-00082-5-JNC |
| PAUL NUSBAUM, STEVE WHITE, and JORGE A. PEREZ, | ) ) ) | |

|  |  |  |
|---|---|---|
| Defendants. | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| CAH ACQUISITION COMPANY 12, LLC, | ) | Case No. 19-01697-5-JNC |
| d/b/a FAIRFAX COMMUNITY HOSPITAL, | ) | Chapter 11 |
| | ) | |
| | ) | |
| THOMAS W. WALDREP, JR., as Litigation | ) | |
| Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 21-00083-5-JNC |
| | ) | |
| PAUL NUSBAUM, STEVE WHITE, and | ) | |
| JORGE A. PEREZ, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| CAH ACQUISITION COMPANY 16, LLC, | ) | Case No. 19-01127-5-JNC |
| d/b/a HASKELL COMMUNITY HOSPITAL, | ) | Chapter 11 |
| | ) | |
| | ) | |
| THOMAS W. WALDREP, JR., as Litigation | ) | |
| Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 21-00084-5-JNC |
| | ) | |
| PAUL NUSBAUM, STEVE WHITE, and | ) | |
| JORGE A. PEREZ , | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

3

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PAUL NUSBAUM AND STEVE WHITE'S MOTION TO DISMISS

NOW COME Defendants Paul Nusbaum and Steve White, by and through counsel, and submit this memorandum of law in support of their motion to dismiss (the "Motion to Dismiss") the above-captioned adversary proceeding, as follows:

## INTRODUCTORY PARAGRAPH

The Complaints[1] contain many allegations that are simply false. Nusbaum and White vigorously dispute the light in which they have been painted by the Plaintiff's broad allegations. Many of the allegations are capable of being determined as false with only a brief investigation. For example, the Complaints allege that Nusbaum and White "were co-owners of HMC/CAH Consolidated, Inc.," and allege that "[t]hrough HMC/CAH, Defendants Nusbaum and White were in a position of superiority over, and exercised control over, the Debtor and its associated hospitals." *Complaints*, ¶¶ 19 and 20. However, Nusbaum and White have never held any ownership interest in HMC/CAH Consolidated, Inc. Similarly, Nusbaum and White

---

[1] The Plaintiff has filed adversary proceedings against Nusbaum and White in the cases of seven affiliated debtors: (i) CAH Acquisition Company #1, LLC, d/b/a Washington County Community Hospital ("CAH 1"), (ii) CAH Acquisition Company #2, LLC, d/b/a Oswego Community Hospital ("CAH 2"), (iii) CAH Acquisition Company # 3, LLC, d/b/a Horton Community Hospital ("CAH 3"), (iv) CAH Acquisition Company 6, LLC, d/b/a I-70 Hospital ("CAH 6"), (v) CAH Acquisition Company 7, LLC, d/b/a Prague Community Hospital ("CAH 7"), (vi) CAH Acquisition Company 12, LLC, d/b/a Fairfax Community Hospital ("CAH 12"), and (vii) CAH Acquisition Company 16, LLC d/b/a Haskell County Community Hospital ("CAH 16", and collectively, the "Debtors"). The paragraph numbering and the factual allegations in the complaints in each of these adversary proceedings are identical, with three exceptions. First, the caption at the top of each complaint is different for each Debtor. Second, the Debtor identified in paragraph 10 of each complaint is different. Third, the Plaintiff filed an amended complaint in CAH 1 to include a cause of action for unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1 *et seq.*, although there are no new or additional factual allegations related to this cause of action. Nusbaum and White have filed a motion to dismiss in each of these adversary proceedings. For the convenience of the Court and the parties, this memorandum of law addresses all the adversary proceedings together. As used herein, the word "Complaints" refers to all complaints in all seven cases, including the amended complaint filed in the case of CAH 1.

never received any transfers from the Debtors,[2] despite the Complaints' assertion of fraudulent transfer claims against them.  This could be easily discerned from the Debtors' bank records.  These are just two of the many instances in which the Complaints' allegations are simply untrue.  If the claims against Nusbaum and White were fully litigated on the merits, the evidence would show that Nusbaum and White are not liable for any of the claims asserted.  Nevertheless, for purposes of a motion to dismiss, this Court must treat all well-pleaded factual allegations as true.

The Complaints paint Nusbaum and White with broad, inflammatory, and disparaging language, alleging that they "pocketed . . . ill-gotten gains," "committed glaring, fundamental breaches of their most basic fiduciary duties," and accuses them of "callous greed."  However, after making these sweeping and conclusory assertions, the Complaints do not make specific factual allegations to back them up.

The Complaints do not plead sufficient factual detail to meet the Supreme Court's *Iqbal/Twombly* standard, and therefore all claims against Nusbaum and White should be dismissed.  Additionally, the Plaintiff has asserted claims (i) that were previously released under a Court-approved settlement agreement, (ii) that the Trustee lacks standing to pursue or are not recognized causes of action under applicable law, and (iii) that are barred by the relevant statute of limitations.

---

[2] It is conceivable that the Debtors may have paid a small travel expense reimbursement or similar small payment to Nusbaum or White that they have since forgotten.  However, there was no transfer of any significant amount by the Debtors to either Nusbaum or White.

For multiple reasons, as discussed herein, the Complaints fail to state any claim against Nusbaum or White for which relief can be granted, and therefore all claims against them should be dismissed under Fed. R. Civ. P. 12(b)(6).

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court held:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (internal citations omitted).

For purposes of the Motion to Dismiss, this Court must accept all well-pleaded facts as true, but not "bare assertions devoid of further factual enhancement." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). Additionally, the Court "need not accept the legal conclusions drawn from the facts, and [it] need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

Additionally, in considering the Motion to Dismiss, this Court may consider facts subject to judicial notice – including the matters reflected in the official docket

6

of the underlying bankruptcy case. *See, e.g., Anderson v. Kimberly-Clark Corp.,* 570 Fed. Appx. 927, 931 (Fed. Cir. 2014) ("In evaluating a Fed. R. Civ. P. 12(b)(6) motion, a court may rely on documents outside the pleadings if they are integral to the plaintiff's claims and their authenticity is not disputed.  The court may also rely on matters subject to judicial notice.")

## FACTUAL ALLEGATIONS OF THE COMPLAINTS

Under *Iqbal/Twombly* and their progeny, this Court must first parse the Complaints to separate factual allegations that are entitled to a presumption of truth from bare assertions devoid of further factual enhancement, which are not entitled to a presumption of truth. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir. 2009); *Angell v. BER Care, Inc. (In re Caremerica, Inc.),* 409 B.R. 737, 747 (Bankr. E.D.N.C. 2009).

Paragraphs 1-5 of the Complaints are summary allegations of the nature of the causes of action, not entitled to a presumption of truth.  Paragraphs 6-10 of the Complaints relate to jurisdiction, venue, and the authority of the Court to enter final judgment.

In the section of the Complaints entitled "Factual Background," paragraphs 21, 30, 31, 40, 51, and 55 are bare allegations devoid of factual enhancement that are not entitled to the presumption of truth under *Iqbal/Twombly.*[3]

---

[3] Paragraph 21 states "[t]hrough HMC/CAH, Defendants Nusbaum and White were in a position of superiority over, and exercised control over, the Debtor and its associated hospitals."  Paragraph 30 states "[u]pon information and belief, the Debtor was insolvent on the date that the Verifi Scheme began and remained insolvent from that date through the filing of these chapter 11 cases."  Paragraph 31 states "Defendants Nusbaum and White were the driving force behind the implementation of the Verifi Scheme at Washington.  Defendants Nusbaum and White used their control over Washington County Hospital and other related Hospitals, including Debtor I-70, to cause them to enter into

In the section of the Complaints that enumerate Counts I through VI, paragraphs 73, 77-88, 90-103, 105-116, 118-131, 135-139, 142, 144, 145, 146, 148, and 149 incorporate preceding paragraphs by reference, recite the elements of the causes of action asserted, make bare allegations devoid of factual enhancement, or are assertions of law, and are not entitled to the presumption of truth under *Iqbal/Twombly*. In the amended complaint filed in case of CAH 1, the additional paragraphs 150-154 do not plead any additional factual content and are merely recitations of the elements of the cause of action.

Additionally, many of the paragraphs throughout the Complaints are interspersed with conclusory legal terms or phrases such as "fraudulent," "scheme," "illicit," "ill-gotten," "improper," "co-conspirators," "accomplices," "conspired," "wrongfully," and "illegal." Under *Iqbal/Twombly,* these terms or phrases should be disregarded, and the Court should analyze the Complaints on their actual factual allegations.

The Complaints use the capitalized terms "Verifi Scheme," "Empower Scheme," and "Billing Schemes" to disguise the lack of specific factual allegations

---

arrangements with Verifi to process laboratory tests." Paragraph 40 states "Indeed, in an attempt to avoid heightened scrutiny, while at the same time lining their own pockets, Defendants Nusbaum and White had already conspired to use their control over the Debtors to place them into a new lab scheme that, in part, would allow Defendants Nusbaum and White and their accomplices to spread out the illicit billing among even more Hospitals, and thereby allay increasing suspicion." Paragraph 51 states: "The Empower Scheme, amazingly, was even worse for the Hospitals. At least under the Verifi Scheme, some revenue was running through the Debtor and its affiliated hospitals—though the vast majority was immediately transferred to Verifi and other scheme participants, like the Defendants." Paragraph 55 states: "In concert with the Empower Scheme, the Defendants, in their capacity as owners, managers, and/or controllers of the Debtor and its affiliated hospitals, approved this structure. In doing so, the Defendants approved tens of millions of dollars in distributions and transfers to Empower and other scheme participants."

regarding the laboratory billing that is alleged to have occurred.  The Complaints refer to these arrangements as "schemes" and conclude that they constituted "fraudulent billing" and "illegal fraud."  These legal conclusions are not entitled to the presumption of truth under *Iqbal/*Twombly.  As discussed below there is no allegation of any false representation made by the Debtors to any private insurer anywhere in the Complaints, or other facts that if true would show that the Debtors engaged in fraudulent laboratory billing.

The Complaints allege that Nusbaum and White were aware, before the arrangement with Verifi was initiated, that it constituted fraud.  They allege that Nusbaum and White were advised by legal counsel that "billing schemes, like the Verifi Scheme" violated state and federal law, and that they "rebuff[ed]" this guidance.  *Complaints*, ¶¶ 34-35.[4]  The Complaints do not identify the identity of such counsel, who the client(s) of such counsel were, the time such advice was given, or the actual content of such purported legal advice.  There is nothing else in the Complaints to support the general statement that "Nusbaum and White were aware . . . that [the arrangement with Verifi] constituted fraud."

Although a pleading of a defendant's knowledge is not subject to the heightened pleading standard under Rule 9, it nevertheless must be supported by

---

[4] Paragraph 36 also contains a parenthetical that states that "the money ended up in the pockets of Defendants Nusbaum and White and their co-conspirators" which is a bare factual statement devoid of further factual enhancement and is not entitled to the presumption of truth.  As discussed below, there are no factual allegations of any amounts of money received by Nusbaum or White, other than broad conclusory statements such as claims that the "money ended up in [their] pockets."

sufficient factual content to meet the requirements of Rule 8. As the Supreme Court noted in *Iqbal*:

> It is true that Rule 9(b) requires particularity when pleading "fraud or mistake," while allowing "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." But "generally" is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid--though still operative--strictures of Rule 8. And Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss.

*Ashcroft v. Iqbal*, 556 U.S. 662, 686-87 (2009). Therefore, the general allegation in Paragraph 34 that "Defendants Nusbaum and White were also well aware, prior to its inception, that the Verifi Scheme was not a legitimate method of generating revenue, but, instead, constituted illegal fraud," is not sufficient to survive a motion to dismiss. More factual content would be required to sufficiently plead Nusbaum or White's knowledge.

Another indicator of the Complaints' lack of factual content is the fact that they are filled with red herrings not relevant to the Debtors, such as (i) referring to a criminal indictment against Jorge Perez related to a hospital in Florida, initiated in June 2020, and (ii) attaching and referring heavily to a state auditor's report related to a hospital in Missouri, released in August 2017. Neither of these hospitals was one of the Debtors, and it is not alleged that Nusbaum or White had any connection to those hospitals whatsoever. These allegations could not even be relevant as

10

evidence of "red flags" that Nusbaum and White knew or should have known about, since they happened after Jorge Perez is alleged to have been granted complete control over the Debtors.

Similarly, the Complaints allege that Nusbaum and White "were actively pushing for the Debtors to engage in an additional lab scheme with Dr. Michael Murphy—the same Michael Murphy that orchestrated the lab scheme detailed in *UnitedHealthCare Insurance v. Michael Murphy, M.D. et al.,* Case No. 5:18-CV-347, filed in the United States District Court for the Western District of Texas." There are no specific allegations of what Nusbaum or White did to "push" for this. More importantly, there is no further allegation in the Complaints that the Debtors engaged in any actual transactions or dealings with Murphy. The Complaints also fail to mention, as reflected in the public record, that (i) the referenced litigation was dismissed with prejudice by UnitedHealthCare in April 2021, without any judgment or finding that any "lab scheme" or other wrongdoing had occurred, and (ii) the litigation was filed after companies owned by Murphy had already commenced a lawsuit in 2017 against UnitedHealthCare, which alleged that UnitedHealthCare had wrongfully failed to pay lab claims. *See Mission Toxicology, LLC et al v. UnitedHealthcare Insurance Company et al,* Case No. 5:17-cv-01016, Dkt. No. 1 (W.D. Tex. Oct. 10, 2017); *UnitedHealthCare Insurance v. Michael Murphy, M.D. et al.,* Case No. 5:18-CV-347, Dkt. No. 49 (W.D. Tex. Apr. 15, 2021). Thus, the reference to this litigation in the Complaints is not probative of any fact conceivably relevant to the asserted causes of action. The Complaints' heavy focus on allegations unrelated to

11

the Debtors suggests that they were included in an attempt to fill the vacuum left by

the lack of factual allegations relevant to the causes of action asserted.

## Summary of Factual Allegations

The factual allegations in the Complaints are summarized as follows:

- The Complaints allege that Nusbaum and White are citizens of West Virginia. *Complaints,* ¶ 11-12.

- They allege the Debtors operated for-profit critical access hospitals in small rural areas in North Carolina, Kansas, Missouri, and Oklahoma (the "Hospitals"). *Complaints,* ¶ *17.*

- They allege that the Debtors entered into contracts with private insurers, pursuant to which the Debtors' hospitals would be designated as "in-network" providers. *Complaints,* ¶ 18.

- The Complaints allege that Nusbaum and White were co-owners of HMC/CAH Consolidated, Inc. ("HMC/CAH"). *Complaints,* ¶ 19. They allege that HMC/CAH owned 100% of the membership interests in the Debtors, through March 29, 2017. *Complaints,* ¶¶ 20, 74.

- The Complaints allege that in late 2015 or in June 2016,[5] Nusbaum and White directed CAH 1 to enter into an arrangement with LGMG, LLC d/b/a Verifi Labs to increase the billings that the Debtors would generate from laboratory tests and recover higher "in-network" reimbursement rates. *Complaints,* ¶¶ 22 and 23. The Complaints allege that "Verifi would work with medical providers throughout the country to collect patient samples for urine analysis and blood testing," for patients that had not visited or received treatment at the Debtors' hospitals. *Complaints,* ¶ 24. They allege that after the tests were performed, reimbursement claims would be submitted under the Hospitals' billing credentials, allowing the Hospitals to claim reimbursement for the higher "in-network" rates afforded to critical access hospitals. *Complaints,* ¶¶ 25-26.

- They allege that the arrangement with Verifi dramatically increased the Hospitals' reimbursement claims and associated lab department revenues. *Complaints,* ¶¶ 27-29. The Complaints allege that most of the lab work associated with these revenues was performed by Verifi. *Complaints,* ¶ 30. They allege that Nusbaum and White were aware of the arrangement with

---

[5] Paragraph 22 indicates that "in or about late 2015, Defendants Nusbaum and White directed the Debtor and certain affiliated hospitals to enter into the first of two billing schemes," which the Complaints then define as the "Verifi Scheme." Paragraph 23 indicates that "in or around June 2016, Defendants Nusbaum and White directed Debtor Washington County Hospital to enter into an arrangement with a hospital laboratory management company, LGMG, LLC, d/b/a Verifi Labs ("Verifi").

Verifi, and that it would permit the Hospitals to seek higher "in-network" reimbursement rates. *Complaints, ¶ 31*.

- The Complaints allege that as the Hospitals' reimbursements "skyrocketed," private insurers began requiring additional documentation and review prior to approving laboratory testing claims, which is alleged to have impeded the Hospitals' day-to-day operations. *Complaints, ¶ 37*. The Complaints also allege that in September 2016, Nusbaum and White were "pushing" for the Debtor to enter into a laboratory billing arrangement with Dr. Michael Murphy, and that Murphy was sued in 2018 by a private insurer in an unrelated case, although there is no allegation that any transactions or dealings between the Debtors and Murphy actually occurred. *Complaints¸ ¶ 33*.

- The Complaints allege that Terry Amstutz, the CEO of CAH 1 (Washington County), wrote to Nusbaum and others, and indicated that Aetna would no longer reimburse the hospital for outreach labs performed by Verifi, and that Aetna said the lab claims were "improper" and "constitute[d] a pattern of abusive billing and [gave] rise to a reasonable suspicion of fraud." *Complaints, ¶ 38*. They allege that Nusbaum and White were concerned that the "illicit gains" were going to Verifi and James Shaffer, while the management fees owed to "Rural County [sic] Hospitals of America," an entity owned by Nusbaum and White, were not being paid. *Complaints, ¶ 39*.

- The Complaints allege that in late 2016, Nusbaum and White were "campaign[ing]" for the Debtors to switch from Verifi to EmpowerHMS, but that "co-owners of HMC/CAH" resisted.[6] *Complaints*, ¶ 41. It alleges that on March 5, 2017, White wrote an email to Kimberly Spies and Jim Shaffer of HMC/CAH, which stated:

> Verifi does not have the ability to provide the volume of specimens in order to expand the program to all of the HMC hospitals. More importantly, the future long term success of hospital outreach laboratory efforts will be assured if specimen collections are obtained from individuals who reside in the state where the hospitals are located or from individuals in adjacent states…[Empower] was one of only two companies that had the ability to send specimens to our hospitals from instate individuals and more importantly provided all lab testing/analysis of the specimens onsite at HMC hospitals to assure that the proposed effort is 100% compliant with all applicable federal, state and third party payer requirements.

---

[6] This paragraph uses conclusory language that they wanted to "utilize the Debtor (and other Hospitals) in a massive fraudulent billing scheme," which is not entitled to a presumption of truth under *Iqbal/Twombly*.

13

*Complaints*, ¶ 43.  The Complaints allege – without any further supporting allegations, and therefore insufficiently under *Iqbal/Twombly* – that White knew that his statement that the arrangement would be compliant with all applicable federal, state, and third-party payer requirements was untrue at the time he sent the email.  *Complaints*, ¶ 44.

- The Complaints allege that Nusbaum and White reiterated the statements contained in White's email at an HMC/CAH Board Meeting on March 6, 2017, which was attended by Defendant Perez.  *Complaints*, ¶ 46.  The Complaints allege that the HMC/CAH Board voted to take the Empower proposal under advisement for further due diligence.  *Complaints*, ¶ 47.

- The Complaints allege that Nusbaum and White provided written notice that Health Acquisition Company LLC ("HAC") was exercising its option to acquire 80% of the member/shareholder interests in the Debtors.  *Complaints*, ¶ 48. They allege that on March 29, 2017, Nusbaum and White executed a Conversion Agreement, whereby the Debtors' parent entity sold 80% of its ownership interests in the Debtors to HAC, in exchange for a release of outstanding debt owed to HAC under a prior loan agreement.  *Complaints, ¶ 49.*

- The Complaints allege that Nusbaum and White then sold 50% of HAC to Jorge Perez, Ricardo Perez, and Carlos Perez.  *Complaints*, ¶ 50.[7]  They allege that Nusbaum and White were 50% owners of HAC following March 29, 2017. *Complaints, ¶ 75.*

- The Complaints allege that on April 20, 2017, Nusbaum and White granted Perez the title of "Primary Manager of HAC."  They allege that on August 3, 2017, Nusbaum and White agreed that Jorge Perez would "be authorized to act on behalf of HAC and any/all of the individual hospital entities … on all matters relating to bank accounts and lending matters including relationships with all banks and government entities."

- They allege that that Empower H.I.S. "was granted complete control over the operations of each of the Hospitals, including control over their bank accounts, billing systems, and their rights to submit claims to insurance companies with which the Hospitals had in-network contracts."  *Complaints*, ¶ 52.  They allege that Perez remained in the role of Primary Manager of HAC at all relevant times. *Complaints*, ¶ 89.

- The Complaints allege that Nusbaum and White authorized Empower H.I.S. to install software at the Hospitals and third-party laboratories, which "enabled their laboratories to transmit patient billing information and

---

[7] This paragraph uses also contains a conclusory sentence that "Defendants Nusbaum and White used their control to bring in Defendant Perez, EmpowerHMS, and the Perez Group to implement the Empower Scheme," which is not entitled to a presumption of truth under *Iqbal/Twombly*.

associated data by wire to Empower in Miami, Florida, for the purpose of submitting insurance claims to insurers and other third-party payors." *Complaints*, ¶¶ 53 and 147.[8]

- The Complaints allege that the Debtors generated and submitted billings for laboratory testing to private insurers seeking reimbursement. *Complaints*, ¶¶ 131, 132, 140, and 141. They allege that the private insurers reimbursed the Debtors for these claims via electronic transfers, which can be identified by the specific source, specific amount, and specific destination. *Complaints*, ¶¶ 134 and 143.

- The Complaints allege that Empower[9] could "pick and choose which Debtor to utilize" to submit laboratory billings.[10] They allege that "rather than revenue initially running to the Hospitals that had any involvement in the related lab work," the money was placed into a central account maintained by EmpowerHMS. They allege that Jorge Perez caused Empower to make distributions from that account to himself and "its other owners as well as other entities and individuals involved." They allege that the majority of the revenue did not pass through the Debtors' financial records, and the Debtors only received what Perez and Empower "chose to share." *Complaints*, ¶ 54.[11]

- The Complaints allege that Nusbaum was involved in the Debtors' day-to-day operations and was a "Senior Leader of the Debtor and its affiliated hospitals' Operation Leadership and attended weekly meetings with Empower addressing financial decisions" and laboratory billing.[12] *Complaints*, ¶ 56. The Complaints allege that "Nusbaum served as a manager of the Debtor and the Hospitals from March 29, 2017 through at least June 2018." *Complaints*, ¶ 76.

- The Complaints allege that in August 2017, a Missouri State Auditor issued an audit report regarding Putnam County Hospital. The Complaints allege that this was not one of the Debtors' hospitals, but that Empower was involved

---

[8] Paragraph 147 also includes the conclusory allegations that Nusbaum and White "fail[ed] to ensure" that laboratory billing proceeds went to the Debtor and "fail[ed] to ensure" that laboratory billing reimbursements were reflected in the Debtors' books and records. These statements are devoid on any factual enhancement and not entitled to a presumption of truth. Paragraph 147 also alleges that "Nusbaum and White actively and substantially assisted Defendant Perez in his wrongful conversion." This is a bare recital of an element of the asserted cause of action and is not entitled to a presumption of truth.

[9] In many instances the Complaints use the term "Empower," which is an undefined term, and it is impossible to discern whether the allegation is intended to refer to EmpowerHMS or Empower H.I.S.

[10] The Complaints refer to them as "fraudulent laboratory billings." The term "fraudulent" is a legal conclusion not entitled to a presumption of truth under *Iqbal/Twombly*

[11] The bare allegation of distributions, without identifying transferor, transferee, date and amount, is not sufficient to meet the *Iqbal/Twombly* standard. *See Angell v. BER Care, Inc. (In re Caremerica, Inc.)*, 409 B.R. 737 (Bankr. E.D.N.C. 2009). However, this paragraph is likely a sufficient pleading for the factual allegation that laboratory billing revenue flowed through an account in the name of EmpowerHMS.

[12] This paragraph uses the conclusory term "scheme" which should be disregarded under *Iqbal/Twombly*.

15

with Putnam County Hospital.  A copy of the State Auditor's report is attached to the Complaint.  *Complaints*, ¶ 57.  The Complaints recite a statement from the auditor's report that the hospital had seen a "significant increase of questionable revenues from laboratory billings of health insurance companies" arising from "out-of-state patients for lab work not conducted in Putnam County."  *Complaints*, ¶ 58.  They recite a statement in the auditor's report that Putnam County Hospital officials "have not provided sufficient support to justify why such activity is being billed through the hospital."  They recite a statement in the auditor's report that one private insurance company was no longer paying claims for the hospital, and a statement that "[c]ontinued use of such questionable laboratory billings could leave the hospital at risk if such activity is deemed to be inappropriate by the insurance companies billed . . . ."  *Complaints*, ¶ 59.  The Complaints state that the auditor's report found that billings generated by Putnam County Hospital "exceeded $90 million between December 2016 and May 2017, as compared to $12.7 million for all of fiscal year 2015, and $7.5 million for all of fiscal year 2016."[13]  *Complaints,* ¶ 60.  The Complaints recite a statement in the auditor's report that 80% of the new revenues associated with the laboratory billings were disbursed to laboratory companies, the billing company, and out-of-state phlebotomists.  *Complaints*, ¶ 61.

- The Complaints allege that after the auditor's report related to Putnam County Hospital, private insurers filed lawsuits against the Debtors, seeking to recover amounts they had paid for claims.  *Complaints*, ¶ 62.  They allege that some private insurers terminated their relationships with the Debtors' hospitals, which deprived the hospitals of revenue.  They allege that in February 2018, Blue Cross Blue Shield of Oklahoma announced that four hospitals in Oklahoma associated with Empower would no longer be part of its network.  *Complaints*, ¶ 63.

- The Complaints allege that on June 17, 2020, Jorge Perez was indicted for claims of conspiracy, wire fraud, health care fraud, and money laundering, in a case captioned *United States v. Jorge Perez, et al., 3:20-cr-86 (M.D. Fla.),* related to a hospital in Florida.  *Complaints*, ¶ 64.

---

[13] The Complaints state that Putnam County Hospital was not one of the Debtors' hospitals.  The Complaints do not allege that Nusbaum or White had any involvement with, knowledge of, or connection to Putnam County Hospital.  Nusbaum and White are not alleged to have had knowledge of the auditor's report prior to it being released, and the auditor's report was released after Nusbaum and White are alleged to have given complete control over the Debtors' to Perez.  Therefore, the allegations related to an auditor's report regarding a completely different hospital than the Debtors' hospitals are not relevant to any of the causes of action against Nusbaum and White.  Nevertheless, they have been included so that all non-conclusory factual allegations in the Complaints have been fully recited herein.

16

- The Complaints allege that EmpowerHMS transferred funds to HAC and attach a listing of transfers in Exhibit B. *Complaints*, ¶ 104 and Exh. B. None of the transfers listed in Exhibit B reflect any transfer to Nusbaum or White.

- The Complaints allege that on February 19, 2019, three creditors filed an involuntary chapter 7 bankruptcy petition against CAH 1.[14] *Complaints*, ¶ 65. They allege that the case was converted to chapter 11 on March 15, 2019, and the Plaintiff was appointed as the Chapter 11 Trustee. *Complaints,* ¶ 66. They allege that in March and April of 2019, CAH 2, CAH 3, CAH 6, CAH 7, CAH 12, and CAH 16 filed voluntary chapter 11 bankruptcy petitions. *Complaints*, ¶ 67. They allege that on October 19, 2020, the case of CAH 6 was converted to chapter 7. *Complaints,* ¶ 68. They allege that on October 19, 2020, CAH 1's chapter 11 plan was confirmed, and that the effective date of the plan occurred on November 3, 2020. *Complaints,* ¶ 69. They allege that on December 7, 2020, the chapter 11 plans of CAH 2, CAH 3, CAH 7, CAH 12, and CAH 16 were confirmed, and the effective date of such plans converted the chapter 11 bankruptcy estates into litigation trusts. *Complaints,* ¶ 70. They allege that the confirmed plans vested the Plaintiff with authority to pursue all claims on behalf of the Debtors' estates. *Complaints,* ¶ 71.

- The Complaints allege that on January 5, 2021, this Court entered an order extending the time for Plaintiff to pursue claims on behalf of the Debtors to March 1, 2022. *Complaints,* ¶ 72.

## Specific Acts of Nusbaum or White Alleged

Therefore, the only specific acts of Nusbaum or White alleged in the Complaints, other than conclusory allegations such as the bare assertion that they "directed" the Debtor to enter into "billing schemes," are as follows: (i) White's email to Kimberly Spies and Jim Shaffer of HMC/CAH on March 5, 2017, (ii) participation in a presentation to the HMC/CAH board on March 6, 2017, which reiterated the statements in White's email, (iii) the sale of an 80% interest in the Debtors by HMC/CAH to HAC, in exchange for the release of debt owed to HAC, pursuant to a Conversion Agreement dated March 29, 2017, (iv) the sale by Nusbaum and White

---

[14] This paragraph also contains a sentence that "the Debtors' participation in the Billing Schemes doomed the Debtor and its affiliated hospitals' businesses," which is a conclusory statement not entitled to the presumption of truth under *Iqbal/Twombly*.

of 50% of HAC to Jorge Perez, Ricardo Perez, and Carlos Perez, on April 20, 2017, (v) the appointment of Jorge Perez as the primary manager of HAC, which gave Perez complete control over HAC and the Debtors, and (vi) Nusbaum attending weekly meetings that addressed the Debtors' financial decisions.  These are the only acts of Nusbaum or White that are alleged with sufficient factual content to meet the level required by *Iqbal/Twombly*.

## LEGAL ARGUMENT

I.   **All the Plaintiff's claims are insufficiently pled under the *Iqbal/Twombly* standard.**

Each of the Plaintiff's claims against Nusbaum and White fail to plead sufficient factual content to meet the standard established under *Iqbal/Twombly,* which is discussed above.

a.   **Counts III and IV (Fraudulent Transfer Claims) fail to identify any alleged transfers to Nusbaum or White.**

The Complaints assert fraudulent transfer claims under 11 U.S.C. § 548, and the state law equivalents pursuant to 11 U.S.C. § 544 and N.C. Gen. Stat. § 39-23.4 and §39-23.5.  The Complaints seek recovery of avoided transfers pursuant to 11 U.S.C. § 550.

In order to recover such claims from Nusbaum or White under §§ 544, 548, and/or 550, the Plaintiff must prove, *inter alia*, that (i) a transfer of an interest of the debtor in property was made, and (ii) Nusbaum or White were the initial transferee(s), or immediate or mediate transferee(s) of such transfer.  However, the Complaints do not allege any factual content showing that Nusbaum or White received any transfers.  Attached to each of the Complaints is a list of alleged

18

transfers to Health Acquisition Company LLC that occurred between January 1, 2018, through June 30, 2018.  No specific transfers to Nusbaum or White are alleged – either as initial transferee(s), or the immediate or mediate transferee(s) of such initial transferee(s).

Under *Iqbal/Twombly,* a plaintiff cannot assert a fraudulent transfer claim simply by alleging that a fraudulent transfer occurred.  The plaintiff must allege factual support for each of the components of the asserted claim.  In *Angell v. BER Care, Inc. (In re Caremerica, Inc.)*, 409 B.R. 737 (Bankr. E.D.N.C. 2009), a chapter 7 trustee filed a complaint seeking to recover certain "preferential and fraudulent transfers made by the debtors to BER Care, Inc. and subsequently transferred to the defendants," which "contained a list of each alleged transfer and included specific amounts, dates, check numbers, payee reference numbers, names of payees, account numbers and account names corresponding to each transfer." *Id.* at 744.  Various defendants, who were alleged to have been subsequent transferees of amounts that the debtor had transferred to BER Care, Inc., filed motions to dismiss, arguing that the complaint did not meet the *Iqbal/Twombly* standard.  Judge Leonard agreed, holding that the claims were not sufficiently pled because the complaint did not include "factual assertations other than dates, amounts and names of transferees." The Court held that in proving that a transfer of an interest of the debtor in property occurred, the plaintiff must "assert facts showing that the debtors had an interest in the property exchanging hands." *Id.* at 750.  It held that the complaint contained insufficient facts to show that the funds flowing through BER Care Inc. originated

with the debtors, and that the statement that the debtors transferred the money was a mere conclusory statement. The Court noted that the exhibit attached to the complaint "provides a list of the transferees, amounts, and dates of each transfer, but fails to indicate what entity initiated each transfer." *Id.* at 750-51. Judge Leonard further held that the complaint failed to identify "the consideration received by each transferor, information as to why the value of such consideration was less than the amount transferred, and facts supporting the debtors' insolvency at the time of the transfer." *Id.* at 756.

To properly allege a fraudulent transfer claim, the Plaintiff must identify each transfer by (i) the transferor, (ii) the transferee, (iii) the date of the transfer, and (iv) the amount to the transfer. *See, e.g., Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g, LLC),* 587 B.R. 445, 456 (Bankr. D. Del. 2018) ("complaints that identify the dates, amounts, source, and transferee of each of the alleged transfers successfully support claims of constructive fraudulent transfer under Fed. R. Civ. Pro. 8(a)(2)'s pleading standard"); *Reagor Auto Mall, Ltd. v. FirstCapital Bank of Tex., N.A. (In re Reagor-Dykes Motors, LP),* 2020 Bankr. LEXIS 2254, at *10 (Bankr. N.D. Tex. Aug. 24, 2020) (holding that "[e]ach transfer must be identified by date, the transferor, the transferee, and amount"); *Meininger v. Euram, LLC (In re Land Res., LLC),* 2011 Bankr. LEXIS 5491, at *14 (Bankr. M.D. Fla. 2011) (citing *Caremerica* and holding that a fraudulent transfer complaint must "at a minimum, identify the transferor and transferee, the date of the transfer, and the amount of the transfer"). Indeed, this requirement existed in the caselaw even before

20

*Iqbal / Twombly* established a higher pleading standard.  *See, e.g., Valley Media v. Borders (in Re Valley Media)*, 288 B.R. 189, 192 (Bankr. D. Del. 2003) ("the following information must be included in a complaint to avoid preferential transfers in order to survive a motion to dismiss . . . an identification of each alleged preference transfer by (i) date, (ii) name of debtor/ transferor, (iii) name of transferee and (iv) the amount of the transfer").

        In addition to factual allegations regarding the transferor, transferee, timing, and amount of transfers, a complaint to avoid a constructively fraudulent transfer must also include non-conclusory factual allegations regarding the adequacy of consideration and the solvency of the debtor at the time of the transfer.  *See, e.g., Cook v. Roberts (In re Yahweh Ctr., Inc.)*, 2019 Bankr. LEXIS 885 (Bankr. E.D.N.C. Mar. 22, 2019) (dismissing a complaint for avoidance of constructively fraudulent transfers, since it failed to include specific factual allegations regarding the adequacy of consideration).   In addition to factual allegations regarding the transferor, transferee, timing, and amount of transfers, a complaint seeking avoidance of an actual fraudulent transfer must contain specific factual allegations that the transfers were made with the actual intent to hinder, delay, or defraud.  A claim for avoidance of an actual fraudulent transfer is subject to the heightened pleading standard under Rule 9, and the allegations of intent must be supported by specific factual allegations – typically in the form of alleged "badges of fraud."  *See Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g, LLC)*, 587 B.R. 445, 459-61 (Bankr. D. Del. 2018).

In this case, the Complaints contain an exhibit identifying transfers of money to Health Acquisition Company (i.e., not Nusbaum or White, and not a defendant in this litigation). A portion of the alleged transfers are indicated as being made by CAH 12 and CAH 16 to Health Acquisition Company. The majority of the transfers in this exhibit reflect transfers made by "HMC/CAH Consolidated, Inc." or simply "HMC," which is not one of the Debtors, to Health Acquisition Company, which is not one of the Defendants.

There is no identification in the exhibit attached to the Complaints, or anywhere else in the Complaints, of any transfer of any interest in property from any Debtor to Nusbaum or White (either as an initial or subsequent transferee). There are no factual allegations of the amount of any transfer(s) Nusbaum or White purportedly received, the date or amount of any such transfer(s), or which Debtor such transfer(s) came from. Additionally, there are no factual allegations related to the adequacy of consideration exchanged for such transfer(s), the insolvency of each applicable Debtor at the time of such transfer(s), or factual allegations supporting the existence of an intent to hinder, delay, or defraud creditors.

With respect to Counts III and IV, the Plaintiff has done nothing other than attach a spreadsheet of alleged transfers between parties *other than Nusbaum and White* and made bare formulaic recitals of the elements of the claims. Therefore, the fraudulent transfer claims against Nusbaum and White should be dismissed, since they fail to meet the pleading standard required under *Iqbal/Twombly*. Counts III

and IV should be dismissed with respect to Nusbaum and White in all seven adversary proceedings.

**b. Count I (Breach of Fiduciary Duty) has not been sufficiently pled under *Iqbal/Twombly*.**

The U.S. Bankruptcy Court for the District of Delaware described the "three ways fiduciary duties [to an LLC] can be established" as follows:

> Primarily, fiduciary duties in LLCs are governed by the limited liability company agreement. In the absence of an LLC agreement or where the LLC agreement is silent, the Delaware Chancery Court has found consistently a default rule that the manager or director of the LLC owes fiduciary duties to fellow LLC members and the LLC. Finally, in rare and highly fact-specific instances, a fiduciary duty of loyalty has been found if the defendant had actual control over an LLC which control was not granted under the LLC agreement. "'[T]he bare conclusory allegation that a [defendant] possessed control is insufficient. Rather, the Complaint must contain well-pled facts' showing that the alleged controller 'exercised actual domination and control' over the subject entity or its directors...."

*Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g, LLC),* 587 B.R. 445, 467 (Bankr. D. Del. 2018) (internal citations and footnotes omitted).

In order to allege that a fiduciary duty was breached, the complaint must include "(1) the 'specific facts as to which transactions a particular defendant authorized... (2) what authority a particular defendant had to approve such transactions' and (3) the Trustee must not lump defendants together 'without supplying specific facts as to each defendant's wrongdoings.'" *Id.*

In *Pennysaver,* a chapter 7 trustee of certain affiliated debtors that were Delaware LLCs alleged breach of fiduciary duty claims against multiple defendants.

23

An entity called PennySaver Investors LLC was the owner of the Debtors, and that LLC was owned and controlled by OpenGate Capital Group LLC and OpenGate Capital Management LLC.  The complaint referred to these three LLCs collectively as "OpenGate."  The trustee brought breach of fiduciary actions against individual defendants associated with OpenGate, alleging that they controlled the Debtors and breached their fiduciary duties by directing fraudulent transfers in a "coordinated effort to drain the Debtors of their cash."  *Id.* at 450-52.

The court held that the claims were inadequately pled because (i) the complaint lumped defendants together, (ii) the complaint identified positions that the defendants held at the companies that owned and managed the debtors, but failed to sufficiently identify the positions the defendants held with the debtors, (iii) the complaint did not "specify which transfer any particular defendant authorized," and (iv) the complaint did not "specify under what authority within the Debtors' LLCs the Defendant acted to authorize the allegedly fraudulent transfers."  *Id.* at 466. Additionally, the Court held that "allegations that the Defendants helped facilitate allegedly fraudulent transfers and benefited from one such transfer alone are insufficient to show that the Defendants exercised actual control over any of the Debtors' LLCs." *Id.*  For these reasons, the Court held that the breach of fiduciary claims had been inadequately pled under *Iqbal/Twombly*.

As was the case in *Pennysaver,* the Complaints in this case (i) lump defendants together, (ii) do not identify what specific transfers or other acts were authorized by

24

Nusbaum or White, and (iii) do not identify Nusbaum or White's specific role and authority to authorize such acts at the time they were taken.

> ### i.   The Complaints do not plead adequate facts to establish the existence of a fiduciary duty of either White or Nusbaum.

The Complaints do not contain allegations regarding the existence or contents of the Debtors' LLC agreements.   Thus, there are no allegations regarding the primary method of establishing the existence of a fiduciary duty to an LLC, as described in *Pennysaver*.

The Complaints do not allege that Nusbaum or White were members of the Debtors.   They allege that Nusbaum and White were owners of HMC/CAH Consolidated, Inc., which owned the Debtor until March 29, 2017.[15] *Complaints*, ¶¶ 19-20,74.   Paragraph 75 alleges that HAC owned the Debtor following March 29, 2017, although paragraph 48 alleges that HAC purchased 80% of the Debtor (i.e., not 100% as would appear to be implied by paragraph 75). *Complaints*, ¶¶ 48 and 75. The Complaints allege that Nusbaum and White owned 50% of HAC.   It does not allege what portion of the 50% figure is alleged to have been owned by Nusbaum and what portion is alleged to have been owned by White.

Nowhere in the Complaints is there any allegation that White – at any point in time – was either a member, manager, employee, officer, or director of any of the Debtors.   Instead, the Complaints rely on the formulaic, conclusory allegation that

---

[15] This allegation is an example of one of the many allegations in the Complaints that are simply incorrect, and capable of being discerned as incorrect with minimal investigation.   Neither Nusbaum nor White ever held any ownership interest in HMC/CAH Consolidated, Inc.   Nevertheless, this allegation must be accepted as true for purposes of this Motion to Dismiss.

White was "in a position of superiority over, and exercised control over the Debtor and its associated hospitals." This is a conclusory statement of the elements of a claim, and not sufficient to survive a motion to dismiss under *Iqbal/Twombly*. Therefore, the Complaints do not include specific factual allegations to establish that White held any fiduciary duty to any of the Debtors and Count I should be dismissed with respect to him.

The Complaints allege that, after Empower took over management of the Debtor, that "Nusbaum acted as a Senior Leader of the Debtor and its affiliated hospitals' Operation Leadership." *Complaints, ¶ 56.* The Complaints do not identify what duties or authority were associated with this alleged role. The Complaints alleges that "Nusbaum served as a manager of the Debtor and the Hospitals from March 29, 2017 through at least June 2018." *Complaints, ¶ 76.* However, the Complaints also allege that Perez and Empower were "granted complete control over the operations of each of the Hospitals, including control over their bank accounts, billing systems, and their rights to submit claims to insurance companies with which the Hospitals had in-network contracts." *Complaints*, ¶ 52.

There are no factual allegations of Nusbaum's role and responsibilities other than the use of the terms "Senior Leader" and "manager." Generally, one would infer from the term "manager" that it would be a position of control, with authority to take actions on behalf of the Debtor. However, the Complaints also allege that Perez was appointed as the Primary Manager of HAC and Empower was "granted complete control over the operations of each of the Hospitals, including control over their bank

accounts, billing systems, and their rights to submit claims to insurance companies with which the Hospitals had in-network contracts." *Complaints*, ¶ 52.  Thus, the mere reference to Nusbaum as a "manager" is insufficient to establish that Nusbaum had authority to control the Debtors' billing practices or any other aspect of the Debtors' operations.  There are no allegations to establish that Nusbaum had any authority to terminate Perez and Empower from their position of management and "complete control" of the Debtors.  There are no allegations to establish that Nusbaum had authority to implement or make changes to the Debtors' laboratory billing practices.  There are no allegations to establish that Nusbaum had authority to implement or make changes to the Debtors' accounting or cash management practices.  Indeed, the allegations in the Complaints appear to support a conclusion that Nusbaum lacked authority or control over the Debtors, since they allege that complete control over the Debtors was conferred upon Perez and Empower. Therefore, the factual allegations in the Complaints are insufficient to plead the existence of a fiduciary duty.

ii.   **The Complaints do not allege sufficient facts to show that fraudulent laboratory billing occurred.**

The Complaints allege that the Debtors entered into arrangements with third-party laboratory testing companies, which obtained samples from patients that had not received treatment at or visited the Debtors' hospitals.  They allege that the Debtors entered into contracts with private insurers.  They allege that the Debtors submitted claims for reimbursement to the private insurers under the Debtors' billing credentials, which allowed the Debtors' to claim reimbursement for "in-network"

27

services at higher rates. They allege that the arrangements with the third-party laboratory testing companies enabled the Debtors' to increase their revenues. The Complaints allege that these actions constituted "fraudulent laboratory billings" by the Debtors on the private insurance companies.

The Complaints do not plead the alleged fraudulent billing with particularity, which is required in order to allege fraud under Fed. R. Civ. P. 9(b). The applicable state law to determine whether each Debtor defrauded private insurance companies will vary based upon the principal place of business for each Debtor and the applicable state law governing the contracts with the private insurance companies. However, the elements of fraud are similar throughout the United States and consist of: "(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages." *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 218 (4th Cir. 2007).

In a recent arbitration award rendered by a former Justice of the Supreme Court of Texas, laboratory billing practices similar to what is described in the Complaints were found to be legal, and Blue Cross Blue Shield ("BCBS") was determined to be liable for damages, penalties, and attorney's fees for its failure to pay for laboratory billings, improperly recouping laboratory billings, and for violating Texas prompt payment laws. A copy of this arbitration award is submitted herewith as Exhibit 1 (the "*Little River* Opinion"). In that case, a struggling critical access hospital located in Texas implemented an aggressive strategy to increase revenues

28

through the use of third-party laboratories.  *Little River Opinion*, ¶¶ 15-18.  After receiving complaints concerning the hospital's billing practices, including complaints that the patients "had never been to the hospital," BCBS placed the hospital on a pre-payment review and initiated an investigation into the hospital's laboratory services. *Id.* at ¶ 19.  Payment issues ensued, which led to cash flow problems and the filing of a chapter 11 bankruptcy case, which was subsequently converted to chapter 7.[16]  *Id. at* ¶ 21.  BCBS alleged that the hospital had engaged in fraudulent billing practices because it submitted bills for services provided by third-party laboratories to non-patients that had not received any services from the hospital.  *Id.* ¶¶ 22, 40, 44, and 46.  The hospital, through its chapter 7 bankruptcy trustee, alleged that these billings were permissible under the applicable contracts with private insurers, and that BCBS was liable for its improper nonpayment and recoupment of such claims.  *Id.* at ¶ 22.  The arbitrator agreed, finding that no fraudulent billing had occurred, and awarding damages, penalties, and attorney's fees in favor of the critical access hospital.  *Id.* at ¶ 136.

The Complaints assert that the Debtors submitted laboratory billings for patients that never were present in the Hospitals, and makes a giant presumption from this fact that the laboratory billings were therefore fraudulent.  However, as noted in the *Little River* Opinion, CMS regulations provide that, for dates of service on or after July 1, 2009, "an individual is no longer required to be physically present

---

[16] A review of the docket reveals that the bankruptcy court entered an order granting stay relief so that the arbitration could proceed.  *In re Little River Healthcare Holdings, LLC, et al.,* Case No. 18-60526-RBK (Bankr. W.D. Tex. 2018).

at the CAH at the time the specimen is collected." As the *Little River* Opinion noted, "CMS defines a 'nonpatient' as a person with whom the CAH has no direct interaction, that is, the patient is not on the CAH campus and a CAH employee does not collect the patient's laboratory specimen." *Little River* Opinion, ¶ 77 (internal citations omitted). It noted that CMS permits billing for laboratory tests provided to "non-patients" and that such individuals were considered "outpatients" under CMS regulations. *Id.* These CMS regulations, *inter alia,* provided support for the arbitrator's ultimate conclusion that an outreach laboratory billing program similar to what is described in the Complaints was not fraudulent billing, and that billing for "non-patients" was permissible outpatient billing under the private insurance contracts. The arbitrator awarded damages, interest, penalties, and attorneys' fees in favor of Little River's bankruptcy estate and against the private insurer for failure to pay.[17]

Count I is a breach of fiduciary duty claim, based upon an allegation that Nusbaum and White caused the Debtors to submit fraudulent billings to private insurers. In order to grant relief on this cause of action, this Court would need to find that fraudulent billing actually occurred. However, the Complaints do not include any allegation that the laboratory billings contained false information that was relied upon by private insurers. The Complaints do not even contain factual allegations to

---

[17] There were millions of dollars of accounts receivable reflected in the Debtors' schedules. Upon information and belief, no or minimal attempt has been made in the bankruptcy cases to collect accounts receivable owed to the Debtors by private insurers. The substantial recovery obtained by the bankruptcy trustee in the *Little River* case suggests that an endeavor to recover these accounts receivable may be worthwhile.

show that the alleged laboratory billings violated the terms of the Debtors' contracts with private insurers (which by itself would not constitute fraud, merely breach of contract).   Since the Complaints do not allege facts to show that "fraudulent laboratory billing" occurred, the basic factual predicate of the Plaintiff's claim has not been adequately plead.   Therefore, Count I of the Complaints is not an adequately pled claim for relief and should be dismissed.

> ### iii.   The Complaints do not plead facts to establish the specific acts that Nusbaum or White authorized, or the authority they had to approve such acts.

In order to adequately plead a claim that a fiduciary duty was breached, the complaint must include "(1) the 'specific facts as to which transactions a particular defendant authorized... (2) what authority a particular defendant had to approve such transactions' and (3) the Trustee must not lump defendants together 'without supplying specific facts as to each defendant's wrongdoings.'" *Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g, LLC),* 587 B.R. 445, 467 (Bankr. D. Del. 2018).   The Complaints do not satisfy this standard.

The Complaints make numerous conclusory and unspecific allegations, such as the assertion that "Nusbaum and White directed the Debtor and certain affiliated hospitals to enter into . . . billing schemes," and that they "[c]aused or permitted the Debtor to make exorbitant distributions and/or dividends." *Complaints, ¶ 22.*   All the transfers specifically alleged in the Complaints, which are set forth in Exhibit B to the Complaints, are alleged to have been made by EmpowerEMS. *Complaints, ¶* 104. Like the claims that were dismissed in *Pennysaver*, the Plaintiff's allegations lump

the defendants together, and do not identify any specific transfers Nusbaum or White are alleged to have made (let alone in what capacity they were made).

The only specific acts of Nusbaum or White alleged in the Complaints are described and discussed in turn below.

The Complaints allege that on March 5, 2017, White wrote an email to Kimberly Spies and Jim Shaffer of HMC/CAH, which stated that "[Empower] was one of only two companies that had the ability to send specimens to our hospitals from instate individuals and more importantly provided all lab testing/analysis of the specimens onsite at HMC hospitals to assure that the proposed effort is 100% compliant with all applicable federal, state and third party payer requirements." *Complaints,* ¶ 43. Nothing in the email communication alleged in the Complaints reflects that White's email was an authorization or direction for the Debtors to do anything. Encouraging or recommending an act is a far cry from being in a position of authority and directing an act to be taken. As discussed above, there is no allegation that White was ever a member, manager, employee, officer, or director of any Debtor.

The Complaints allege that on March 6, 2017, Nusbaum and White made a presentation at an HMC/CAH Board Meeting, which was attended by Perez, where they reiterated the statements in the March 5, 2017 email. *Complaints,* ¶ *46.* The Complaints do not allege that Nusbaum and White were attending the meeting as directors of the HMC/CAH board, or that they had any authority to vote on the proposal. More importantly, the Complaints allege that the board took no action on

32

the proposal and voted to take the proposed laboratory testing program under advisement. *Complaints,* ¶ 47. There is nothing in this allegation that identifies that Nusbaum or White authorized or directed any action of the Debtor. In any event, the Complaints allege that no action was taken in response to the proposal made at the meeting.

The Complaints alleges that HAC exercised an option to acquire 80% of the membership interests in the Debtors, and that on March 29, 2017, Nusbaum and White executed a Conversion Agreement whereby HMC/CAH sold 80% of its ownership interests in the Debtors to HAC in exchange for a release of outstanding debt owed to HAC. *Complaints,* ¶¶ 48 and 49. The conversion of debt to equity by HAC is not a direction or authorization for the Debtors to take any action. It is not alleged that the Debtors were even parties to the Conversion Agreement.

The Complaints allege that Nusbaum and White sold 50% of HAC to Jorge Perez, Ricardo Perez, and Carlos Perez. *Complaints,* ¶ 50. The sale of an interest in a non-debtor entity is not a direction or authorization for the Debtors to take any action. It is not alleged that the Debtors were parties to this sale.

The Complaints allege that on April 20, 2017, Nusbaum and White bestowed Perez with the title of "Primary Manager" of HAC. They allege that Nusbaum signed corporate minutes of HAC on August 3, 2017, which stated that Perez would "be authorized to act on behalf of HAC and any/all of the individual hospital entities … on all matters relating to bank accounts and lending matters including relationships with all banks and government entities." *Complaints,* ¶ 52. The appointment of

33

Perez as manager of HAC (a non-debtor entity) and agreeing that Perez would be authorized to act on behalf of HAC and the Debtors is not a direction or authorization for the Debtors to take any action.

The Complaints allege that Nusbaum attended weekly meetings with Empower that addressed financial decisions of the Debtors.  *Complaints,* ¶ 56.  It does not allege any specific transfers or acts that were authorized by Nusbaum.  An allegation that Nusbaum attended meetings that addressed financial decisions, without more, is insufficient to allege a breach of fiduciary duty.

Therefore, there are no allegations in the Complaints, with the level of specificity required by *Iqbal/Twombly*, to establish that a breach of fiduciary duty occurred, even assuming *arguendo* that the existence of a fiduciary duty had been adequately pled.

> iv.   **Assuming *arguendo* that fiduciary duties existed, the Complaints do not plead facts showing that Nusbaum or White knew they were acting in a manner inconsistent with their fiduciary duties.**

Assuming *arguendo* that the existence of a fiduciary duty was sufficiently pled, the Complaints do not sufficiently allege the breach of the duty of care.

In order to prevail on a claim of lack of oversight, the plaintiff must "pro[ve] that a director acted inconsistent with his fiduciary duties, and most importantly, that the director *knew* that he was so acting."  *Id.* (quoting *In re Massey Energy Co.*, 2011 Del. Ch. LEXIS 83 (Del. Ch. May 31, 2011)).  "In other words, a plaintiff must allege that 'a director knowingly violated a fiduciary duty or failed to act in violation

34

of a known duty to act, demonstrating a conscious disregard for her duties.'"  *Id.* (quoting *In re Citigroup Shareholder Deriv. Litig.,* 964 A.2d 106, 125 (Del. Ch. 2009)).

Under Delaware's business judgment rule, there is a presumption that business decisions were made "on an informed basis, in good faith and in the honest belief that the action the action taken was in the best interests of the company." *See, e.g., Gantler v. Stephens,* 965 A.2d 695, 705-06 (Del. 2009).  "Delaware's courts have held unambiguously that *the plaintiff* bears the burden of proof to rebut the business judgment rule's presumption." *Reed v. Linehan (In re Soporex, Inc.),* 463 B.R. 344 (Bankr. N.D. Tex. 2011) (emphasis in original).  The plaintiff must rebut the presumption with factual pleadings in the complaint itself. *Id.*

As discussed above, the Supreme Court held in *Iqbal* that allegations of knowledge are not exempt from the requirements of Rule 8. *Ashcroft v. Iqbal*, 556 U.S. 662, 686-87 (2009).  In order to survive a motion to dismiss, the Plaintiff must plead – for each of Nusbaum and White – factual content to rebut the business judgment rule's presumption.  The Complaints in this case do not do that.

> ### v.    With respect to the claim for the breach of duty of loyalty, the Complaints do not identify any personal benefit received by Nusbaum or White.

"The duty of loyalty 'mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.'" *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).  "To state a legally sufficient claim for breach of the duty of loyalty, plaintiffs must allege facts showing that a self-

interested transaction occurred, and that the transaction was unfair to the plaintiffs." *Joyce Cuccia*, 1997 Del. Ch. LEXIS 71 (Del. Ch. May 14, 1997).

The Complaints contain conclusory allegations that Nusbaum and White engaged in a self-interested transaction but do not contain any specific allegations of any personal benefit they received. It does not allege any money or other benefit received by Nusbaum or White from the alleged "Billing Schemes," other than by making broad conclusory statements. Therefore, the claim for breach of the duty of loyalty should be dismissed.

### c. Count IV (Aiding and Abetting Conversion), even if it were a valid cause of action, has not been sufficiently pled under *Iqbal/Twombly*.

Aiding and abetting conversion is not a recognized cause of action in most jurisdictions, including North Carolina. The validity of the cause of action in these cases is discussed below. However, even assuming *arguendo* that the cause of action is valid, it has not been sufficiently plead under *Iqbal/Twombly*.

In the few states where the cause of action is recognized, such as New York, the elements are recited as follows: "(1) the existence of a [conversion] committed by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in achievement of the violation." *Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2006 U.S. Dist. LEXIS 7761, at *17 (S.D.N.Y. Feb. 15, 2006). The alleged aider and abettor must have "culpable knowledge that such funds did not belong to [the converter]," and "must 'know of [the converter's] intention to convert the funds." *Id.* Constructive knowledge is not recognized – the aider and

36

abettor must have actual knowledge. *Id.* In *Dangerfield*, the court dismissed a claim for aiding and abetting conversion due to lack of evidence that the alleged aider and abettor had actual knowledge of any conversion. *Id.*

A cause of action for conversion of money, as is alleged in the Complaints, is not recognized in all jurisdictions. *See., e.g., Commerce Nat. Ins. Servs., Inc. v. Buchler,* 2003 U.S. Dist. LEXIS 22429 ("No Delaware court has 'recognized a cause of action for conversion of money, as opposed to goods.'"). Conversion of money is a recognized cause of action in North Carolina, but only if the money can be traced and is separately identifiable. *Cananwill, Inc. v. Emar Grp., Inc.*, 250 B.R. 533 (M.D.N.C. 1999). In this case, the underlying cause of action for conversion by Perez (Count V) has not been adequately pled because it does not identify the specific funds of each Debtor that are alleged to have been converted, let alone plead the factual allegations to show that the allegedly converted funds can be traced and are separately identifiable. The Complaints allege that (i) "the Debtor had immediate ownership and right of possession of the money private insurers paid to Empower," (ii) that Perez caused that money to be deposited into a central fund controlled by Empower, and (iii) that Perez converted those funds by causing Empower to distribute the money to himself and the other owners of Empower. *Complaints,* ¶¶ 133-36. Much like the fraudulent transfer claims, these bare allegations are insufficient. The Complaints must allege factual content in support of the alleged conversion, such as the timing and amounts of the money allegedly converted.

Moreover, even if the underlying claim for conversion was sufficiently pled, the Complaints have not pled any facts to sufficiently allege that Nusbaum or White had actual knowledge of any conversion of funds, let alone that they provided "substantial assistance."  A bare recital alleging knowledge is insufficient without more factual content.  Paragraph 147 alleges that Nusbaum and White "failed to ensure that funds . . . went to the Debtors," and authorized Empower H.I.S. to install software that allowed transmittal of billing information.  Even if true, "failing to ensure" that an act does not occur is not substantial assistance in that act.  Even if Nusbaum and White knew or authorized software to be installed that allowed Empower to access billing information, it would certainly be a far cry from substantial assistance in any conversion.  It would be normal for the management of a hospital to have access to the hospital's billing information.  Why would Nusbaum or White have cause for concern even if they knew that Empower had access to such information?  Nevertheless, knowledge or authorization of such software would not establish knowledge that any funds were being converted, let alone substantial assistance in any conversion that may have occurred.

Therefore, even if aiding and abetting conversion was a valid cause of action under the applicable state law in these cases, the Complaints have not pled sufficient factual content to support the claim.

### d. Count VII in the case of CAH 1 (Unfair and Deceptive Trade Practices) has not been sufficiently pled under *Iqbal/Twombly*.

As discussed below, the North Carolina Supreme Court has held that the N.C. Gen. Stat. § 75-1.1, *et seq.* (the "UDTP Act") does not apply to internal business

38

matters, such as situations involving breach of fiduciary duty. Under the applicable
caselaw, the UDTP Act does not apply in this case, since the allegations in the
Complaints establish that Nusbaum and White's alleged acts were not "in or affecting
commerce," even if true. This is discussed in greater detail below.

However, even if the UDTP Act applied, the Complaints do not allege sufficient
factual detail of what Nusbaum or White did that was unfair or deceptive to the
Debtors. As discussed in section I.b.iii above, the sole acts of Nusbaum or White that
are pled with factual detail in the Complaints consist of (i) White's email to Kimberly
Spies and Jim Shaffer of HMC/CAH, (ii) a presentation to the HMC/CAH board, (iii)
the sale of an 80% interest in the Debtors by HMC/CAH to HAC, in exchange for the
release of debt owed to HAC, (iv) the sale by Nusbaum and White of 50% of HAC to
Perez, (v) the appointment of Perez as the primary manager of HAC, which gave
Perez complete control over HAC and the Debtors, and (vi) Nusbaum attending
weekly meetings that addressed the Debtors' financial decisions. None of these
allegations are sufficient to plead the factual content required by *Iqbal/Twombly*.

## II.    All the Plaintiff's claims were released under the terms of the court-approved settlement in the cases of CAH 2, 3, 7, 12, and 16.

On October 28, 2020, this Court entered an *Order Granting Motion to Approve
Compromise and Settlement Pursuant to Fed. R. Bankr. P. 9019*, in the cases of CAH
2, CAH 3, CAH 7, CAH 12, and CAH 16. *See* Case No. 19-01230, Doc. No. 491; Case
No. 19-01180, Doc. No. 549; Case No. 19-01298, Doc. No. 778; Case No. 19-01697, Doc.
No. 734; and Case No. 19-01227, Doc. No. 686 (collectively, the "Settlement Orders").
Each of the of the Settlement Orders was substantially identical, and approved a

certain settlement agreement between Nusbaum, White, the Trustee, and two other parties (the "Settlement Agreement"). A copy of the Settlement Agreement is attached to the Settlement Orders. The Settlement Agreement was also incorporated by reference into the confirmed plans in the cases of CAH 2, CAH 3, CAH 7, CAH 12, and CAH 16. As discussed above, the Court may take judicial notice of the court-approved settlement in the underlying bankruptcy cases for purposes of considering a motion to dismiss.

Section 6(a) of the Settlement Agreement provides:

> Effective upon the Settlement Effective Date, each Party shall be deemed to have released each other Party (together with such other Party's officers, agents, attorneys, employees, members, shareholders, heirs, executors, administrators, successors, and assigns and, in the case of the Trustee, each of the estates of the Debtors) from any and all liabilities, claims, actions, and causes of action that such Party may have against any other Party and that arise out of or relate to any Party's claims against, liens upon assets of, or payments to such Party by any of the Debtors; provided, however, that the foregoing release shall not operate to release (i) any Party from such Party's liabilities and obligations under the Settlement Agreement; (ii) any Party from a cause of action for fraud by the Trustee based upon a Party's active knowledge, assistance, and/or participation in any fraudulent billing scheme engaged in by the Debtors pre-petition; or (iii) N/W from any claim that CBSG may have to a security interest in any promissory note that N/W (or any affiliate of N/W) may have obtained directly or indirectly from HAC, other than the Gemino Note. The Trustee represents to each of the other Parties that, as of the date of this Settlement Term Sheet, the Trustee is not aware of any other Party's knowledge of, assistance with, and/or participation in any fraudulent billing scheme engaged in by any Debtor; and the Trustee further represents that any potential claim for

40

any such possible misconduct is being preserved solely because the Trustee has not completed his investigation, through counsel retained by him, of the relevant facts and circumstances.

Section 6(b) of the Settlement Agreement provides:

Each Party will be deemed to have covenanted and agreed, effective on the Settlement Effective Date, not to file or continue to pursue any action, suit or other proceeding against another Party or against HAC or any member or manager of HAC in his capacity as such, with the sole exception of (i) any action, suit or other proceeding to enforce the terms of the Settlement Agreement or (ii) a cause of action for fraud by the Trustee based upon a Party's active knowledge, assistance, and/or participation in any fraudulent billing scheme engaged in by the Debtors pre-petition.

Therefore, the Trustee released any and all claims or causes of action against Nusbaum or White, and covenanted not to sue with respect to any and all claims or causes of action against Nusbaum or White, with the sole exception of an action to enforce the terms of the Settlement Agreement, or "cause of action for fraud by the Trustee based upon a Party's active knowledge, assistance, and/or participation in any fraudulent billing scheme engaged in by the Debtors pre-petition."

None of the causes of action asserted in the Complaints is a cause of action for fraud. A cause of action for fraud consists of the following elements: "(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages." *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 218 (4th Cir. 2007).

The causes of action asserted against Nusbaum and White in the Complaints (and the amended complaint in CAH 1) are (i) breach of fiduciary duty, (ii)

41

constructive fraudulent transfer, (iii) actual fraudulent transfer, (iv) aiding and abetting conversion and (vi) unfair and deceptive trade practices. None of these is a cause of action for fraud.

The Trustee may argue that an actual fraudulent transfer claim is a claim for "fraud." However, the Complaints do not allege any false representation made by Nusbaum or White to any Debtor, nor any reliance by any Debtor on such false representation. Therefore, it is not a claim for fraud.

All of these claims were released, and the Trustee covenanted not to sue with respect to these claims, in the cases of CAH 2, CAH 3, CAH 7, CAH 12, and CAH 16. Therefore, the Complaints in each of those cases should be dismissed, since the causes of action were released under the terms of the settlement previously approved by this Court.

### III.   Count VI (Aiding and Abetting Conversion) is not a recognized cause of action in North Carolina, Kansas, Missouri, or Oklahoma.

Since aiding and abetting conversion is a tort claim, the law of the state where the injury occurred will apply. A claim for "aiding and abetting conversion" has been recognized as a valid cause of action in some states, but not in others. *See, e.g., NC & VA Warranty Co. v. Fid. Bank (In re NC & VA Warranty Co.)*, 554 B.R. 110, 130 (Bankr. M.D.N.C. 2016) (dismissing a claim for aiding and abetting conversion, because it was not a recognized cause of action under Ohio law).

The Complaints do not identify the principal place of business of the Debtors, but that information is available in the public record in the underlying bankruptcy cases. CAH 1 was located in North Carolina. CAH 2 was located in Kansas. CAH 3

and CAH 6 were located in Missouri.  CAH 7, CAH 12, and CAH 16 were located in Oklahoma.

A Lexis search for "aiding and abetting conversion" yielded no instance of a North Carolina, Kansas, or Missouri state court using that phrase.  A Lexis search for "aiding and abetting conversion" yielded one instance of an Oklahoma state court using that phrase to recite a claim that was alleged, although there was no discussion of the viability of the cause of action.  *See Raven Res., L.L.C. v. Legacy Bank*, 229 P.3d 1273 (Okla. Civ. App. 2009).

North Carolina courts have specifically rejected the existence of a cause of action for "aiding and abetting fraud."  *Sompo Japan Ins., Inc. v. Deloitte & Touche, LLP*, 2005 NCBC 2 (N.C. Bus. Ct. 2005) (holding that "North Carolina courts would not recognize a claim for aiding and abetting fraud").  North Carolina courts have not recognized the existence of a cause of action for "aiding and abetting breach of fiduciary duty," and a Federal district court has rejected the validity of the cause of action outright.  *See, e.g., Laws v. Priority Tr. Servs. of N.C., LLC,* 610 F. Supp. 2d 528, 532 (W.D.N.C. 2009) ("no such cause of action exists in North Carolina"); *Bell v. Kaplan*, 2016 U.S. Dist. LEXIS 24408, *14-15 (W.D.N.C. Feb. 29, 2016) ("North Carolina has never recognized this cause of action."); *Bottom v. Bailey*, 238 N.C. App. 202, 211-12, 767 S.E.2d 883, 889 (N.C. Ct. App. 2014)) ("The validity of an aiding and abetting a breach of fiduciary duty claim brought against a corporation for the actions of its directors is unsettled in North Carolina.").

43

Since a cause of action for "aiding and abetting conversion" has not been recognized in North Carolina, Kansas, Missouri, or Oklahoma, Count VI of the Complaints should be dismissed.

## IV. Count VII (Unfair and Deceptive Trade Practices) in the case of CAH 1 should be dismissed, because applicable caselaw establishes that UDTP Act does not apply to the facts alleged in the Complaints.

In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff. *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). The Complaints do not plead sufficient facts to establish these elements.

As discussed in section I.b.iii above, the sole acts of Nusbaum or White that are pled with factual detail in the Complaints consist of (i) White's email to Kimberly Spies and Jim Shaffer of HMC/CAH, (ii) a presentation to the HMC/CAH board, (iii) the sale of an 80% interest in the Debtors by HMC/CAH to HAC, in exchange for the release of debt owed to HAC,  (iv) the sale by Nusbaum and White of 50% of HAC to Perez, (v) the appointment of Perez as the primary manager of HAC, which gave Perez complete control over HAC and the Debtors, and (vi) Nusbaum attending weekly meetings that addressed the Debtors' financial decisions.  None of these allegations establish an unfair or deceptive act.

The term "commerce" has been defined by the courts "inclusively as 'business activity, however denominated.'" *Dalton v. Camp,* 353 N.C. 647, 656-57 (2001). However, the Complaints do not allege any business activity between Nusbaum or

White and the Debtor.  The Complaints allege that Nusbaum and White sold 50% of HAC to Perez, and appointed Perez as primary manager of HAC, but these acts are not business activities to which the Debtor was a party.

The cause of action alleges that Nusbaum and White are liable under the UDTP Act for "[c]ausing or permitting the Debtor . . . 'to enter into both the Verifi Scheme and the Empower Scheme,'" for "[f]ailing to ensure that the Debtor's financial statements . . . accurately represented the Debtors' financial conditions," and for "[c]ausing or permitting the Debtor to make exorbitant Insider Distributions to themselves and/or Empower." *Amended Complaint in CAH 1*, ¶ 153.  None of these conclusory statements is supported by specific factual allegations.

Nevertheless, if it were true that Nusbaum or White had the ability to cause the Debtor to make distributions, and made distributions from the Debtors' to themselves, this could potentially give rise to a UDTP claim.  *See, e.g., Sara Lee Corp. v. Carter*, 351 N.C. 27 (1999) (holding, despite the general principle that employer-employee relationships are not subject to the UDTP Act, that UDTP liability was supported where an employee created businesses and caused his employer to purchase computer equipment at inflated prices from his businesses).  However, the Complaints do not allege facts to show that Nusbaum or White had authority to make disbursements on behalf of the Debtor, nor do they identify any distributions to Nusbaum or White.

"Causing or permitting the Debtor . . . 'to enter into both the Verify Scheme and the Empower Scheme,'" or "[f]ailing to ensure that the Debtor's financial

statements . . . accurately represented the Debtors' financial conditions," would not violate the UDTP Act, even if the Complaints included factual content to support these conclusory allegations.  The North Carolina Supreme Court has held that N.C. Gen. Stat. § 75-1.1, *et seq.* (the "UDTP Act"), "sought to prohibit unfair or deceptive conduct in interactions between different market participants." *White v. Thompson*, 364 N.C. 47, 47-48, 691 S.E.2d 676, 676 (2010).  It held that the UDTP Act does not "regulate purely internal business operations." *Id.*  In that case, it was alleged that a partner in a fabrication and welding business left a partnership and conspired with one of the partnership's customers to "divert work originally contracted for by [the partnership]" to his separate business entity.  *Id.*  It was also alleged that he conspired to "improperly keep and maintain the books" of the partnership.  *Id.*  After a jury trial, the trial court entered a judgment finding that the partner had breached his fiduciary duties and violated the UDTP Act.  The Court of Appeals reversed, and the Supreme Court affirmed such reversal.  It held that the UDTP Act was intended to "regulate two types of interactions in the business setting: (1) interactions between businesses, and (2) interactions between businesses and consumers." *Id.* at 679.

The amended complaint in CAH 1 does not allege any business interactions between CAH 1 and Nusbaum or White.  At most, the Complaints allege facts related to the internal business operations of the Debtor, which are not covered by the UDTP Act.  Therefore, Count VII in the amended complaint filed in CAH 1 should be dismissed.

V.    **The Plaintiff lacks standing to pursue claims based upon alleged fraudulent billing submitted to private insurers, since such acts would constitute particularized injury to such private insurers.**

The Complaints assert claims based upon improper distributions or transfers made by the Debtors.  As discussed above, the Complaints do not include allegations to establish that Nusbaum or White had the ability to cause the Debtors to make distributions.  The Complaints do not allege any specific transfers that Nusbaum or White received, or any specific transfers that they directed or authorized.  Nevertheless, there is no dispute that the Plaintiff would have standing to pursue claims based upon allegations of improper transfers or distributions made by the Debtor.

However, the Complaints also assert claims based upon a theory that the Defendants caused the Debtors to submit fraudulent laboratory billing to private insurers.  These claims are not viable because they allege particularized harm specific to such private insurers.  Therefore, these claims would belong to the private insurers, not the bankruptcy estate.

"[A] party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Wight v. BankAmerica Corp.*, 219 F.3d 79 (2d Cir. 2000) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

Under 11 U.S.C. § 541(a)(1), property of a bankruptcy estate includes all of the debtor's interests in any cause of action that has accrued prior to the filing of the bankruptcy case.  Federal law (i.e., 11 U.S.C. § 541) determines the scope of property of the estate, but the court must look to state law in determining a debtor's interest in property.  *Butner v. U.S.*, 440 U.S. 48, 55 (1979).  Thus, "[s]tate law determines

47

whether a right to sue belongs to the debtor pursuant to § 541(a) or to the individual creditor." *In re Bostic Construction Inc.*, 435 B.R. 46, 60 (Bankr. M.D.N.C. 2010). A trustee lacks standing to pursue claims that belong solely to creditors of the debtor. *Ivey v. First Citizens Bank & Trust Co. (In re Whitley)*, 2013 Bankr. LEXIS 521 (Bankr. M.D.N.C. Feb. 7, 2013) (citing *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972)).

The Fourth Circuit adopted the following distinction for determining whether an individual creditor holds standing to sue directors for fraud or mismanagement:

> 1.   Where a creditor of a corporation has sustained an identifiable loss peculiar and personal to himself by reason of the fraud or negligent mismanagement of the corporation's business by its directors, he has a cause of action against the directors for the recovery of his personal loss, and such recovery will inure to him personally and not to the other creditors of the corporation.

> 2.   Where the alleged fraud or negligent mismanagement has resulted in loss to the corporation and its creditors generally, the right of action belongs to the corporation and it may be maintained only in the name of the corporation or its receiver if it is insolvent. It is only where the corporation or its receiver declines upon request to bring the action that it may be maintained by an individual creditor, but even then the proceeds of any recovery are held for the benefit of all creditors of the corporation.

*Ford Motor Credit Co. v. Minges*, 473 F.2d 918, 920 (4th Cir. 1973).

In this case, it is alleged that the Debtors submitted improper billing to specific private insurers, which gave rise to liability specific to those private insurers. Thus, it alleges an "identifiable loss peculiar and personal" to these insurers, and not a general harm that applied equally to all creditors. Therefore, under *Minges*, any

claims based upon alleged improper billing are not property of the bankruptcy estate and are claims that would belong to the private insurers.

### VI.    All the Plaintiff's claims are barred by the applicable statutes of limitations.

As an initial matter, the statute of limitations for a breach of fiduciary duty claim based upon alleged "Verifi Scheme" expired prior to the filing of the Debtors' bankruptcy petitions, and this can be discerned from the face of the Complaints, and the official record in the underlying bankruptcy cases.  The Complaints allege that the "Verifi Scheme" began in late 2015.  *Complaints*, ¶ 22.  Each of the Debtors is a Delaware LLC, as reflected in the record in the underlying bankruptcy case.  CAH 1's bankruptcy case was commenced on February 19, 2019, and all of the other Debtors' bankruptcy cases were commenced in March or April of 2019.  *Complaints*, ¶¶ 65-67.  A cause of action for breach of the duty of loyalty or breach of the duty of care is subject to a three-year statute of limitations under Delaware law.  *See* 10 Del. C. § 8106.  Therefore, the statute of limitations for any breach of fiduciary duty claim based upon the alleged "Verifi Scheme" implemented in late 2015 expired three years later in late 2018 – before the bankruptcy cases were filed.

However, for reasons that require greater discussion, <u>all</u> of the claims asserted in the Complaints are time-barred.   Under 11 U.S.C. §§ 108(a) and 546(a), the Plaintiff had two years from the filing of the petition in each Bankruptcy Case to file the above captioned adversary proceedings.  Therefore, the statutes of limitations established under §§ 108(a) and 546(a) expired at the latest by April 2021 (with the exact expiration date varying for each Debtor).  The Complaints were not filed until

49

August 21, 2021, after the statutory period under §§ 108(a) and 546(a) had expired. The Complaints do not allege any facts in support of equitable tolling of these statutes of limitations. However, the Complaints assert that the time to pursue the claims was extended under certain orders entered in the underlying bankruptcy cases, which granted the Trustee's motions to extend the statute of limitations under § 108(a) and 546(a). *Complaints,* ¶ 72.

On Thursday, December 31, 2020, the Trustee filed an identical motion in each of the Bankruptcy Cases seeking to extend the statute of limitations to bring causes of action that were property of the bankruptcy estate. *See, e.g.,* Case No. 19-00730, Doc. No. 1044. The motion sought to apply the extension "to all third parties, including those who are presently unknown to the Trustee." The motion did not identify prospective defendants, other than Perez and Empower. There was no mention of Nusbaum or White in the motion, nor any indication of any concealment, action, or inaction by Nusbaum or White.

The motion alleged that the Trustee believed a fraudulent laboratory billing scheme had occurred, and that "the potential causes of action arising out of the Billing Scheme have been concealed and obstructed by the actions of certain third parties, including those presently unknown to the Trustee, who were engaged in the Billing Scheme." The motion alleged that the Trustee had made "significant efforts to investigate, pursue and prosecute potential causes of action … [but the] Trustee's efforts to access additional records and documents that are not in Debtors' possession, however, have been hampered due to, amongst other things, limitations on estate

50

assets, impeding criminal proceedings, and associated recalcitrant respondents." The motion recited a criminal investigation and prosecution of Jorge Perez, Ricardo Perez, EmpowerHMS, and Empower H.I.S., and alleged that this criminal matter had "hindered the Trustee's ability to obtain internal records from Empower." It alleged that the Trustee had been unable to serve a subpoena on Ernesto Fesser, a former controller of Empower. It alleged that "[d]ue to the lengthy and intensive nature of this review, the impediments arising out of the indictment of certain key figures in the Billing Scheme, and the intentional hindrance of the location and review of critical materials, the Trustee expects that he and his counsel will require additional time beyond the statutory deadlines set forth above to fully investigate and pursue litigation actions and proceedings related to the Billing Scheme."

The day after the motion was filed, January 1, 2021, was a Federal holiday. January 2 and January 3 were weekend days. Monday, January 4, 2021, was the first and only business day between the filing of the motion and the entry of the order granting the motion. On Tuesday, January 5, 2021, the Court entered an order granting the motion and extending the statute of limitations in each of the Bankruptcy Cases to March 1, 2022. *See, e.g.,* Case No. 19-00730, Doc. No. 1071 (collectively, the "Extension Orders"). No hearing was conducted on the motion, and no evidence was entered into the record in support of the motion. There was no sworn declaration or affidavit attached to the motion. Additionally, there was no notice attached to the motion, or anything contained within the motion itself, that identified a response deadline. No response deadline with respect to the motion was set forth

51

in the docket, or anywhere else in the official record. The motion did not identify that it intended to seek an expedited or *ex parte* consideration of the relief requested.

Since the Plaintiff contends that the Extension Orders extended the statute of limitations to pursue claims against Nusbaum and White, they intend to file a motion to set aside the Extension Orders under Rule 60 for three alternative reasons. First, the Extension Orders should be set aside under Rule 60(b)(4) as void, since they were entered in a manner inconsistent with due process of law, because the motions were granted without evidence and without an opportunity for Nusbaum and White to be heard. Second, the Extension Orders should be set aside under Rule 60(b)(1), since they were based upon a mistake of law or fact. Third, the Extension Orders should be set aside under Rule 60(b)(6), since they enabled the Plaintiff/Trustee to apply equitable tolling to unidentified claims against unidentified parties, without proof of the requisite elements of equitable tolling, and without the opportunity for Nusbaum and White to conduct discovery or present evidence related to the elements of equitable tolling, which is unfair and inequitable to them.

Nusbaum and White anticipate that their motion to set aside the Extension Orders in the underlying bankruptcy cases shall be filed in sufficient time that it can be heard either prior to or concurrently with the hearing on this Motion to Dismiss. To the extent that the motion to set aside the Extension Orders is granted in the underlying bankruptcy cases, then all the claims asserted in the Complaints are barred by the statute of limitations.

## CONCLUSION

Each of the claims pled in the Complaints fails to meet the *Iqbal/Twombly* standard and should be dismissed.  Moreover, leave to amend should not be granted. Amendment of the Complaints in an attempt to meet the *Iqbal/Twombly* standard would be futile since (i) all claims were released under the court-approved settlement in CAH 2, CAH 3, CAH 7, CAH 12, and CAH 16, (ii) "aiding and abetting conversion" is not a recognized cause of action in North Carolina, Kansas, Missouri, or Oklahoma, (iii) claims based upon alleged fraudulent billing to certain private insurers assert a particularized harm to such insurers that the Plaintiff lacks standing to pursue, (iv) the facts alleged in the amended complaint in CAH 1 establishes that the UDTP Act does not apply, and (v) all claims asserted against Nusbaum or White are time-barred.

NOW, THEREFORE, Defendants Nusbaum and White respectfully request that all claims against them in the Complaints be dismissed.

RESPECTFULLY SUBMITTED this the 1st day of November 2021.

NORTHEN BLUE, LLP

/s/ John Paul H. Cournoyer
John Paul H. Cournoyer, NCSB #42224
1414 Raleigh Road, Suite 435
Chapel Hill, NC  27517
Telephone No. (919) 968-4441
Email: jpc@nbfirm.com

*Counsel for Defendants Nusbaum and White*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by automatic ECF notice upon the following on this date:

Thomas W. Waldrep, Jr.
John R. Van Swearingen
Counsel for the Plaintiffs

This the 1st day of November 2021.

NORTHEN BLUE, LLP

 /s/ John Paul H. Cournoyer
John Paul H. Cournoyer, NCSB #42224
1414 Raleigh Road, Suite 435
Chapel Hill, NC  27517
Telephone No. (919) 968-4441
Email: jpc@nbfirm.com

*Counsel for Defendants Nusbaum and White*