**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| CAH ACQUISITION COMPANY #1, LLC, | ) | Case No. 19-00730-5-JNC |
| d/b/a WASHINGTON COUNTY | ) | Chapter 11 |
| COMMUNITY HOSPITAL, | ) | |
| | ) | |
| | ) | |
| THOMAS W. WALDREP, JR., as Litigation | ) | |
| Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 21-00078-5-JNC |
| | ) | |
| PAUL NUSBAUM, STEVE WHITE, and | ) | |
| JORGE A. PEREZ, | ) | |
| | ) | |
| Defendants. | ) | |
| In re: | ) | |
| | ) | |
| CAH ACQUISITION COMPANY #2, LLC, | ) | Case No. 19-01230-5-JNC |
| d/b/a OSWEGO COMMUNITY HOSPITAL, | ) | Chapter 11 |
| | ) | |
| | ) | |
| THOMAS W. WALDREP, JR., as Litigation | ) | |
| Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 21-00079-5-JNC |
| | ) | |
| PAUL NUSBAUM, STEVE WHITE, and | ) | |
| JORGE A. PEREZ, | ) | |
| | ) | |
| Defendants. | ) | |
| In re: | ) | |
| | ) | |
| CAH ACQUISITION COMPANY #3, LLC, | ) | Case No. 19-01180-5-JNC |
| d/b/a HORTON COMMUNITY HOSPITAL, | ) | Chapter 11 |

THOMAS W. WALDREP, JR., as Litigation Trustee,

  Plaintiff,

v.             Adv. Pro. No. 21-00080-5-JNC

PAUL NUSBAUM, STEVE WHITE, and JORGE A. PEREZ,

  Defendants.

In re:

CAH ACQUISITION COMPANY 6, LLC, d/b/a I-70 HOSPITAL,    Case No. 19-01300-5-JNC
               Chapter 7

THOMAS W. WALDREP, JR., as Chapter 7 Trustee,

  Plaintiff,

v.             Adv. Pro. No. 21-00081-5-JNC

PAUL NUSBAUM, STEVE WHITE, and JORGE A. PEREZ,

  Defendants.

In re:

CAH ACQUISITION COMPANY 7, LLC, d/b/a PRAGUE COMMUNITY HOSPITAL, Case No. 19-01298-5-JNC
               Chapter 11

THOMAS W. WALDREP, JR., as Litigation Trustee,

  Plaintiff,

v.             Adv. Pro. No. 21-00082-5-JNC

PAUL NUSBAUM, STEVE WHITE, and JORGE A. PEREZ,

|  |  |  |
|---|---|---|
| Defendants. | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| CAH ACQUISITION COMPANY 12, LLC, | ) | Case No. 19-01697-5-JNC |
| d/b/a FAIRFAX COMMUNITY HOSPITAL, | ) | Chapter 11 |
| | ) | |
| THOMAS W. WALDREP, JR., as Litigation | ) | |
| Trustee, | ) | |
| | ) | |
|      Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 21-00083-5-JNC |
| | ) | |
| PAUL NUSBAUM, STEVE WHITE, and | ) | |
| JORGE A. PEREZ, | ) | |
| | ) | |
|      Defendants. | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| CAH ACQUISITION COMPANY 16, LLC, | ) | Case No. 19-01127-5-JNC |
| d/b/a HASKELL COMMUNITY HOSPITAL, | ) | Chapter 11 |
| | ) | |
| THOMAS W. WALDREP, JR., as Litigation | ) | |
| Trustee, | ) | |
| | ) | |
|      Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 21-00084-5-JNC |
| | ) | |
| PAUL NUSBAUM, STEVE WHITE, and | ) | |
| JORGE A. PEREZ , | ) | |
| | ) | |
|      Defendants. | ) | |

3

<u>**REPLY IN SUPPORT OF DEFENDANT PAUL NUSBAUM AND STEVE WHITE'S MOTION TO DISMISS**</u>

NOW COME Defendants Paul Nusbaum and Steve White, by and through counsel, and submit this reply in support of their motion to dismiss (the "<u>Motion to Dismiss</u>") the above-captioned adversary proceedings as follows:

<u>**ARGUMENT**</u>

I.   **All Counts against Nusbaum and White in CAH 2, CAH 3, CAH 7, CAH 12, and CAH 16 were released under the unambiguous language of the court-approved settlement agreement.**

The settlement agreement in the cases of CAH 2, CAH 3, CAH 7, CAH 12, and CAH 16 provided for a complete release of all causes of action against Nusbaum and White, with one exception: "a cause of action for fraud by the Trustee based upon a Party's active knowledge, assistance, and/or participation in any fraudulent billing scheme engaged in by the Debtors pre-petition." The Plaintiff's response brief attempts to write the words "for fraud" out of the agreement, by arguing that this language "is ambiguous regarding whether the Trustee was releasing non-fraud claims against Defendants arising out of the Billing Schemes."

Nusbaum and White agree that, in order to fall within this exception to the broad release, the cause of action must be based upon "active knowledge, assistance, and/or participation in any fraudulent billing scheme engaged in by the Debtors pre-petition." However, the Plaintiff's proffered reading of the settlement agreement attempts to re-write the words "cause of action for fraud" to "any cause of action." The words "cause of action for fraud" are not ambiguous. The only cause of action that was not released was "a cause of action for fraud," if such fraud claim was based

4

upon active knowledge, assistance, and/or participation in any fraudulent billing scheme. Therefore, the non-fraud causes of action asserted in the adversary proceedings were released under the settlement agreement.

## II. The Complaints rely upon conclusory allegations that are not entitled to a presumption of truth under *Iqbal/Twombly*.

The Plaintiff, in arguing that his claims are well-pled, quotes many of the Complaints' allegations that are conclusory in nature and not entitled to a presumption of truth.  "[N]otice pleading is designed to provide defendants with fair notice of the plaintiffs' claims and the grounds upon which those claims rest." *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008). The Complaints are based upon opaque, conclusory allegations, and fail to meet this standard.

In considering the motions to dismiss, this Court must engage in the unenviable task of parsing the complaints to separate well-pleaded factual allegations from bare assertions devoid of further factual enhancement. Nusbaum and White's initial brief discusses the allegations asserted in the complaints in detail, and this brief will not regurgitate that analysis herein. However, this brief will address the specific arguments raised in the Plaintiff's brief.

### a. The Complaints to not adequately plead facts to show that fraudulent billing occurred.

Count I (Breach of Fiduciary Duty), Count IV (Aiding and Abetting Conversion), and Count VII (Unfair and Deceptive Trade Practices) are predicated on an allegation that Nusbaum and White directed the Debtors to enter into fraudulent

billing schemes. However, the Complaints do not contain any factual detail of the alleged fraudulent billing schemes other than to allege that the Debtors submitted claims to private insurers for laboratory services for patients that were not physically present in the Debtors' hospitals. The Plaintiff's response brief argues that the Complaints "specifically allege[] that the schemes were fraudulent because they allowed the hospitals to claim reimbursement for laboratory testing at higher, in-network rates even though those services were not actually performed at the hospitals."[1] This is plainly insufficient to allege fraud.

Nusbaum and White's brief discussed the arbitration award that was entered in favor of the bankruptcy trustee in the case of *In re Little River Healthcare Holdings, LLC, et al.,* Case No. 18-60526-RBK (Bankr. W.D. Tex. 2018). The Plaintiff's response brief argues that this Court "should exclude and not consider" this arbitration decision because it is "extrinsic to the Complaint." However, this arbitration decision is discussed as legal authority – it is not presented as factual evidence. That case involved critical access hospitals that submitted laboratory billings for patients that were never physically were present in the hospitals. The private insurer alleged that this was fraudulent billing, and the chapter 7 trustee for the debtors alleged that the billing was permissible under the applicable contracts. The arbitrator ultimately decided that the billing was not fraudulent and awarded damages in favor of the

---

[1] The Plaintiff's response brief also relies on the allegation in paragraph 64 of the Complaint, that there was a criminal indictment against Jorge Perez related to a hospital in Florida that is not one of the Debtors. Paragraph 64 does not contain any factual allegation about any act of the Debtors, let alone Nusbaum or White. The fact that the Plaintiff points to a criminal indictment against Jorge Perez as support for his claims against Nusbaum and White is a revealing indicator of the lack of factual content supporting the claims asserted against them.

bankruptcy estate for non-payment of the laboratory billings. The arbitration decision is relevant legal authority in support of Nusbaum and White's position.

In order to prove that fraudulent billing occurred, the Plaintiff must establish that the billing submitted by the Debtors to the private insurers contained a misrepresentation of material fact, was made with the intent to deceive, and was justifiably relied upon by such private insurers. *See, e.g., Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 218 (4th Cir. 2007) (reciting the basic elements of fraud). The Complaints contain no allegation of any misrepresentation of material fact made to the private insurers. There are not even sufficient allegations to show that such billing violated the terms of the Debtors' contracts with such private insurers, which by itself would not constitute fraud. Absent further factual recitals to support the allegation that fraudulent billing occurred, the causes of action predicated on such alleged fraudulent billing are insufficiently plead.

### b. The Complaints do not adequately plead the existence of a fiduciary duty for either Steve White or Paul Nusbaum.

There is no allegation in the Complaints that Steve White was ever a member, manager, employee, officer, or director of any of the Debtors. The Plaintiff's response brief does not address this obvious deficiency, except by stating that the "Defendants controlled the debtors through their ownership of HMC/CAH."

"'[T]he bare conclusory allegation that a [defendant] possessed control is insufficient. Rather, the Complaint must contain well-pled facts' showing that the alleged controller 'exercised actual domination and control' over the subject entity or its directors...." *Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g,*

7

*LLC),* 587 B.R. 445, 467 (Bankr. D. Del. 2018) (internal citations and footnotes omitted). There are no factual allegations in the Complaints to show that Steve White exercised actual domination and control over the Debtors. With respect to Steve White, the Complaints are plainly insufficient to allege the existence of a fiduciary duty.

With respect to Paul Nusbaum, the Complaints do contain the allegation that he was a manager of the Debtors from March 29, 2017, to June 2018. However, the Complaints do not provide factual detail regarding what duties and responsibilities that role entailed. The Complaints do not provide copies of the Debtors' operating agreements, nor do the Complaints contain factual averments describing the scope of a manager's duties under the Debtors' operating agreements. The Complaints allege that Jorge Perez and his company Empower H.I.S. "was granted complete control over the operations of each of the Hospitals, including control over their bank accounts, billing systems, and their rights to submit claims to insurance companies with which the Hospitals had in-network contracts." *Complaints*, ¶ 52.

The Plaintiff argues that Nusbaum and White have not "cite[d] a single case for the proposition that a manager's fiduciary duties are eliminated if another individual or entity was performing the day-to-day work." However, as discussed in Nusbaum and White's initial brief, there are three ways to establish the existence of a fiduciary duty: (i) it is provided for under an LLC agreement, (ii) a default fiduciary duty would apply to a manager if there is no LLC agreement, or if the LLC agreement

8

is silent on the issue, or (iii) "in rare and highly fact-specific instances," if a defendant had actual control over the LLC.

The Complaints do not attach the Debtors' LLC agreements, nor do they identify relevant provisions of the LLC Agreements.  LLC agreements can eliminate fiduciary duties altogether, or they can provide for the delegation of duties to others. *See, e.g.,* 6 Del. Ch. § 18-1101(c); *Kelly v. Blum,* Civil Action No. 4516-VCP, 2010 Del. Ch. LEXIS 31, at *34-42 (Del. Ch. Feb. 24, 2010) ("In the case of fiduciary duties, the LLC Act permits LLC contracting parties to expand, restrict, or eliminate duties, including fiduciary duties, owed by members and managers to each other and to the LLC.").  Thus, without information about the provisions of the Debtors' LLC Agreements, it is impossible to discern the fiduciary duties of a manager.

Additionally, the default rule under Delaware law is that a manager may delegate his or her duties to another.  6 Del. C. § 18-407 ("[u]nless otherwise provided in the limited liability company agreement, a member or manager of a limited liability company has the power and authority to delegate to 1 or more other persons any or all of the member's or manager's, as the case may be, rights, powers and duties to manage and control the business and affairs of the limited liability company . . .").

The Complaints do not allege any detail regarding the terms of the Debtor's LLC agreements, nor do they allege whether such duties could be delegated under such agreements. Simply alleging that Nusbaum was a "manager," while simultaneously alleging that Perez and Empower had "complete control" over the Debtors affairs, is insufficient to adequately plead the existence of a fiduciary duty.

9

**c. The Complaints do not adequately plead the breach of a fiduciary duty by either Steve White or Paul Nusbaum.**

In order to adequately plead a claim that a fiduciary duty was breached, the complaint must include "(1) the 'specific facts as to which transactions a particular defendant authorized... (2) what authority a particular defendant had to approve such transactions' and (3) the Trustee must not lump defendants together 'without supplying specific facts as to each defendant's wrongdoings.'" *Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g, LLC)*, 587 B.R. 445, 467 (Bankr. D. Del. 2018). The Complaints fail on each of these counts, as discussed in Nusbaum and White's initial brief.

In response, the Plaintiff argues that "the Complaint specifically alleges that Defendants authorized, encouraged, and facilitated both entry into the Verifi scheme and the creation of the Empower scheme," and cites paragraphs 22-34 and 37-50 of the Complaints. However, there is no discussion of how these paragraphs meet the pleading standard required by *Iqbal/Twombly*.

The paragraphs cited by the Plaintiff allege that in late 2015 or in June 2016, Nusbaum and White "directed" CAH 1 to enter into an arrangement with LGMG, LLC d/b/a Verifi Labs to increase the billings that the Debtors would generate from laboratory tests and recover higher "in-network" reimbursement rates. The Complaints allege that under this arrangement, "Verifi would work with medical providers throughout the country to collect patient samples for urine analysis and blood testing," for patients that had not visited or received treatment at the Debtors' hospitals. They allege that after the tests were performed, reimbursement claims

10

would be submitted under the Hospitals' billing credentials, allowing the Hospitals to claim reimbursement for the higher "in-network" rates afforded to critical access hospitals. The Complaints allege that on March 29, 2017, HAC converted certain debt to an 80% equity interest in the Debtors, sold 50% of HAC to Jorge Perez and certain of Perez's family members. The Complaints allege that Nusbaum and White subsequently agreed that Perez would be the "Primary Manager" of HAC, and was "granted complete control over the operations of each of the Hospitals."

With respect to the "Verifi Scheme," it is insufficient to simply allege that in 2015 or 2016 "Nusbaum and White directed [the Debtors] to enter into the first of two billing schemes . . . ." The Complaints do not tell us what Nusbaum or White allegedly did in order to direct the Debtors to engage such "schemes." Moreover, they do not tell us what authority either of them had to direct the Debtors to take any action whatsoever in 2015 or 2016. As discussed above, there is no allegation in the Complaints that White was ever a member, manager, employee, officer, or director of any of the Debtors, and Nusbaum is not alleged to have been a manager of the Debtors until March 29, 2017. Lastly, this allegation lumps Nusbaum and White together, without distinguishing between the actions of the two.

With respect to the Empower Scheme, the Complaints at least alleged some specific acts of Nusbaum or White, although such allegations are extremely limited. The specific acts of Nusbaum or White alleged in the Complaints are (i) White's email to Kimberly Spies and Jim Shaffer of HMC/CAH on March 5, 2017,  (ii) participation in a presentation to the HMC/CAH board on March 6, 2017, which reiterated the

11

statements in White's email, (iii) the sale of an 80% interest in the Debtors by HMC/CAH to HAC, in exchange for the release of debt owed to HAC, pursuant to a Conversion Agreement dated March 29, 2017, (iv) the sale by Nusbaum and White of 50% of HAC to Jorge Perez, Ricardo Perez, and Carlos Perez, on April 20, 2017, (v) the appointment of Jorge Perez as the primary manager of HAC, which gave Perez complete control over HAC and the Debtors, and (vi) Nusbaum attending weekly meetings that addressed the Debtors' financial decisions.

In essence, the Complaint alleges that Nusbaum and White made a presentation to HMC/CAH about Empower, caused HAC to convert debt to an 80% equity interest in the Debtors, sold a 50% interest in HAC to Jorge Perez, Ricardo Perez, and Carlos Perez, and agreed that Jorge Perez would be the primary manager of HAC, which gave him complete control over the Debtors. None of these actions are actions taken on behalf of any of the Debtors. Each of these allegations are discussed in more detail in pages 31 through 34 of Nusbaum and White's initial brief. The Complaints do not plead sufficient content in support any alleged breach of fiduciary duty by Nusbaum or White.

## III. Counts III and IV (Fraudulent Transfer Claims) fail to identify any alleged transfers to Nusbaum or White.

The Plaintiff's response brief cites *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87 (Bankr. S.D.N.Y. 2011) ("BLMIS"), and *In re Palm Beach Fin. Partners, L.P.*, 488 B.R. 758, 766 (Bankr. S.D. Fla. 2013), for the proposition that the court should take a liberal view of the pleading requirements for an actual fraudulent transfer claim asserted by a bankruptcy trustee. However, these cases do

not stand for the proposition that a trustee can assert a fraudulent transfer claim against a defendant without identifying any transfer received by such defendant.

In *BLMIS*, the liquidation trustee asserted fraudulent transfer claims against certain of Bernie Madoff's family members. The court noted that a party asserting a claim for an actual fraudulent transfer "must ordinarily allege: '(1) the property subject to the transfer, (2) the timing and, if applicable, frequency of the transfer and (3) the consideration paid with respect thereto.'" *BLMIS,* 458 B.R. at 106. As noted by the Plaintiff, the court cited caselaw for the proposition that a "more liberal view" applies when the claim is asserted by a bankruptcy trustee. *Id.* However, it went on to hold that "'relaxing the particularity requirement' of Rule 9(b) does not 'eliminate' it." *Id.* It found that "opacity, rather than particularity, best describes the [fraudulent transfer] allegations" in the *BLMIS* case. It found that the complaint alleged a sum total of fraudulent transfers, but did so without specifying the details of the transfers. *Id*. at 107. For example, the court noted that the complaint alleged that there were four payments totaling $274,562 made for the purchase and restoration of an Aston Martin for Madoff's son, "but it is not clear how, to whom, or when those payments were made." *Id.* The court found that the complaint had "too many porous and disparate factual allegations." It granted the motion to dismiss, with leave for the trustee to amend to add more factual detail. *Id*. at 108.

Similarly, the court in *BLMIS* granted a motion to dismiss with respect to certain of the claims for constructively fraudulent transfers, to the extent that insufficient detail was provided. For example, the trustee had alleged certain

13

transfers "without providing any date associated with the transfer," and the court granted the motion to dismiss with respect to those claims, with leave to amend.

In the present case, the Plaintiff has not identified <u>any</u> transfers to Nusbaum or White, let alone the details associated with such transfers such as which debtor transferred the money, the date of the transfer, or the amount of the transfer. This falls woefully short of the notice pleading standard, because neither Nusbaum nor White are capable of discerning what transfers they are alleged to have received. Indeed, Nusbaum and White vigorously dispute the general allegation that they received any transfers from the Debtors – either directly or indirectly through subsequent transfers.

All the Complaints have done is allege certain transfers to HAC made by HMC/CAH (a non-Debtor entity), CAH 12, and CAH 16. *See Complaints*, Exh. B. There are no alleged transfers from CAH 1, CAH 2, CAH 3, CAH 6, or CAH 7. More importantly, Complaints do not allege any subsequent transfers to Nusbaum or White. There is no factual content in the Complaints of a transfer from any Debtor to Nusbaum or White, either directly or as a subsequent transferee.

The Plaintiff alleges in his response brief that Nusbaum and White "received funds from the scheme after money was transferred to HAC's operating account." It cites paragraph 105 of the complaints in support of that allegation. However, paragraph 105 states: "[u]pon information and belief, Defendants Nusbaum and White, as 50% owners of HAC, indirectly received funds transferred by EmpowerHMS to bank accounts held and controlled by HAC, including but not

14

limited to, HAC's Operating Account, US Bank Account ending in 8759." This is not sufficient to plead a fraudulent transfer claim against either Nusbaum or White.

It is black letter law that in order to adequately plead a fraudulent transfer claim, a plaintiff must plead factual content of the transfers alleged to have been received by a defendant. *See Angell v. BER Care, Inc. (In re Caremerica, Inc.)*, 409 B.R. 737 (Bankr. E.D.N.C. 2009) ; *see also Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g, LLC),* 587 B.R. 445, 456 (Bankr. D. Del. 2018) ("complaints that identify the dates, amounts, source, and transferee of each of the alleged transfers successfully support claims of constructive fraudulent transfer under Fed. R. Civ. Pro. 8(a)(2)'s pleading standard"); *Reagor Auto Mall, Ltd. v. FirstCapital Bank of Tex., N.A. (In re Reagor-Dykes Motors, LP),* 2020 Bankr. LEXIS 2254, at *10 (Bankr. N.D. Tex. Aug. 24, 2020) (holding that "[e]ach transfer must be identified by date, the transferor, the transferee, and amount"); *Meininger v. Euram, LLC (In re Land Res., LLC)*, 2011 Bankr. LEXIS 5491, at *14 (Bankr. M.D. Fla. 2011) (citing *Caremerica* and holding that a fraudulent transfer complaint must "at a minimum, identify the transferor and transferee, the date of the transfer, and the amount of the transfer"). Indeed, this requirement existed in some caselaw even before *Iqbal/Twombly* established a higher pleading standard. *See, e.g., Valley Media v. Borders (in Re Valley Media)*, 288 B.R. 189, 192 (Bankr. D. Del. 2003) ("the following information must be included in a complaint to avoid preferential transfers in order to survive a motion to dismiss . . . an identification of each alleged preference transfer

by (i) date, (ii) name of debtor/ transferor, (iii) name of transferee and (iv) the amount of the transfer").

Counts III and IV should be dismissed with respect to Nusbaum and White in all seven adversary proceedings, since the Complaints do not identify any transfers received by either of them.

**IV.    This Court should not recognize the existence of a cause of action for aiding and abetting conversion for states where no court in the state has recognized the existence of such cause of action.**

As discussed in Nusbaum and White's initial brief, the claims for aiding and abetting conversion are insufficiently plead under *Iqbal/Twombly* because the Complaints have not alleged sufficient factual detail in support of the claims.  In the states that recognize a claim for aiding and abetting conversion, there are three elements: "(1) the existence of a [conversion] committed by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in achievement of the violation." *Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 2006 U.S. Dist. LEXIS 7761, at *17 (S.D.N.Y. Feb. 15, 2006).   Nusbaum and White do not know whether any conversion did in fact occur.  However, assuming *arguendo* that the first element was satisfied, there are insufficient factual pleadings to show that Nusbaum or White knew that conversion occurred at the time, nor are there specific factual allegations to show that either of them provided substantial assistance.   Additionally, (i) these claims were released under the settlement agreement in the cases of CAH 2, 3, 7, 12, and 16, and (ii) all of the claims were filed

after the expiration of the statute of limitations. Thus, it is not likely necessary for this Court to engage in the difficult task of predicting whether the highest courts in North Carolina, Kansas, Missouri and Oklahoma would recognize a cause of action for aiding and abetting conversion.

Nevertheless, the Fourth Circuit has applied a general principle that federal courts should not recognize state law causes of action that have never been recognized by any court of that state. It declined to recognize the existence of a cause of action for breach of fiduciary duty between a franchisor and franchisee under North Carolina law, when no North Carolina court had ever recognized the existence of a fiduciary duty between franchisor and franchisee. It held that "as a federal court exercising concurrent jurisdiction over this important question of state law we are most unwilling to extend North Carolina tort law farther than any North Carolina court has been willing to go." *See Broussard v. Meineke Disc. Muffler Shops, Inc.,* 155 F.3d 331, 348 (4th Cir. 1998). This Court should follow that general principle in this case.

<u>North Carolina (Count VI in CAH 1)</u>

The Plaintiff cites the statement in *Conti v. Fid. Bank & Assurance Co. (In re NC & VA Warranty Co.)*, 594 B.R. 316, 355 (Bankr. M.D.N.C. 2018), that "[w]hether North Carolina recognizes a cause of action for aiding and abetting a common law tort remains an open question, with conflicting opinions in both the North Carolina state and federal courts." This is an accurate statement.

17

More importantly, no state court in North Carolina has ever recognized a cause of action for aiding and abetting conversion. *See Cent. Nat'l Gottesman Inc. v. Nakos Paper Prods.,* No. 3:18-cv-640-RJC-DSC, 2019 U.S. Dist. LEXIS 183528, at *9 (W.D.N.C. Aug. 28, 2019) ("No North Carolina court has recognized a cause of action for aiding and abetting conversion."). The court in *Nakos Paper* held that "[s]ince the claim of aiding and abetting conversion has never been recognized in North Carolina, this claim should be dismissed." *Id.* (citing the Fourth Circuit's language from *Broussard* that "a federal court [should not] extend North Carolina tort law farther than any North Carolina court has been willing to go").

The Plaintiff also cites *In re Am. Ambulette & Ambulance Serv., Inc.,* 560 B.R. 256, 269 (Bankr. E.D.N.C. 2016), which is not a case discussing the viability of a claim for aiding and abetting conversion. That case, *inter alia*, addressed the continuing uncertainty regarding whether or not a claim for aiding and abetting breach of fiduciary duty is recognized under North Carolina law. However, with respect to a claim for aiding and abetting conversion, it found that "the pleadings focus almost exclusively on aiding and abetting a breach of fiduciary duty, as opposed to aiding and abetting misappropriation of corporate opportunities, conversion, or fraudulent transfers." *Id.* It found that "aiding and abetting breach of fiduciary duty is the essence of the claim," and did not engage in any discussion of the viability of a claim for aiding and abetting conversion under North Carolina law. *Id.*

18

No North Carolina court has ever recognized a claim for aiding and abetting conversion.  Therefore, like the court in *Nakos Paper,* this Court should dismiss Count VI in the case of CAH 1.

<u>Kansas (Count VI in CAH 2)</u>

The Plaintiff cites *Penalosa State Bank v. Calista Grain & Mercantile Co.*, 128 Kan. 132 (1929), in support of his contention that aiding and abetting conversion is a recognized cause of action in Kansas.  However, that case involved a claim for conversion, not a claim for aiding and abetting conversion.  In *Penalosa*, the plaintiff brought an "action in conversion of the proceeds of a crop of wheat."  A financially-distressed farmer, in order to fund his ability to grow the next year's wheat crop, entered into an agreement granting a bank ownership of his wheat crop, with an option to repurchase the completed crop back from the bank.  The farmer never repurchased the crop, but granted the defendant a lien on the crop, under the pretense that the farmer already owned it. The defendant subsequently discovered the bank's interest in the crop.  Nevertheless, once the crop was completed, the defendant claimed a right to receive the sale proceeds from the grain elevator company, which paid the proceeds of the bank's crop to the defendant. *Id.* at 133-34. The bank sued the defendant for conversion, and prevailed.  On appeal, the defendant argued that he was not guilty of conversion because he never had possession of the wheat.  The court, in analyzing this argument, concluded that an important fact was that the defendant had "aided and abetted in the conversion" by going to the grain elevator and demanding payment.  It concluded that "[w]hen he took that money he

knew he had no right to it . . . [and] knew it belonged to the bank." *Id.* at 137.  Thus, *Penalosa* used the words "aided and abetted," but the cause of action at issue was conversion.  It does not stand for the proposition that "aiding and abetting conversion" is a recognized cause of action in Kansas.  The Plaintiff has not cited any other case in support of his contention that this is a recognized cause of action in Kansas.  This court should decline to recognize a cause of action for aiding and abetting conversion, when no state court in Kansas has done so.

<u>Missouri (Count VI in CAH 3 and 6) and Oklahoma (Count VI in CAH 7, CAH 12, and CAH 16)</u>

The Plaintiff has identified some cases from the Missouri Court of Appeals that support an argument that the Supreme Court of Missouri might recognize a claim for aiding and abetting conversion. *See Coleman v. Pioneer Studebaker, Inc.*, 403 S.W.2d 948 (Mo. App. 1966) ("the facts as set out would amply justify the conclusion of the jury that the defendant . . . aided and assisted in the conversion of plaintiff's money"); *Grothe v. Helterbrand*, 946 S.W.2d 301, 305 (Mo. Ct. App. 1997) ("a jury could have reasonably inferred that Defendant aided and abetted the conversions of Plaintiff's silver"); *Broyles v. Pioneer Cooperage Co.*, 208 S.W. 122, 124 (Mo. Ct. App. 1919) ("there is sufficient evidence from which a jury can find that the respondent . . . was aiding and abetting  . . . in the trespass and conversion").  Similarly, the Plaintiff cites *Cont'l Gin Co. v. De Bord*, 34 Okla. 66, 123 P. 159 (1912), which is a case where the cause of action at issue was conversion – not aiding and abetting conversion. However, the court found that: "actual possession by the defendant is not an indispensable requirement in an action of conversion" and that a defendant that

20

"exercises dominion over the property and participates in the wrongful act of one who is in actual possession, to the extent of aiding or abetting the consummation of the wrong . . . and who share the proceeds" is guilty of conversion. *Id.* at 75.

Undersigned counsel acknowledges that there is some state court caselaw to support a prediction that the cause of action might be recognized by the highest court in Missouri or Oklahoma. Nevertheless, Nusbaum and White maintain their position that this Court should not recognize the existence of this cause of action under Missouri or Oklahoma law, since it has not been recognized by the highest court in either state.

<u>Florida</u>

Lastly, the Plaintiff argues that "Perez and Empower were located in Florida" and that "arguably Florida law should apply." The Plaintiff's brief does not cite any legal authority in support of this position, which would deviate from established choice of law principles. In determining choice of law with respect to tort claims, a federal district court with jurisdiction over a state law cause of action should apply the choice of law rules of the forum state. *Kenney v. Indep. Order of Foresters*, 744 F.3d 901, 905 (4th Cir. 2014). "North Carolina follows the *lex loci delicti* rule (law of the situs of the claim) in resolving choice of law for tort claims." *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563, 668 S.E.2d 349, 351 (2008) (quoting *Terry v. Pullman Trailmobile*, 92 N.C. App. 687, 690, 376 S.E.2d 47, 49 (1989)). "The law of the place where the injury occurs controls tort claims, because an act has legal significance only if the jurisdiction where it occurs recognizes that legal rights and

obligations ensue from it." *Id.* In this case, this would be the states where each applicable Debtor's hospital was located. Regardless, neither the Debtors, nor Nusbaum or White, were located in Florida. There is no convincing argument for the application of Florida law to any tort claims asserted against Nusbaum or White.

## V.    Count VII (Unfair and Deceptive Trade Practices) in the case of CAH 1 fails to state a claim because the acts alleged were not "in or affecting commerce."

Count VII in the case of CAH 1 is inadequately pled for lack of sufficient factual allegations under *Iqbal/Twombly*. As is discussed above and in Nusbaum and White's initial brief, the Complaints are based upon opaque and conclusory allegations, and Count VII should be dismissed on that basis.

However, granting leave to amend would be futile, because the UDTP Act does not apply to the facts alleged. As acknowledged in the Plaintiff's brief, the UDTP Act applies to "two types of interactions in the business setting: (1) interactions between businesses, and (2) interactions between businesses and consumers." *White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010). The Complaints allege that Nusbaum and White sold 50% of HAC to Jorge Perez and his family members, and agreed that Perez would be the Primary Manager of HAC. CAH 1 was not a party to this transaction, and it could not form the basis of a UDTP claim. The Complaints also allege, in vague and conclusory terms, that Nusbaum and White used their "position of superiority over, and exercised control over" CAH 1 to "direct" it to conduct the alleged fraudulent billing schemes. However, even if these conclusory allegations were true, the UDTP Act would not apply because this is an allegation of

activities within a single market participant. *White v. Thompson*, 364 N.C. 47, 47-48, 691 S.E.2d 676, 676 (2010); *see also, e.g.*, *Poluka v. Willette,* 2021 NCBS LEXIS 105 (N.C. Super. Ct. Dec. 2, 2021) (dismissing a UDTP claim that alleged that one member of an LLC that owned a restaurant engaged in self-dealing transactions and registered a trademark for the restaurant's name in his separate entity's name, and distinguishing *Sara Lee* and *Songwooyarn*); *Botanisol Holdings II, LLC v. Propheter*, 2021 NCBC LEXIS 94, at **24–28 (N.C. Super. Ct. Oct. 18, 2021) (dismissing a UDTP claim when the plaintiff alleged that a co-member of an LLC created a new LLC to divert business opportunities away from the plaintiff and the existing LLC); *Potts v. KEL, LLC*, 2018 NCBC LEXIS 24, at *12–16 (N.C. Super. Ct. Mar. 27, 2018) (dismissing UDTP claim based upon allegation that a shareholder had engaged in self-dealing transactions by funneling the company's money to other entities in which he had an interest); *JS Real Estate Invs. LLC v. Gee Real Estate, LLC*, 2017 NCBC LEXIS 104, at *17–22 (N.C. Super. Ct. Nov. 9, 2017) (dismissing UDTP claim based upon the allegation that one former business partner had paid money owed to another into a separate LLC that he controlled).  Therefore, Count VII in the case of CAH 1 should be dismissed without leave to amend.

## VI.   The Plaintiff lacks standing to assert claims based upon particularized harm to private insurers.

Nusbaum and White do not dispute the general principle cited in the Plaintiff's response brief that if a cause of action was property of the Debtor that the Debtor would have had standing to pursue, then it could be asserted by the Plaintiff as bankruptcy trustee.  Indeed, this general principle was cited in Nusbaum and White's

initial brief.  However, the Complaints include state law causes of action based upon particularized harm to private insurers, which are not claims that would be property of the Debtor that the Plaintiff has standing to pursue.

The Complaints assert claims based upon two types of harm: (i) alleged fraudulent billing by the Debtors against private insurers and (ii) alleged fraudulent transfers or conversion of the Debtors' funds by Empower and Perez. Alleged conversion of the Debtors' money constitutes harm to the Debtors, for which the Plaintiff has standing to pursue.  The claims against Nusbaum and White that are founded upon the alleged transfers or conversion of the Debtor's funds by Jorge Perez or Empower fail for multiple reasons but not for lack of standing.  However, the Plaintiff lacks standing to pursue claims based upon fraudulent billing by the Debtors against private insurers, since that constitutes particularized harm to such private insurers. Therefore, any causes of action seeking to recover for this alleged harm would belong to those specific creditors, not the Plaintiff.  *Ford Motor Credit Co. v. Minges*, 473 F.2d 918, 920 (4th Cir. 1973).

## VII.   The Plaintiff claims were filed after the expiration of the statute of limitations, and the Complaints do not include any allegations to support equitable tolling.

Nusbaum and White have filed a separate motion in the underlying bankruptcy cases, including substantial legal authority, that the orders extending the statute of limitations are void orders and/or should be set aside.  These issues have already been adequately briefed.

The Plaintiff's response brief further argues that equitable tolling should apply, because "[p]rior to the issuance of [an auditor's report related to a non-debtor hospital] the scheme was 'inherently unknowable' by debtor due to Defendants' intentional and fraudulent concealment and that fact that the Defendants and other participants in the Billing Schemes were in control of the Debtors." However, the Complaints themselves have not pled facts in support of equitable tolling with respect to Nusbaum or White, including any concealment on either's part. Except to the extent that amendment would be futile for other reasons, such as the claims that were released under the settlement agreement, Nusbaum and White acknowledge that it would be appropriate to grant leave for the Plaintiff to amend the Complaints to allege facts in support of equitable tolling. However, at present the Complaints do not include sufficient facts in support of equitable tolling against either Nusbaum or White.

## **CONCLUSION**

Each of the claims pled in the Complaints fails to meet the *Iqbal/Twombly* standard and should be dismissed. Moreover, (i) all claims were released under the court-approved settlement in CAH 2, CAH 3, CAH 7, CAH 12, and CAH 16, (ii) "aiding and abetting conversion" is not a recognized cause of action in North Carolina or Kansas, Missouri, or Oklahoma, (iii) claims based upon alleged fraudulent billing to certain private insurers assert a particularized harm to such insurers that the Plaintiff lacks standing to pursue, (iv) the facts alleged in the amended complaint in CAH 1 establish that the UDTP Act does not apply, and (v) all claims asserted against Nusbaum or White are time-barred.

NOW, THEREFORE, Defendants Nusbaum and White respectfully request that all claims against them in the Complaints be dismissed.

RESPECTFULLY SUBMITTED this the 17th day of January 2022.

NORTHEN BLUE, LLP

/s/ John Paul H. Cournoyer
John Paul H. Cournoyer, NCSB #42224
1414 Raleigh Road, Suite 435
Chapel Hill, NC  27517
Telephone No. (919) 968-4441
Email: jpc@nbfirm.com

*Counsel for Defendants Nusbaum and White*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by automatic ECF notice upon the following on this date:

Thomas W. Waldrep, Jr.
John R. Van Swearingen
Counsel for the Plaintiffs

This the 17th day of January 2022.

NORTHEN BLUE, LLP

/s/ John Paul H. Cournoyer
John Paul H. Cournoyer, NCSB #42224
1414 Raleigh Road, Suite 435
Chapel Hill, NC  27517
Telephone No. (919) 968-4441
Email: jpc@nbfirm.com

*Counsel for Defendants Nusbaum and White*

27