## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 19-00730-JNC |
| CAH ACQUISITION COMPANY #1, LLC, d/b/a WASHINGTON COUNTY COMMUNITY HOSPITAL, | CHAPTER 11 |
| | Adv. Pro. No. 21-00078-5-JNC |
| THOMAS W. WALDREP, JR., as Litigation Trustee, | |
| Plaintiff, | |
| v. | |
| ESTATE OF PAUL NUSBAUM BY AND THROUGH HIS ADMINISTRATRIX HARRIETT FITZWATER NUSBAUM, STEVE WHITE, JORGE A. PEREZ, RURAL COMMUNITY HOSPITALS OF AMERICA; and HEALTH ACQUISITION COMPANY LLC, | |
| Defendants. | |

## SECOND AMENDED COMPLAINT

Thomas W. Waldrep, Jr., in his capacity as Litigation Trustee in the above-captioned case, complains against Defendants Estate of Paul Nusbaum by and through his Administratrix Harriett Fitzwater Nusbaum, Steve White, Jorge A. Perez, Rural Community Hospitals of America, and Health Acquisition Company LLC, as follows:

## NATURE OF THE ACTION

1.      Defendants aided and orchestrated two coordinated schemes to generate fraudulent reimbursements for laboratory tests at a number of rural hospitals located in multiple states. The schemes–which generated massive amounts in fraudulent billings–defrauded third-party payors, private insurers, patients, and ultimately hospitals, like the above-captioned Debtor, which were utilized as instrumentalities in those schemes.

2.     The schemes, in essence, were straightforward: Defendants caused the hospitals to enter into arrangements with third-party laboratory testing companies. Pursuant to those arrangements, the laboratory testing companies obtained samples from patients throughout the country, none of whom had received treatment from the hospitals or had any connection to the hospitals whatsoever. The parties would then bill those tests to private insurers as if they had been conducted at the hospitals themselves for patients of those hospitals. Doing so allowed the hospitals to charge private insurers higher, in-network reimbursements rates for procedures that were, in reality, out-of-network and should have been reimbursed, if at all, at much lower rates.

3.     As stated, in addition to defrauding private insurers, the schemes also constituted a fraud on the hospitals that Defendants were purporting to serve.  Rather than turning the proceeds of the schemes over to the hospitals, Defendants and their cohorts pocketed much of the ill-gotten gains while exposing the hospitals to massive liability and jeopardizing their relationships with the private insurers on whose reimbursements the hospitals depended to maintain their operations.  In the process, Defendants—who were owners and managers of the Debtor and its associated hospitals and/or controlled the Debtor and its associated hospitals—committed glaring, fundamental breaches of their most basic fiduciary duties.

4.     Ultimately, the schemes destroyed the hospitals, the Debtor being no exception. When it was uncovered, the private insurers targeted by the scheme began heavily scrutinizing the hospitals' claims and, in some instances, stopped doing business with the hospitals entirely. The Debtor and its affiliated hospitals were forced to file for bankruptcy, and some have ceased operation.  As a result, rural communities have been deprived of the health care services, and associated jobs, that they desperately need–all stemming from the callous greed of those like the Defendants that sought to profit off the Debtors' precarious economic status.

5.      The Litigation Trustee thus brings this adversary proceeding, which asserts claims for, among others, breach of fiduciary duty, fraudulent transfer, conversion, fraud, and unfair and deceptive trade practices to rectify the harm that Defendants caused the Debtor's business.

## JURISDICTION AND VENUE

6.      This Adversary Proceeding arises from and relates to the above-captioned bankruptcy case (the "Bankruptcy Case").

7.      This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157(b)(2) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      This is both a core and non-core proceeding pursuant to 28 U.S.C. § 157.

9.      The Plaintiff consents to this Court determining the cause and entering final judgment thereon.

## THE PARTIES

10.      Plaintiff, Thomas W. Waldrep Jr., is the Litigation Trustee of CAH Acquisition Company #1, LLC ("CAH 1," and together with its affiliates in jointly administered cases proceeding before the United States Bankruptcy Court for the Eastern District of North Carolina, the " Hospitals").

11.      On information and belief, Defendant White is a citizen and domiciliary of West Virginia.

12.      On information and belief, at the times alleged in this Complaint, Defendant Nusbaum was a citizen and domiciliary of West Virginia. Mr. Nusbaum is now deceased, and his Estate is being administered by Harriett Fitzwater Nusbaum, Administratrix, as reflected in the Letter of Administration issued by the Kanawha County, West Virginia clerk attached as Exhibit A.

13.      On information and belief, Defendant Perez is a citizen and domiciliary of Florida.

14.     Defendant Rural Community Hospitals of America LLC ("RCHA") is a West Virginia limited liability company.

15.     Defendant Health Acquisition Company, LLC ("HAC") is a West Virginia limited liability company.

## FACTUAL BACKGROUND

### I.    Critical Access Hospitals and the Debtors

16.     The Balanced Budget Act of 1997, Pub. Law. 105-33, created a new category of hospitals, known as critical access hospitals ("CAH").  Hospitals qualify for the CAH program by meeting certain regulatory requirements promulgated by the Centers for Medicare & Medicaid Services ("CMS"), including that the hospital: (1) is located in a rural area; (2) provides 24-hour emergency services seven days a week; (3) has 25 or fewer inpatient beds also used for swing bed services; and (4) has an annual average acute inpatient length stay of 96 hours or fewer.

17.     Congress created the CAH program to address a string of rural hospital closures and a concern about the ongoing financial viability of rural hospitals. The program is designed to ensure the continued viability of rural hospitals, which provide life-saving medical treatment and needed jobs to underserved communities.

18.     To further that goal, CAHs are reimbursed by insurance companies at much higher rates than other hospitals—typically 101 percent of reasonable costs—for most inpatient and outpatient services, including certain laboratory testing procedures.

19.     The Debtor and its affiliates, certain of which are also debtors before this Court, owned and operated a number of for-profit, critical access hospitals (collectively, the Hospitals) that provided acute care, swing bed, emergency medicine, imaging, rehabilitation, laboratory, and related outpatient ancillary services in small rural areas in North Carolina, Kansas, Missouri, and

Oklahoma.  Each of the Hospitals is classified as a CAH or was classified as a CAH before it ceased operations.

20.     In addition to their status as CAHs for purposes of federal reimbursements, each of the Hospitals entered into contractual arrangements with certain private insurers (the "Private Insurers"), pursuant to which the Hospitals would be designated as "in-network" providers.  In-network providers are reimbursed for qualifying medical services and qualifying patients at higher rates than other, "out-of-network" providers.

## II.    The Billing Schemes

21.     At all relevant times, Defendants Nusbaum and White were co-owners of HMC/CAH Consolidated, Inc. ("HMC/CAH").

22.     HMC/CAH owned 100% of the member and shareholder interests in the Debtor and the other Hospitals.

23.     Through HMC/CAH, Defendants Nusbaum and White were in a position of superiority over, and exercised control over, the Debtor and the other Hospitals.

24.     Upon information and belief, Defendants Nusbaum and White owned RCHA, which in turn was the purported manager for the Debtor and the other Hospitals.

25.     In or about late 2015, Defendants RCHA, Nusbaum, and White directed the Debtor and certain affiliated hospitals to enter into the first of two billing schemes—aimed at enriching themselves at the expense of the government, private insurers, and, ultimately, the Hospitals themselves (the "Verifi Scheme").  The Verifi Scheme sought to take advantage of the higher reimbursement rates that the Hospitals received from the Private Insurers in light of their status as "in-network" providers.

26.     Upon information and belief, in furtherance of that scheme, in or around June 2016, Defendants RCHA, Nusbaum, and White directed Debtor Washington County Hospital to enter

into an arrangement with a hospital laboratory management company, LGMG, LLC, d/b/a Verifi Labs ("Verifi"), to dramatically increase the billings that the Hospitals would generate for performing certain laboratory tests, including urine analysis and blood testing to detect the presence of alcohol or illegal drugs.

27.     Upon information and belief, the contract with Verifi was individually signed by Nusbaum on behalf of RCHA.

28.      Under the scheme, Verifi would work with medical providers throughout the country to collect patient samples for urine analysis and blood testing. Virtually all those patients had not received treatment at any of the Hospitals and had never visited any of the Hospitals, and the Hospitals often lacked the necessary equipment and/or staff to perform such services.  In many instances, those patients did not even reside in a state where any of the Hospitals were located.

29.     After the tests were performed (by Verifi and its staff), claims for reimbursement would be submitted to the Private Insurers under the Hospitals' billing credentials, even though in many cases: (1) the Hospitals had not performed the tests; and (2) the patients whose blood or urine was tested did not receive treatment and had no connection to the Hospitals.

30.     Submitting the tests under the Hospitals' billing credentials allowed the Hospitals to claim reimbursement for "in-network" services at the higher rates afforded CAHs—rates that would not have been available had the tests been submitted under the billing credentials of the laboratories where the tests were actually performed.

31.     The Verifi Scheme caused the Hospitals to immediately and dramatically increase the claims that they submitted to the Private Insurers for reimbursement and associated revenue.

32.     In particular, Washington County Hospital's monthly lab department revenue went from $116,325.00 in July 2016 to more than $580,000 the following month, then more than $1.2 million by January 2017.

33.     In the following months of the Verifi Scheme (February 2017 – July 2017), Debtor Washington County Hospital, a rural hospital with only 25 beds, recognized monthly revenue of $853,994.57, $1,256,093.56, $1,311,199.34, $1,185,032.94, $2,120,012.94, and $1,023,015.81 (respectively) for lab worked allegedly performed by the hospital – most of which was actually performed by Verifi, using Verifi's equipment, staff, and facilities.

34.     Upon information and belief, the Debtor was insolvent on the date that the Verifi Scheme began and remained insolvent from that date through the filing of these chapter 11 cases.

35.     At all times, Defendants RCHA, Nusbaum, and White were aware of the Verifi Scheme, as well as the fact that the Verifi Scheme would permit Verifi (through the Hospitals) to seek in-network reimbursement for laboratory tests that otherwise would not have qualified for in-network reimbursement.

36.     Indeed, Defendants RCHA, Nusbaum, and White were the driving force behind the implementation of the Verifi Scheme at Washington. Defendants RCHA, Nusbaum, and White used their control over Washington County Hospital and other related Hospitals, including Debtor I-70, to cause them to enter into arrangements with Verifi to process laboratory tests.

37.     To this end, in or around September of 2016, Defendants Nusbaum and White were actively pushing for the Debtors to engage in an additional lab scheme with Dr. Michael Murphy—the same Michael Murphy that orchestrated the lab scheme detailed in UnitedHealthCare Insurance v. Michael Murphy, M.D. et al., Case No. 5:18-CV-347, filed in the United States District Court for the Western District of Texas (the "Proposed Murphy Scheme").

38.     On September 1, 2016, White, while feigning concerns regarding questions raised by others as to the legality to the proposed scheme, pushed further consideration by the Hospitals stating "I don't have to remind anyone as to the financial challenges we are now facing. This could be a game changer for HMC and merits our expedited attention."

39.     On September 15, 2016, counsel to the Hospitals provided Nusbaum and White with a detailed memorandum discussing the infirmities of lab billing schemes in general – and the Proposed Murphy Scheme in particular. In particular, counsel advised against entering into the Proposed Murphy Scheme because of its "questionable" compliance with anti-kickback and Stark laws.

40.     Defendants Nusbaum and White rebuffed the expert legal guidance.

41.     On September 19, 2016, Nusbaum responded to counsel's analysis, copying White, arguing that "I have reviewed the memorandum you sent regarding the Off Site Model proposed by Dr. Murphy. I obviously disagree with the conclusion and my disagreement is based on days of reviewing rules, regulations, applicable laws and discussions with many hospital experts, including healthcare lawyers both in the private sector and the government."

42.     Continuing to push for participation in the Proposed Murphy Scheme, Nusbaum would later write that he intended to revise the Proposed Murphy Scheme agreements by "cutting and pasting" provisions from Verifi agreements. In response, Brent Lagergren, Vice President and Chief Compliance Officer for RCHA, admonished Nusbaum: "you cut and paste at your own peril…Remember, despite your assertions to the contrary, you are not a lawyer."

43.     Ultimately, Nusbaum, White, and their corporate entity, RCHA, were unable to obtain the Hospitals' acquiescence to enter into the Proposed Murphy Scheme, but the three remained undeterred.

44.     Unfortunately for Defendants RCHA, Nusbaum, and White, as the volume of the Hospitals' reimbursements skyrocketed (though the money ended up in the pockets of the Defendants RCHA, Nusbaum, White, and their co-conspirators), the Hospitals began facing increasing scrutiny from the Private Insurers.

45.     Certain of the Private Insurers began requiring additional documentation and/or additional review before approving claims relating to laboratory testing.  This increased scrutiny impeded the Hospitals' ability to carry out their day-to-day functions, including providing care and obtaining reimbursement for legitimate patients and legitimate medical treatment.

46.     Along these lines, on March 14, 2017, Terry Amstutz, the Chief Executive Officer for Washington County Hospital, wrote Nusbaum and others informing them that Aetna would no longer reimburse Washington County Hospital for its "outreach" labs performed by Verifi Labs. In particular, Aetna advised that the submitted lab claims were "improper" and "constitute[d] a pattern of abusive billing and [gave] rise to a reasonable suspicion of fraud."

47.     Defendants RCHA, Nusbaum, and White continued the scheme in blatant defiance to the advice and guidance they were receiving.  To this end, rather than ensure the Debtor's compliance with applicable law, their principal concern—as detailed in a comprehensive memorandum prepared by Nusbaum—was that the vast majority of the illicit gains were going to Verifi Labs and their former colleague, James Shaffer, while their own management fees (through ownership of RCHA) were not getting paid.

48.     Indeed, in an attempt to avoid heightened scrutiny, while at the same time lining their own pockets, Defendants RCHA, Nusbaum, and White (having been rebuffed on their attempts to join the Proposed Murphy Scheme), had already conspired to use their control over the Debtors to place them into a new lab scheme that, in part, would allow Defendants RCHA,

Nusbaum, and White and their accomplices to spread out the illicit billing among even more Hospitals, and thereby allay increasing suspicion.

**III.  Defendants Effect a Coup and Bring in EmpowerHMS**

49.     In particular, in late 2016, Defendants RCHA, Nusbaum, and White began a campaign to switch horses and join forces with Defendant Perez and EmpowerHMS to utilize the Debtor (and other Hospitals) in a massive fraudulent billing scheme (the "Empower Scheme", collectively with the Verifi Scheme, the "Billing Schemes").

50.     Defendants RCHA, Nusbaum, and White, however, continued to face resistance from co-owners of HMC/CAH, the same owners that refused to consent to the Proposed Murphy Scheme.

51.     On March 5, 2017, Defendant White wrote an email to Jim Shaffer of HMC/CAH, and counsel, Kim Spies, defending the desire to engage Empower and Mr. Perez for purposes of expanding their lab billing scheme to all of the Hospitals and, purportedly, curing the legal deficiencies of their existing program—such as the fact that most of the existing "outreach" lab work under the Verifi Scheme was coming from halfway across the country, rather than from within the states in which the Debtors reside (or even states adjacent thereto)—stating:

> Verifi does not have the ability to provide the volume of specimens in order to expand the program to all of the HMC hospitals.  More importantly, the future long term success of hospital outreach laboratory efforts will be assured if specimen collections are obtained from individuals who reside in the state where the hospitals are located or from individuals in adjacent states…[Empower] was one of only two companies that had the ability to send specimens to our hospitals from instate individuals and more importantly provided all lab testing/analysis of the specimens onsite at HMC hospitals to assure that the proposed effort is 100% compliant with all applicable federal, state and third party payer requirements.

52.     Upon information and belief, Defendants White, Nusbaum, and RCHA knew that the proposed effort was not compliant with all applicable federal, state, and third-party payer requirements at the time that he sent the March 5, 2017 email.

53.     Upon further information and belief, Defendant White wrote the March 5, 2017 email to Ms. Spies and Mr. Shaffer, despite knowing that it was false, for the purpose of inducing Ms. Spies and Mr. Shaffer to approve the engagement of Empower and Defendant Perez for Defendants' personal benefit.

54.     Defendants Nusbaum and RCHA, despite knowledge of the false and misleading statements of White, never corrected the statement or notified management of the Hospitals of White's misrepresentations.

55.     On or about March 6, 2017, Defendants Nusbaum and White presented the Empower Scheme at an HMC/CAH Board Meeting, attended by Defendant Perez, where they reiterated the false statements contained in Defendant White's March 5, 2017 email.

56.     The HMC/CAH Board, however, did not vote in favor of the proposal.  Rather, the Board voted to take the proposed laboratory testing program under advisement for further due diligence.

57.     Faced with the dissent to the expansion of the ongoing illicit scheme to the remaining Hospitals, like it did with respect to the Proposed Murphy Scheme, Defendants Nusbaum and White effected a coup.  While the meeting remained ongoing, Nusbaum and White provided written notice that HAC (a special purpose entity formed by the Defendants for their ownership in HMC/CAH) was exercising its option to acquire 80% of the member/shareholder interests in the Debtors (and related Hospitals).

58.     In furtherance of this coup, on or about March 29, 2017, Defendants Nusbaum and White executed a so-called Conversion Agreement, whereby the Debtors' former corporate parent "sold" 80% of its ownership interests in the Debtors (and related Hospitals) to HAC in exchange for a release of outstanding debt owed to HAC under a prior loan agreement.

59.    At the same time, Defendants Nusbaum, White, and HAC used their control to bring in Defendant Perez, EmpowerHMS, and the Perez Group to implement the Empower Scheme.   Immediately thereafter, on April 20, 2017, Defendants Nusbaum and White sold Defendant Perez (along with Ricardo Perez and Carlos Perez) 50% of HAC.

60.    The Empower Scheme, amazingly, was even worse for the Hospitals.   At least under the Verifi Scheme, some revenue was running through the Debtor and its affiliated hospitals—though the vast majority was immediately transferred to Verifi and other scheme participants, like the Defendants.

61.    Under the Empower Scheme, however, Empower H.I.S. (an Empower affiliate), in dereliction of the fiduciary duties of Defendants RCHA, HAC, Nusbaum, and White, was granted complete control over the operations of each of the Hospitals, including control over their bank accounts, billing systems, and their rights to submit claims to insurance companies with which the Hospitals had in-network contracts.   Along these lines, on April 20, 2017, Defendants RCHA, Nusbaum, and White bestowed Defendant Perez with the title of Primary Manager of HAC, and on August 3, 2017, as reflected in corporate minutes signed by Nusbaum, Defendants RCHA, Nusbaum, and White agreed that Defendant Perez would "be authorized to act on behalf of HAC and any/all of the individual hospital entities … on all matters relating to bank accounts and lending matters including relationships with all banks and government entities."

62.    Likewise, as part of the Empower Scheme, Defendants authorized Empower H.I.S. to install software at both the CAH Hospitals and the third-party laboratories participating in the Empower Scheme. The software enabled their laboratories to transmit patient billing information and associated data by wire to Empower in Miami, Florida, for the purpose of submitting insurance claims to insurers and other third-party payors.

63.     In doing so, Empower was able to pick and choose which Debtor to utilize for purposes of submitting its fraudulent laboratory billings.  As it relates to Washington, lab director, Kari Hardison, began noting a curious daily occurrence.  Every night, she would create a log of all the lab work performed by the Debtor that day, creating hard copies of the related records.  When she would arrive at work the following day, however, numerous additional labs would appear in the Debtor's electronic billing system – notwithstanding that the Debtor's labs had been closed and hospital staff had not run any additional lab work overnight.

64.     When legal concerns regarding this practice were raised directly to defendant Nusbaum (individually and in his capacity at RCHA and HAC), he repeatedly advised that the practice was legal and fully compliant with governing state and federal law.  Upon information and belief, Nusbaum knew those statements to be false at the time he made them.

65.     As an additional issue, rather than revenue initially running to the Hospitals that had any involvement in the related lab work (even if just for billing), the money was placed into a central slush fund maintained by EmpowerHMS.  Upon information and belief, Defendant Perez would then cause Empower to make distributions from that account to himself and its other owners as well other entities and individuals involved in the Empower Scheme.  By doing so, the majority of the revenue never even passed through the Debtor and its affiliated hospitals' financial records, only receiving what Defendant Perez and Empower chose to share.

66.     In concert with the Empower Scheme, Defendants RCHA, HAC, Nusbaum, and White approved this structure in their capacity as owners, managers, and/or controllers of the Debtor and the other Hospitals.  In doing so, the Defendants approved tens of millions of dollars in distributions and transfers to Empower and other scheme participants.

67.     Moreover, though providing Empower with free rein over the Debtor and the other Hospitals' books, records, and billing systems, Defendants RCHA and Nusbaum remained heavily involved in the day-to-day operation of the scheme.  Indeed, Nusbaum acted as a Senior Leader of the Debtor and its affiliated hospitals' Operation Leadership and attended weekly meetings with Empower addressing financial decisions, including, without limitation, relating to the Empower Scheme.

IV.     **Ongoing Misrepresentations to Debtor and Hospital Management**

68.     At all times, based upon their own analysis and advice of counsel, Defendants RCHA, HAC, Nusbaum, and White were aware of the illicit nature of the Billing Schemes.

69.     Notwithstanding such knowledge, when questioned by hospital level management and staff of the legality of the Billing Schemes, such as former president of the Debtor, Melanie Perry, and lab directors Kari Hardison and Carrie Dickerson-Boyd, Defendant Nusbaum repeatedly misrepresented that the Billing Schemes were lawful and that the Debtor was "just like LabCorp," a national reference laboratory.  Of course, that was false.

70.     Upon information and belief, Defendant White, HAC and RCHA were aware of Nusbaum's repeated assurances to Hospital management and staff of the legality of the Billing Schemes.

71.     Defendants HAC, RCHA and White, however, despite knowledge of Nusbaum's false misrepresentations, failed to disclose the illicit nature of the Billing Schemes (or the advice they received with respect thereto) to the management and staff at the hospital tasked with implementation.

72.     The Debtor's management and staff charged with implementation of the Billing Schemes, including, without limitation, Ms. Perry, Ms. Hardison and Ms. Dickerson-Boyd,

reasonably relied upon the Defendants' statements and omissions in implementing the Billing Schemes at the direction of Defendants, RCHA, HAC, Nusbaum, White, and Perez.

**V.    The Billing Schemes Unravel**

73.    In August 2017, the Office of the Missouri State Auditor issued an audit report regarding one of the Hospitals involved in the Empower Scheme, Putnam County Hospital, in Unionville, Missouri (not one of the CAH Hospitals). A copy of the State Auditor's report is attached hereto as Exhibit B.

74.    The State Auditor found that Putnam County Hospital had seen a "significant increase of questionable revenues from laboratory billings of health insurance companies" arising from "out-of-state patients for lab work not conducted in Putnam County."

75.    The State Auditor noted that hospital officials "have not provided sufficient support to justify why such activity is being billed through the hospital." The State Auditor further noted that at least one private insurance company was no longer paying any claims for the hospital as a result of the Empower Scheme, and that "[c]ontinued use of such questionable laboratory billings could leave the hospital at risk if such activity is deemed to be inappropriate by the insurance companies billed . . .."

76.    The State Auditor determined that the billings generated by Putnam County Hospital alone exceeded $90 million between December 2016 and May 2017, as compared to $12.7 million for all of fiscal year 2015, and $7.5 million for all of fiscal year 2016.

77.    The State Auditor noted that, while billings had exploded, little of that money was actually going to Putnam County Hospital.  Instead, 80 percent of the new revenues were disbursed to the laboratory companies (including those owned and operated by Defendant Perez), with an additional 6 percent going to the billing company and another portion going to out-of-state phlebotomists.

78.     Following the State Auditor's report, the Private Insurers filed lawsuits seeking to recover the amounts they paid the Debtor and the Hospitals for the fraudulent claims.

79.     Some of the Private Insurers also terminated their relationships with the Hospitals, thereby depriving the Hospitals of a needed source of revenue. For example, in February 2018, Blue Cross Blue Shield of Oklahoma ("BCBS") announced that four Hospitals participating in the Empower Billing Scheme would no longer be a part of BCBS of Oklahoma's network.

80.     The uncovering of the Empower Scheme also drew the attention of the federal government. On June 17, 2020, the United States Department of Justice indicted a number of participants in the Empower Scheme, including Defendant Perez, for conspiracy, wire fraud, health care fraud, and money laundering, in a case captioned United States v. Jorge Perez, et al., 3:20-cr-86 (M.D. Fla.), relating to a similar scheme at a Florida hospital.

## VI.    The Debtors' Bankruptcies

81.     Ultimately, the Debtors' participation in the Billing Schemes doomed the Debtor and its affiliated hospitals' businesses.  On February 19, 2019 (the "Petition Date"), Washington County, North Carolina, Medline Industries, Inc., and Dr. Robert Venable (collectively, the "Petitioning Creditors") filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against one of the CAH Hospitals, CAH Acquisition Company #1, LLC ("CAH 1," Case No. 19-00730).

82.     On March 15, 2019, CAH 1's bankruptcy case was converted from Chapter 7 to Chapter 11, and the Litigation Trustee was appointed as the Chapter 11 Trustee for CAH 1 pursuant to Section 1104 of the Bankruptcy Code.

83.     In March and April 2019, six of CAH 1's affiliates, CAH Acquisition Company 2, LLC ("CAH 2,"Case No. 19-01230), CAH Acquisition Company 3, LLC ("CAH 3," Case No. 19-01180), CAH Acquisition Company 6, LLC ("CAH 6," Case No. 01300), CAH Acquisition

16

Company 7, LLC ("CAH 7," Case No. 19-01298), CAH Acquisition Company 12, LLC ("CAH 12," Case No. 19-01697), and CAH Acquisition Company 16, LLC ("CAH 16," Case No. 19-01227), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "Bankruptcy Cases").

84.     On October 19, 2020, the Court entered an Order of Conversion in which CAH 6 was converted from a case under Chapter 11 to a Chapter 7 Case.

85.     On that same date, the Court confirmed CAH 1's Amended Chapter 11 Plan of Orderly Liquidation (the "Washington Plan").  The Effective Date (as defined in the Washington Plan) occurred on November 3, 2020.

86.     On December 7, 2020, the Court confirmed Chapter 11 plans for each of CAH 2, CAH 3, CAH 7, CAH 12, and CAH 16.  The Effective Dates for each such plan (as defined in the respective plans) was: (i) December 22, 2020 for CAH 7 and CAH 12; and (ii) February 20, 2021 for CAH 2, CAH 3, and CAH 16.  The Effective Date of each such plan converted those Chapter 11 estates into litigation trusts (each a "Litigation Trust," and altogether, the "Litigation Trusts").

87.     Plaintiff is the Litigation Trustee under each of the above-mentioned plans, vested with the authority to pursue all claims on behalf of the Debtors' estates.

88.     On January 5, 2021, the Court entered an order extending the time for Plaintiff to pursue claims on behalf of the Debtor and its affiliated hospitals' estates to and including March 1, 2022.  The Court subsequently entered an order allowing the Debtor and the other Hospital estates through and including May 4, 2022, within which to amend the complaint against defendants Nusbaum and White.

VII.     **The Trustee's Investigation**

89.     In February of 2019, when the Trustee was notified of the potential for his appointment, he conducted a site visit to Washington County Hospital.  There, he was informed

by Curtis Potter, the attorney for Washington County, regarding pending investigations by federal and state entities into the Empower H.I.S., LLC, Empower HMS, and related entities ("Empower"), who served as pre-petition management for the Debtors.  On the same trip, Melanie Perry, then serving as the CEO of Washington County Hospital, informed the Trustee that (i) Empower removed all local control over and access to the facility's financial operations when it assumed control, and (ii) Empower had recently shut down substantially all local access to the facility's computer system.

90.    Following his appointment, the Trustee was able to obtain access to a network of servers in Kansas City, Missouri, which had served as the nerve center for the Debtors' operations. The Trustee worked diligently to inspect and maintain the data on those servers and engaged third party experts to assist in that endeavor.  Further, the Trustee sought protection of such data through the *Trustee's Emergency Motion for Authority to Access and Preserve Data Located at or Managed by Onpar Technologies, to Authorize Onpar Technologies to Maintain Its Litigation Hold on Such Data, and to Enjoin All Persons and Entities from Accessing, Deleting, or Modifying any Such Data*.  See Case No. 19-00730, D.I. 244.

91.    Certain data on the servers facilitated the Trustee's ability to reopen and operate, through new management companies, the hospitals at Washington County Hospital, CAH 7, CAH 12, and CAH 16.  The Trustee subsequently utilized Relativity e-Discovery software to analyze the Kansas City servers for evidence or other records related to the Billing Scheme, but the Trustee found that the servers contained little actual financial information.

92.    The primary focus of the Trustee, from his initial appointment through December of 2020, was (i) returning health care services to those communities with facilities that could be reopened; (ii) organizing and conducting Section 363 sales of the Debtors' facilities; (iii) working

to resolve a dispute between competing secured creditors asserting interests in the assets of CAH 2, CAH 3, CAH 7, CAH 12, and CAH 16; (iv) resolving payroll tax non-compliance issues; and (v) creating confirmable plans for each of the Chapter 11 Debtors.

93.     However, during this period, the Trustee continued to attempt to investigate the Billing Scheme.  In April of 2020, the Trustee sought authority to obtain special litigation counsel from the firm of McDonald Hopkins LLC in the case of Washington County Hospital.  Case No. 19-00730, D.I. 756.  On May 12, 2020, the Court approved such employment.  Case No. 19-00730, D.I. 784.

94.     In early June of 2020, the Court granted the Trustee's motions for Bankruptcy Rule 2004 examinations by depositions and production of documents from Empower and additional related entities, iHealthcare, Inc. and two affiliates thereof ("iHealthcare").  Empower did not cooperate with the subpoenas and failed to designate an officer for deposition or produce documents.

95.     The Trustee identified potential accounts associated with Empower and its affiliates as recipients of payments from the Debtors on the Debtors' respective financial records.  In August of 2020, the Trustee sought and obtained authority pursuant to Bankruptcy Rule 2004 to issue subpoenas to U.S. Bank National Association ("U.S. Bank"); TD Bank, N.A. ("TD Bank"); Branch Banking and Trust Company, now Truist Bank ("BB&T"); BankUnited, N.A. ("BankUnited"); and Bank of Hays to obtain financial records concerning the Debtors' transactions with Empower.

96.     In October of 2020, the Trustee sought and obtained authority pursuant to Bankruptcy Rule 2004 to issue subpoenas to De la Hoz, Perez & Barbeito, P.A. (the accounting firm for Empower); Santiago "Sandy" Pique (the former CFO of Empower); and Ernesto Fesser (the former corporate controller for Empower and iHealthcare).

97.     On January 5, 2021, the Court entered the Extension Orders, providing the Trustee with an extension through March 1, 2022 to file adversary proceedings. The Court subsequently entered an order allowing the Debtor and the other Hospital estates through and including May 4, 2022, within which to amend the complaint against defendants Nusbaum and White.

98.     Following the effective dates of the Plans of Washington County Hospital, CAH 2, CAH 3, CAH 7, and CAH 12, the Trustee (in his capacity as Litigation Trustee) employed Forensic Strategic Solutions ("FSS"), a forensic accounting firm, to review and analyze the Debtors' financial records and documents to begin constructing the flow of transactions related to the Billing Schemes.  The Court approved the employment of FSS.

99.     In September of 2021, directed by the diligent efforts of FSS, the Trustee sought and obtained authority pursuant to Bankruptcy Rule 2004 to issue subpoenas to several insurance companies; the Centers for Medicare and Medicaid Services; Jose Salazar; JVS Billing Services, Inc.; and additional financial institutions.[1]

100.    As a result of FFS's review of financial records produced in response to the subpoenas, the Trustee determined that additional discovery was warranted on newly-identified bank accounts from which transfers were made to outside clinical reference labs, consultants, physicians, marketing entities, and other third parties that facilitated and/or benefitted from the Billing Schemes in the two years preceding the Petition Date.  In December of 2021, the Trustee sought and obtained authority pursuant to Bankruptcy Rule 2004 to issue subpoenas to thirteen additional financial institutions that were determined to hold accounts for Empower and related entities.

---

[1] In November of 2021, the Trustee sought and obtained authority pursuant to Bankruptcy Rule 2004 to issue corrected subpoenas to Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of Oklahoma, and Wells Fargo Bank, N.A.

101.    Despite the best efforts of the Trustee and his professionals, these investigations have neither been fast nor simple.  The complete failure of Empower, its related entities, and related individuals to comply with the Trustee's discovery efforts has required the Trustee to reconstruct the Debtors' historical finances through multiple rounds of discovery.  These efforts have not been straightforward.  For example, U.S. Bank—which appears to have been the primary bank through which the proceeds from the Billing Schemes were distributed—informed the Trustee in December of 2021 that the bank could not use any automated process to pull records for more than 11,000 bank transactions involving hundreds of millions of dollars in transfers to unknown third parties. At the Trustee's request, U.S. Bank has begun pulling each transaction manually. That process has taken months and the Trustee is still awaiting completion of that production.[2]  Although the Trustee was able to access the data of the Debtors that was contained in the servers in Kansas City, no server for Empower records has been found or accessed, which considerably slowed and enlarged the investigative process.

### COUNT I
### (BREACH OF FIDUCIARY DUTY)
### (DEFENDANTS RCHA, HAC, NUSBAUM, AND WHITE)

102.    The Litigation Trustee realleges and incorporates paragraphs 1 through 101 as though set forth fully herein.

103.    Defendants Nusbaum and White were 50% owners of HMC/CAH, the entity that itself owned the Debtor and the Hospitals up and through March 29, 2017.

104.    Defendants Nusbaum and White were 50% owners of HAC, the entity that owned the Debtor and the Hospitals following March 29, 2017.

---

[2] As noted in the Opposition to the Motion to Set Aside the Extension Orders, the Trustee has reason to believe that many of those transfers were made in connection with the Billing Schemes and may assist the Trustee in identifying potential defendants. However, the Trustee has been unable to confirm all the recipients of those transfers and will not be able to do so until U.S. Bank's collection work is completed.

105.    Upon information and belief, Defendant Nusbaum served as a manager of and managed the Debtor and the Hospitals from March 29, 2017 through at least June 2018.

106.    Upon information and belief, Defendant RCHA served as a manager of and managed the Debtor and the Hospitals at all times relevant hereto, up and through at least June 2018.

107.    Given their corporate positions, active management, position of superiority over the Debtor, and control over the Debtor and the Hospitals through their ownership of HMC/CAH, Defendants RCHA, HAC, Nusbaum, and White owed the Debtor statutory and fiduciary duties, including duties of care and loyalty.

108.    Given their corporate positions and active management, position of superiority over the Debtor, and control over the Debtor through their ownership of HMC/CAH, Defendants RCHA, HAC, Nusbaum, and White owed fiduciary duties, including duties of care and loyalty, to the Debtor's creditors.

109.    The duty of care requires a fiduciary to exercise the care which an ordinary and prudent person would use in similar circumstances.  Among other things, the duty of care requires a fiduciary to refrain from taking steps that the fiduciary knows or should know would expose the entity to civil or criminal liability.

110.    The duty of loyalty requires a fiduciary to refrain from placing his or her own personal pecuniary interest above the interest of the entity as a whole.  A fiduciary must deal openly and honestly with the entity and is prohibited from usurping the entity's benefits or opportunities.

111.    Defendants RCHA, HAC, Nusbaum, and White each took actions and or made statements to the Debtor's management and staff misrepresenting that the Billing Schemes were lawful.

112.    Defendants RCHA, HAC, Nusbaum, and White never disclosed to the Debtor's management and staff charged with implementing the Billing Schemes the advice received by various counsel that the Billing Schemes were illicit, notwithstanding representations made to such individuals of the legality thereof.

113.    Defendants RCHA, HAC, Nusbaum, and White breached their duties of care by:

a.  Causing or permitting the Debtor and/or the other Hospitals to enter into both the Verifi Scheme and the Empower Scheme, thereby exposing the Debtor to civil and criminal liability, jeopardizing the Debtor's relationships with third-party payors, and threatening their continued financial viability.

b.  Causing or permitting the Debtor to make exorbitant distributions and/or dividends to themselves and/or Empower at a time when the Debtor was insolvent and/or which rendered the Debtor insolvent.

c.  Failing to ensure that the Debtor's financial statements, including without limitation federally mandated cost reports, accurately represented the Debtor's financial conditions.  Indeed, Defendants Nusbaum and White effectively "handed over the keys" to Empower, allowing it access and control over the Debtor's electronic billing system, thereby frustrating the ability of the Debtor to accurately track billings, revenue, and income associated with the Billing Schemes.

d.  Failing to be active monitors of the Debtor's corporate performance and the effects of the distributions made as part of the Billing Schemes.

114.     Defendants RCHA, HAC, Nusbaum, and White breached their duties of loyalty by:

a.  Causing the Debtor to enter into the Billing Schemes for the pecuniary gain of Defendants Nusbaum and White despite their knowledge that the Billing Schemes were unlawful and would expose the Debtor to civil and criminal liability, could result in third-party payors terminating their relationships with the Debtor, and could threaten its continued financial viability.

b.  Usurping the Debtor's opportunities for their own benefit. In particular, even though the supposed purpose of the Billing Schemes was to increase the Debtor's revenues, Defendants Nusbaum and White instead misappropriated the money for their own benefit.

c.  Misrepresenting to the Debtor's management and staff the legality of the Billing Schemes that they were required to implement at direction of the Defendants.

d.  Failing to disclose the illicit nature of the Billing Schemes to management and employees tasked with its implementation, notwithstanding knowledge of prior statements and actions which rendered the omissions as misleading and fraudulent.

115.     It is evident from the foregoing allegations that, at all relevant times, Defendants RCHA, HAC, Nusbaum, and White repeatedly and deliberately decided to elevate their individual interests over the interests of the Debtor and its creditors.

116.     As a direct and proximate result of breaches by Defendants RCHA, HAC, Nusbaum, and White of their fiduciary duties, the Debtor's business was destroyed, impairing creditors, and imperiling the ongoing necessity of medical care for at risk locations.

117.     The behavior of Defendants RCHA, HAC, Nusbaum, and White constitutes gross negligence.

118.    The behavior of Defendants RCHA, HAC, Nusbaum, and White was extreme and outrageous, justifying the imposition of punitive damages.

119.    The Debtor has suffered damages in an amount to be proven at trial, but no less than $10 million.

Wherefore, the Litigation Trustee requests entry of a final judgment for the benefit of the Litigation Trust against Defendants RCHA, HAC, Nusbaum, and White for breach of fiduciary duty and awarding the Litigation Trust damages of no less than $10 million, awarding attorneys' fees and costs, punitive damages, and granting such further relief as is just and appropriate.

## COUNT II
## (BREACH OF FIDUCIARY DUTY)
## (DEFENDANT PEREZ)

120.    The Litigation Trustee realleges and incorporates paragraphs 1 through 119 as though set forth fully herein.

121.    On April 20, 2017, Defendant Perez was appointed as the Primary Manager of HAC.  On information and belief, Defendant Perez remained in that role at all relevant times.

122.    Given his role as the Primary Manager of HAC, which gave him active management and control over the Debtor and the Hospitals, Defendant Perez owed the Debtor and the Hospitals statutory and fiduciary duties, including duties of care and loyalty.

123.    Given his role as the Primary Manager of HAC, which gave him active management and control over the Debtor and the Hospitals at times when they were insolvent, Defendant Perez owed fiduciary duties, including duties of care and loyalty, to the Debtor's creditors.

124.    The duty of care requires a fiduciary to exercise the care which an ordinary and prudent person would use in similar circumstances.  Among other things, the duty of care requires

a fiduciary to refrain from taking steps that the fiduciary knows or should know would expose the entity to civil or criminal liability.

125.     The duty of loyalty requires a fiduciary to refrain from placing his or her own personal pecuniary interest above the interest of the entity as a whole.  A fiduciary must deal openly and honestly with the entity and is prohibited from usurping the entity's benefits or opportunities.

126.     Defendant Perez breached his duty of care by:

a.   Causing or permitting the Debtor and/or the CAH Hospitals to enter into the Empower Scheme, thereby exposing the Debtor to civil and criminal liability, jeopardizing the Debtor's relationships with third-party payors, and threatening their continued financial viability.

b.   Causing or permitting the Debtor to make exorbitant distributions and/or dividends to Empower, and through Empower, to himself, at a time when the Debtor was insolvent and/or which rendered the Debtor insolvent.

c.   Failing to ensure that the Debtor's financial statements, including without limitation federally mandated cost reports, accurately represented the Debtor's financial conditions.

127.     Defendant Perez breached his duty of loyalty by:

a.   Causing the Debtor to enter into the Empower Scheme for his own pecuniary gain despite knowledge that the Empower Scheme was unlawful and would expose the Debtor to civil and criminal liability, could result in third-party payors terminating their relationships with the Debtor, and could threaten its continued financial viability.

b.  Usurping the Debtor's opportunities for his own benefit. In particular, even though the supposed purpose of the Empower Scheme was to increase the Debtor's revenues, Defendant Perez instead misappropriated the money for his own benefit.

128.   It is evident from the foregoing allegations that, at all relevant times, Defendant Perez repeatedly and deliberately decided to elevate his individual interests over the interests of the Debtor and its creditors.

129.   As a direct and proximate result of breaches by Defendant Perez of his fiduciary duties, the Debtor's business was destroyed, impairing creditors, and imperiling the ongoing necessity of medical care for at risk locations.

130.   Defendant Perez's behavior constitutes gross negligence.

131.   Defendant Perez's behavior was extreme and outrageous, justifying the imposition of punitive damages.

132.   The Debtor has suffered damages in an amount to be proven at trial, but no less than $10 million.

Wherefore, the Litigation Trustee requests entry of a final judgment for the benefit of the Litigation Trust against Defendant Perez for breach of fiduciary duty and awarding the Litigation Trust damages of no less than $10 million, awarding attorneys' fees and costs, punitive damages, and granting such further relief as is just and appropriate.

**COUNT III**
**(CONSTRUCTIVE FRAUDULENT TRANSFER)**
**(ALL DEFENDANTS)**

133.   The Litigation Trustee realleges and incorporates paragraphs 1 through 132 as though set forth fully herein.

134.    In their capacity as owners and managers of the Debtor and the other Hospitals, Defendants improperly approved millions in distributions to EmpowerHMS and to themselves and/or businesses that they controlled.

135.    Upon information and belief, RCHA improperly received funds on account of the Billing Schemes from Debtor, the other Hospitals, and HMC/CAH, including but not limited to, those listed in Exhibit C, attached hereto and incorporated herein. Thus, upon information and belief, Nusbaum and White as owners of RCHA received funds directly or indirectly from the Billing Schemes.

136.    Upon information and belief, EmpowerHMS transferred funds received on account of the Empower Scheme to the Defendants, either directly or through entities controlled by the Defendants, in furtherance of the Empower Scheme.

137.    Upon information and belief, HAC improperly received funds on account of the Billing Schemes from Debtor, the other Hospitals, and HMC/CAH, including but not limited to, those listed in Exhibit D, attached hereto and incorporated herein.,

138.    Upon information and belief, Defendants Nusbaum and White, as 50% owners of HAC, indirectly received funds transferred to bank accounts held and controlled by HAC, including but not limited to, HAC's Operating Account, US Bank Account ending in 8759.

139.    Upon information and belief, Nusbaum improperly received funds on account of the Billing Schemes from Debtor, the other Hospitals, and HMC/CAH, including but not limited to, those listed in Exhibit E, attached hereto and incorporated herein.

140.    Defendants caused the Debtor, the other Hospitals, and HMC/CAH to make the distributions set out in Exhibits C, D and E in connection with, and in furtherance of, the Billing Schemes (the "Insider Distributions").

141.    The Insider Distributions were made without fair consideration.

142.    The Insider Distributions were made for less than reasonably equivalent value.

143.    The Insider Distributions were made while the Debtor had unreasonably small capital.

144.    The Insider Distributions were made while the Debtor intended to incur or believed they would incur debts beyond their ability to pay such debts as they matured.

145.    The Insider Distributions were made in connection with the Billing Schemes and outside the course of ordinary business.

146.    The Insider Distributions are avoidable under N.C. Gen. Stat. § 39-23.5 and 11 U.S.C. §§ 544 and 548.

147.    The Litigation Trustee may recover the Insider Distributions pursuant to 11 U.SC. § 550.

Wherefore, the Litigation Trustee requests entry of a final judgment avoiding the Insider Distributions and a judgment for the benefit of the Litigation Trust against the Defendants for the improper distributions and payments arising out of the Billing Schemes, awarding attorneys' fees and costs, and granting such further relief as is just and appropriate.

**COUNT IV**
**(ACTUAL FRAUDULENT TRANSFER)**
**(ALL DEFENDANTS)**

148.    The Litigation Trustee realleges and incorporates paragraphs 1 through 147 as though set forth fully herein.

149.    In their capacity as owners and managing managers of the Debtor and the Hospitals, Defendants approved millions in distributions to EmpowerHMS and to themselves and/or businesses which they controlled.

150.    Upon information and belief, EmpowerHMS transferred funds received on account of the Empower Scheme to the Defendants, either directly or through entities controlled by the Defendants, in furtherance of the Empower Scheme.

151.    Upon information and belief, Debtor, the other Hospitals, and HMC/CAH transferred funds received on account of the Billing Schemes to RCHA including but not limited to, those listed in Exhibit C, attached hereto and incorporated herein.  Upon information and belief, Nusbaum and White as owners of RCHA received funds directly or indirectly from the Billing Schemes.

152.    Upon information and belief, HAC improperly received funds on account of the Billing Schemes from Debtor, the other Hospitals, and HMC/CAH, including but not limited to, those listed in Exhibit D, attached hereto and incorporated herein.

153.    Upon information and belief, Defendants Nusbaum and White, as 50% owners of HAC, indirectly received funds transferred to bank accounts held and controlled by HAC, including but not limited to, HAC's Operating Account, US Bank Account Number 1-455-9286-8759.

154.    Upon information and belief, Nusbaum improperly received funds on account of the Billing Schemes from Debtor, the other Hospitals, and HMC/CAH, including but not limited to, those listed in Exhibit E, attached hereto and incorporated herein.

155.    Defendants caused the Debtor, the other Hospitals, and HMC/CAH to make the distributions set out in Exhibits C, D and E in connection with, and in furtherance of, the Billing Schemes (the "Insider Distributions").

156.    The Insider Distributions were made to insiders of the Debtor.

157.    The Insider Distributions rendered the Debtor insolvent.

158.    The Insider Distributions were made without fair consideration.

159.    The Insider Distributions were made for less than reasonably equivalent value.

160.    The Insider Distributions were made while the Debtor had unreasonably small capital.

161.    The Insider Distributions were made while the Debtor intended to incur or believed they would incur debts beyond their ability to pay such debts as they matured.

162.    The Insider Distributions were made in connection with the Billing Schemes and outside the course of ordinary business.

163.    The Insider Distributions were made for purposes of hindering and/or defrauding the Debtor's creditors.

164.    The Insider Distributions are avoidable pursuant to N.C. Gen. Stat. § 39-23.4 and 11 U.S.C. §§ 544 and 548.

165.    The Litigation Trustee may recover the Insider Distributions pursuant to 11 U.S.C. § 550.

Wherefore, the Litigation Trustee requests entry of a final judgment avoiding the Insider Distributions and a judgment for the benefit of the Litigation Trust against the Defendants for the improper distributions and payments arising out of the Billing Schemes, awarding attorneys' fees and costs, and granting such further relief as is just and appropriate.

## COUNT V
## (CONVERSION)
## (AGAINST DEFENDANT PEREZ)

166.    The Litigation Trustee realleges and incorporates paragraphs 1 through 165 as though set forth fully herein.

167.    Through the Empower Scheme, the Debtor and the other Hospitals generated millions of dollars in billings for laboratory testing.

168.    The Debtor and the other Hospitals submitted those billings to private insurers through reimbursement.

169.    As the entities invoicing private insurers for those billings, the Debtor had immediate ownership and right of possession of the money private insurers paid to Empower in connection with those billings.

170.    The private insurers reimbursed the Debtor and the other Hospitals electronically. Those electronic transfers can be identified by the specific source, specific amount, and specific destination of the funds in question.

171.    Through his ownership and control of Empower, Defendant Perez caused the money received from private insurers in connection with the Empower Scheme to be deposited into a central fund owned and controlled by Empower, rather than in the accounts of the Debtor or the other Hospitals.

172.    Defendant Perez then wrongfully converted those funds for his own benefit by causing Empower to distribute the money to himself and the other owners of Empower.

173.    As a result of Defendant Perez's actions, the Debtor and the other Hospitals never received the majority of the reimbursements generated by the Empower Scheme.

174.    As a direct and proximate result of Defendant Perez's wrongful conversion of the reimbursements, the Debtor suffered losses in an amount to be proven at trial but not less than $10,000,000.00.

Wherefore, the Litigation Trustee requests entry of a final judgment for the benefit of the Litigation Trust against Defendant Perez for conversion and awarding the Litigation Trust damages of no less than $10,000,000, and granting such further relief as is just and appropriate.

### COUNT VI
### (UNFAIR AND DECEPTIVE TRADE PRACTICES)

**(ALL DEFENDANTS)**

175.    The Litigation Trustee realleges and incorporates paragraphs 1 through 174 as though set forth fully herein.

176.    The actions and omissions of Defendants, as alleged in the Factual Background and in Counts One through Six of this Amended Complaint, were unfair as defined by N.C.G.S. § 75-1.

177.    The actions and omissions of Defendants, as alleged in the Factual Background and in Counts One through Six of this Amended Complaint, were deceptive as defined N.C.G.S. § 75-1.1.

178.    At all relevant times, Defendants were engaged in commerce in the State of North Carolina, and the unfair and deceptive actions and omissions of Defendants were in and affecting commerce in this state. The unfair and deceptive acts and omissions of Defendants directly impacted the business activities of the Debtor, including but not limited to:

a.  Causing or permitting the Debtor and/or the other Hospitals to enter into both the Verifi Scheme and the Empower Scheme, thereby exposing the Debtor to civil and criminal liability, jeopardizing the Debtor's relationships with third-party payors, and threatening the Debtor's continued financial viability.

b.  Failing to ensure that the Debtor's financial statements, including without limitation federally mandated cost reports, accurately represented the Debtor's financial conditions, and allowing Empower access and control over the Debtor's electronic billing system, thereby frustrating the ability of the Debtor to accurately track billings, revenue, and income associated with the Billing Schemes.

c. Causing or permitting the Debtor to make exorbitant Insider Distributions to themselves and/or Empower and failing to be active monitors the effects of the Insider Distributions, which were made without fair consideration and for less than reasonably equivalent value, and while the Debtor had unreasonably small capital, rendering the Debtor insolvent.

179. As a direct and proximate result of Defendants' unfair and deceptive trade practices as described herein, the Debtor has suffered damages in an amount to be proven at trial, but no less than $10 million.

Wherefore, the Litigation Trustee requests entry of a final judgment for the benefit of the Litigation Trust against Defendants for unfair and deceptive trade practices and awarding the Litigation Trust damages of no less than $10,000,000 and granting such further relief as is just and appropriate. Pursuant to N.C. Gen. Stat. § 75-16, the Debtor is entitled to have all damages trebled. Pursuant to N.C. Gen. Stat. § 75-16.1, the Debtor is entitled to have and recover its reasonable attorney's fees incurred in bringing this action.

## COUNT VII
## (FRAUD)
## (DEFENDANTS RCHA, HAC, NUSBAUM, AND WHITE)

180. The Litigation Trustee realleges and incorporates paragraphs 1 through 179 as though set forth fully herein.

181. Defendants Nusbaum and White were 50% owners of HMC/CAH, the entity that itself owned the Debtor and the other Hospitals up and through March 29, 2017.

182. Defendants Nusbaum and White were 50% owners of HAC, the entity that owned the Debtor and the other Hospitals following March 29, 2017.

183. Upon information and belief, Defendant Nusbaum served as a manager of the Debtor and the other Hospitals from March 29, 2017 through at least June of 2018.

184.    Upon information and belief, Defendant RCHA served as a manager of the Debtor and the other Hospitals at all times relevant hereto, up and through at least June of 2018.

185.    Given their corporate positions, active management, position of superiority over the Debtor, and control over the Debtor and the other Hospitals through their ownership of HMC/CAH, Defendants RCHA, HAC, Nusbaum, and White owed the Debtor statutory and fiduciary duties, including duties of care and loyalty.

186.    Given their corporate positions and active management, position of superiority over the Debtor, and control over the Debtor through their ownership of HMC/CAH, Defendants RCHA, HAC, Nusbaum and White owed fiduciary duties to the Debtor's creditors.

187.    A fiduciary must deal openly and honestly with the entity and has an affirmative obligation to disclose any and all material facts that might impact the beneficiary's interest.

188.    Defendants RCHA, HAC, Nusbaum, and White received numerous opinions by counsel and third parties that the Billing Schemes were unlawful.

189.    Notwithstanding repeated warning from counsel that the Billing Schemes were illegal, Defendants RCHA, HAC, Nusbaum and White never disclosed such advice to the Debtor's Hospital level management and staff charged with implementing the Billing Schemes (the "Hospital Management").

190.    Moreover, Defendants RCHA, HAC, Nusbaum, and White each made affirmative representations to the Debtor's Hospital Management that the Billing Schemes were lawful, either knowing those statements were false or with reckless disregard as to the truth thereof.

191.    Defendants RCHA, HAC, Nusbaum, and White never sought to correct the misrepresentations made to the Debtor's Hospital Management.

192.    Defendants RCHA, HAC, Nusbaum and White made these statements with the intent that the Debtor and the Hospital Management would implement the Billing Schemes.

193.    The Debtor's Hospital Management reasonably relied upon, and in fact acted upon: (i) the false statements of Defendants RCHA, HAC, Nusbaum and White with respect to the legality of the Billing Schemes; and (ii) the failure of Defendants RCHA, HAC, Nusbaum, and White to correct those misstatements.

194.    As a direct and proximate result of the fraud of Defendants RCHA, HAC, Nusbaum, and White, the Debtor's business was destroyed, impairing creditors, and imperiling the ongoing necessity of medical care for at risk locations.

195.    Defendants RCHA, HAC, Nusbaum, and White each benefited by receiving distributions on account of the Billing Schemes.

196.    The behavior of Defendants RCHA, HAC, Nusbaum, and White was extreme and outrageous, justifying the imposition of punitive damages.

197.     The Debtor has suffered damages in an amount to be proven at trial, but no less than $10 million.

Wherefore, the Litigation Trustee requests entry of a final judgment for the benefit of the Litigation Trust against Defendants RCHA, HAC, Nusbaum, and White for fraud and awarding the Litigation Trust damages of no less than $10 million, awarding attorneys' fees and costs, punitive damages, and granting such further relief as is just and appropriate.

## COUNT VIII
## (CONSTRUCTIVE FRAUD)
## (DEFENDANTS RCHA, HAC, NUSBAUM, AND WHITE)

198.    The Litigation Trustee realleges and incorporates paragraphs 1 through 197 as though set forth fully herein.

199.    Defendants Nusbaum and White were 50% owners of HMC/CAH, the entity that itself owned the Debtor and the other Hospitals up and through March 29, 2017.

200.    Defendants Nusbaum and White were 50% owners of HAC, the entity that owned the Debtor and the other Hospitals following March 29, 2017.

201.    Upon information and belief, Defendant Nusbaum served as a manager of the Debtor and the other Hospitals from March 29, 2017 through at least June of 2018.

202.    Upon information and belief, Defendant RCHA served as a manager of the Debtor and the other Hospitals at all times relevant hereto, up and through at least June of 2018.

203.    Given their corporate positions, active management, position of superiority over the Debtor, and control over the Debtor and the other Hospitals through their ownership of HMC/CAH, Defendants RCHA, HAC, Nusbaum, and White owed the Debtor statutory and fiduciary duties.

204.    Given their corporate positions and active management, position of superiority over the Debtor, and control over the Debtor through their ownership of HMC/CAH, Defendants RCHA, HAC, Nusbaum, and White owed fiduciary duties, including duties of care and loyalty, to the Debtor's creditors.

205.    A fiduciary must deal openly and honestly with the entity and has an obligation to disclose any and all material facts that might impact the beneficiary's interest.

206.    Defendants RCHA, HAC, Nusbaum, and White received numerous opinions by counsel and third parties that the Billing Schemes were unlawful.

207.    Notwithstanding their knowledge of the illicit nature of the Billing Schemes, Defendants RCHA, HAC, Nusbaum, and White used their authority over the Debtor and the other Hospitals to enter them into the Empower Scheme.

208.     Notwithstanding repeated warning from counsel that the Billing Schemes were illegal, Defendants RCHA, HAC, Nusbaum, and White never disclosed such advice to the Debtor's Hospital Management.

209.     Moreover, Defendants RCHA, HAC, Nusbaum, and White each made affirmative representations to the Debtor's Hospital Management that the Billing Schemes were lawful, either knowing those statements were false or with reckless disregard as to the truth thereof.

210.     Defendants RCHA, HAC, Nusbaum, and White never sought to correct the misrepresentations made to the Debtor's Hospital Management.

211.     The Debtor's Hospital Management reasonably relied upon, and in fact acted upon: (i) the false statements of Defendants RCHA, HAC, Nusbaum, and White with respect to the legality of the Billing Schemes; and (ii) the failure of Defendants RCHA, HAC, Nusbaum and White to correct those misstatements.

212.     As a direct and proximate result of the fraud of Defendants RCHA, HAC, Nusbaum and White, the Debtor's business was destroyed, impairing creditors, and imperiling the ongoing necessity of medical care for at risk locations.

213.     Defendants RCHA, HAC, Nusbaum, and White each benefited by receiving distributions on account of the Billing Schemes.

214.     The behavior of Defendants RCHA, HAC, Nusbaum, and White was extreme and outrageous, justifying the imposition of punitive damages.

215.      The Debtor has suffered damages in an amount to be proven at trial, but no less than $10 million.

Wherefore, the Litigation Trustee requests entry of a final judgment for the benefit of the Litigation Trust against Defendants RCHA, HAC, Nusbaum, and White for fraud and awarding

the Litigation Trust damages of no less than $10 million, awarding attorneys' fees and costs, punitive damages, and granting such further relief as is just and appropriate.

Respectfully submitted, this the 26th day of April, 2022.

/s/  Micah E. Marcus
Micah E. Marcus
Christopher Allen
McDONALD HOPKINS LLC
300 North LaSalle Street, Suite 1400
Chicago, Illinois 60654
Telephone: (312) 280-0111
Facsimile: (312) 280-8232
mmarcus@mcdonaldhopkins.com
callen@mcdonaldhopkins.com

Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
James D. Wall (NC Bar No. 17947)
J. Dennis Bailey (NC Bar No. 12847)
James C. Lanik (NC State Bar No. 30454)
Jennifer B. Lyday (NC Bar No. 39871)
Natalia L. Talbot (NC Bar No. 55328)
WALDREP WALL BABCOCK & BAILEY PLLC
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
Telefax: 336-717-1340
Email: notice@waldrepwall.com

*Attorneys for the Trustee*