**SO ORDERED.**

**SIGNED this 22 day of September, 2022.**

_Joseph N. Callaway_
**Joseph N. Callaway**
**United States Bankruptcy Judge**

---

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

In re:

|  |  |
|---|---|
| CAH ACQUISITION COMPANY #1, LLC, d/b/a WASHINGTON COUNTY COMMUNITY HOSPITAL, | Case No. 19-00730-5-JNC<br>Chapter 11 |

Thomas W. Waldrep, Jr., as Litigation Trustee,

    Plaintiff,

    v.                                           Adv. Pro. No. 21-00078-5-JNC

Estate of Paul Nusbaum by and through His Administratrix Harriett Fitzwater Nusbaum, Steve White, Jorge A. Perez, Rural Community Hospitals of America and Health Acquisition Company LLC,

    Defendants.

In re:

|  |  |
|---|---|
| CAH ACQUISITION COMPANY #2, LLC, d/b/a OSWEGO COMMUNITY HOSPITAL, | Case No. 19-01230-5-JNC<br>Chapter 11 |

Thomas W. Waldrep, Jr., as Litigation Trustee,

    Plaintiff,

    v.                                                                              Adv. Pro. No. 21-00079-5-JNC

Estate of Paul Nusbaum by and through His
Administratrix Harriett Fitzwater Nusbaum, Steve
White, Jorge A. Perez, Rural Community
Hospitals of America and Health Acquisition
Company LLC,
  Defendants.

---

In re:

    CAH ACQUISITION COMPANY #3, LLC,                  Case No. 19-01180-5-JNC
    d/b/a HORTON COMMUNITY HOSPITAL,                        Chapter 11

---

Thomas W. Waldrep, Jr., as Litigation Trustee,

    Plaintiff,

    v.                                                                              Adv. Pro. No. 21-00080-5-JNC

Estate of Paul Nusbaum by and through His
Administratrix Harriett Fitzwater Nusbaum, Steve
White, Jorge A. Perez, Rural Community
Hospitals of America and Health Acquisition
Company LLC,

    Defendants.

---

In re:

    CAH ACQUISITION COMPANY 6, LLC,                     Case No. 19-01300-5-JNC
    d/b/a I-70 COMMUNITY HOSPITAL,                            Chapter 7

---

Thomas W. Waldrep, Jr., as Chapter 7 Trustee,

    Plaintiff,

2

      v.                                             Adv. Pro. No. 21-00081-5-JNC

Estate of Paul Nusbaum by and through His Administratrix Harriett Fitzwater Nusbaum, Steve White, Jorge A. Perez, Rural Community Hospitals of America and Health Acquisition Company LLC,

    Defendants.

---

In re:

    CAH ACQUISITION COMPANY 7, LLC,           Case No. 19-01298-5-JNC
    d/b/a PRAGUE COMMUNITY HOSPITAL,        Chapter 11

---

Thomas W. Waldrep, Jr., as Litigation Trustee,

    Plaintiff,

      v.                                             Adv. Pro. No. 21-00082-5-JNC

Estate of Paul Nusbaum by and through His Administratrix Harriett Fitzwater Nusbaum, Steve White, Jorge A. Perez, Rural Community Hospitals of America and Health Acquisition Company LLC,

    Defendants.

---

In re:

    CAH ACQUISITION COMPANY 12, LLC,       Case No. 19-01697-5-JNC
    d/b/a FAIRFAX COMMUNITY HOSPITAL,      Chapter 11

---

Thomas W. Waldrep, Jr., as Litigation Trustee,

    Plaintiff,

      v.                                             Adv. Pro. No. 21-00083-5-JNC

Estate of Paul Nusbaum by and through His

3

Administratrix Harriett Fitzwater Nusbaum, Steve White, Jorge A. Perez, Rural Community Hospitals of America and Health Acquisition Company LLC,
   Defendants.

---

In re:

CAH ACQUISITION COMPANY 16, LLC, d/b/a HASKELL COUNTY COMMUNITY HOSPITAL,

Case No. 19-01227-5-JNC

Chapter 11

---

Thomas W. Waldrep, Jr., as Litigation Trustee,
   Plaintiff,

v.

Adv. Pro. No. 21-00084-5-JNC

Estate of Paul Nusbaum by and through His Administratrix Harriett Fitzwater Nusbaum, Steve White, Jorge A. Perez, Rural Community Hospitals of America and Health Acquisition Company LLC,
   Defendants.

## ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS

The matters before the court are the virtually identical motions to dismiss amended complaints filed on July 15, 2022, by or on behalf of defendants Estate of Paul Nusbaum ("Nusbaum"),[1] Steve White ("White"), Rural Community Hospitals of America ("RCHA"), and Health Acquisition Company, LLC ("HAC") (collectively, the "Defendants"), in each of the related adversary proceedings listed in the combined captions above (*see, e.g.,* Dkt. 41 in AP case

---

[1] Paul Nusbaum as an individual was an original defendant. Unfortunately, post-filing he passed away, and a Suggestion of Death of Paul Nusbaum was filed on the docket on February 24, 2022 (AP Dkt. 27). On April 26, 2022, a consent order was entered substituting The Estate of Paul Lawrence Nusbaum, by and through his Administratrix Harriet Fitzwater Nusbaum, in place of Mr. Nusbaum as a named defendant in these actions. For consistency, Paul Nusbaum and The Estate of Paul Nusbaum are collectively referred to as "Nusbaum."

21-00078) (collectively, the "Motions"). Plaintiff Thomas W. Waldrep, Jr., as Litigation Trustee in each chapter 11 case identified in the captions above (except as chapter 7 trustee in Case No. 19-01300), filed responses in opposition (*see, e.g.,* Dkt. 43 in AP case 21-00078). A hearing on the Motions was held on August 30, 2022, in Greenville, North Carolina. The matters were taken under advisement. After due consideration, the Motions are denied for the reasons stated below.

### Procedural History of the Adversary Proceedings

Thomas W. Waldrep, Esq. (the "Trustee") was appointed as the chapter 11 Trustee for the seven related medical centers and hospital chapter 11 debtors filed in seven separate bankruptcy cases brought before this court in 2019.[2] CAH 6 subsequently converted to a chapter 7 proceeding, and he was named as the chapter 7 trustee in that case. The Trustee subsequently obtained chapter 11 plan confirmation orders in CAH 1, 2, 3, 7, 12, and 16 chapter 11 cases as discussed below, and he was named as the Litigation Trustee in those six cases.

On August 6, 2021, the Trustee commenced the seven above-captioned adversary proceedings by filing substantially similar complaints on behalf of the litigation trusts in the chapter 11 cases and the bankruptcy estate in CAH 6 against defendants Paul Nusbaum, White, and Jorge A. Perez ("Perez") (AP Dkt. 1; the "Complaint").[3]  The Complaint in the CAH 1 Action

---

[2] CAH Acquisition #1, LLC d/b/a Washington County Hospital, Case No. 19-00730 ("CAH 1"); CAH Acquisition Company #2, LLC d/b/a Oswego Community Hospital, Case No. 19-01230 ("CAH 2"); CAH Acquisition Company #3, LLC, d/b/a Horton Community Hospital, Case No. 19-01180 ("CAH 3"); CAH Acquisition Company 6, LLC, d/b/a I-70 Community Hospital, Case No. 19-01300 ("CAH 6"); CAH Acquisition Company 7, LLC, d/b/a Prague Community Hospital, Case No. 19-01298 ("CAH 7"); CAH Acquisition Company 12, LLC, d/b/a Fairfax Community Hospital, Case No. 19-01697 ("CAH 12"); and CAH Acquisition Company 16, LLC, d/b/a Haskell County Community Hospital, Case No. 19-01227 ("CAH 16").

[3] For simplicity's sake, unless otherwise specified, all AP docket number and date references used herein refer to CAH 1 (Case No. 19-730) and its associated Adv. Pro. No. 21-00078-5-JNC (the "CAH 1 Action"). It and the other adversary proceedings subject to this Order, being Adv. Pro. No. 21-00079 (the "CAH 2 Action"); Adv. Pro. No. 21-00080 (the "CAH 3 Action");  Adv. Pro. No. 21-00081 (the "CAH 6 Action"); Adv. Pro. No. 21-00082 (the "CAH 7 Action"); Adv. Pro. No. 21-00083 (the "CAH 12 Action"); and Adv. Pro. No. 21-00084 (the "CAH 16 Action"). All referenced matters are collectively referenced herein as the "CAH Actions."

was amended as a matter of right on September 9, 2021, adding a claim under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. 75-1.1 et seq. (AP Dkt. 6). Defendant Perez failed to appear, answer, or otherwise respond in any of the related adversary proceedings. Entries of default (AP Dkt. 13) were entered against him in the CAH Actions. Nusbaum and White filed a first set of motions to dismiss (AP Dkt. 15) in the CAH Actions on November 11, 2021.

After hearing, on February 1, 2022, orders were entered granting the first set of motions to dismiss[4] in part as to Nusbaum and White in the CAH Actions, summarized as follows:

- All counts in the CAH 1 Action were dismissed as to Nusbaum and White, except the breach of fiduciary duty and NC UDTPA causes of action;

- All counts in the CAH 6 Action were dismissed as to Nusbaum and White, except the breach of fiduciary duty cause of action; and

- All counts in the CAH 2 Action, CAH 3 Action, CAH 7 Action, CAH 12 Action, and CAH 16 Action were dismissed as to Nusbaum and White.

Upon request made at the hearing, the effect of the orders dismissing the specified cases or causes of actions on the initial motion was stayed to permit the Trustee time to file amended complaints in the CAH Actions. After extensions, the Trustee filed amended complaints (the "Amended Complaint")[5] in each adversary proceeding on April 26, 2022 (AP Dkt. 32). The Amended Complaint added RCHA and HAC as defendants in addition to Nusbaum, White, and Perez; added considerable details; and revised the claims to assert the following causes of action:

---

[4] The claims against Perez were unaffected by the orders as he remains in default.
[5] Because the Trustee had already amended the Complaint once as a matter of right in the CAH 1 Action, the amended complaint in it is a second amended complaint. In all the other CAH Actions, the Trustee filed a first amended complaint. For uniform reference purposes, all are commonly referred to as the Amended Complaint.

| Count I: Breach of Fiduciary Duty | Against Defendants Nusbaum, White, RCHA, and HAC |
|---|---|
| Count II: Breach of Fiduciary Duty | Against Defendant Perez only |
| Count III: Constructive Fraudulent Transfer (544/548 and corresponding state statutes) | Against Defendants Nusbaum, White, RCHA, HAC, and Perez |
| Count IV: Actual Fraudulent Transfer (544/548 and corresponding state statutes) | Against Defendants Nusbaum, White, RCHA, HAC, and Perez |
| Count V: Conversion | Against Defendant Perez only |
| Count VI: Unfair and Deceptive Trade Practices (CAH 1 only) | Against Defendants Nusbaum, White, RCHA, HAC, and Perez |
| Count VI/VII: Fraud[6] | Against Defendants Nusbaum, White, RCHA, and HAC |
| Count VII/VIII: Constructive Fraud | Against Defendants Nusbaum, White, RCHA, and HAC |

On June 16, 2022, Nusbaum and White filed a Motion to Grant Derivative Standing or Permission to Intervene to Defend Claims Asserted Against Health Acquisition Company, LLC (Dkt. 38; the "Motion to Intervene"). No appearance was made on behalf of HAC after the filing of the Amended Complaint as it is ostensibly managed by defendant Perez. The Motion to Intervene sought authority for Nusbaum and White, as holders of membership and economic interests in HAC, to defend claims asserted against HAC due to Perez's failure to appear and apparent shirking of all duties. The Motion to Intervene was unopposed and granted on July 15, 2022 (AP Dkt. 40).

On July 15, 2022, defendants Nusbaum, White, RCHA, and HAC filed the presented Motions, seeking to dismiss all claims asserted against them in the Amended Complaint (AP Dkt. 41), supported by a Memorandum of Law in Support (AP Dkt. 42). The Trustee opposes the

---

[6] Count VII in the CAH 1 Action and Count VIII in all others; similarly with respect to Count VII/Count VIII.

Motions to Dismiss in his filings made August 5, 2022 (AP Dkt. 43).

### Background of the Bankruptcy Cases

In considering Rule 12 motions, a court must construe well-pleaded allegations in the light most favorable to the non-moving party, here the Trustee. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 440 (4th Cir. 2011). Pertinent allegations from the Amended Complaint are discussed below for motion to dismiss analysis purposes only, and do not constitute findings of fact. In sum, the Trustee maintains and alleges that the Defendants, as fiduciaries of the Debtors, knowingly or with sufficient state of mind caused the Debtors to enter fraudulent insurance billing schemes, which ultimately forced the Debtors into severe financial difficulties leading to the filing of the various CAH bankruptcy cases. These schemes were not isolated incidents, according to the Trustee, but part of a concerted plan to generate fraudulent reimbursements in the millions of dollars for improper laboratory tests performed at the behest of but not by the Debtor hospitals, allowing the Defendants in turn to siphon and take significant amounts of the ill-gotten gains from the coffers of the Debtors.

On February 19, 2019, three creditors filed an involuntary petition against CAH 1 seeking relief under chapter 7 of the Bankruptcy Code. The Trustee was immediately appointed as interim trustee in that bankruptcy estate. On March 15, 2019, the claim for relief was granted without opposition, and by consent the CAH 1 case was converted to chapter 11. The Trustee was, again with the consent of all parties, appointed as CAH 1's chapter 11 trustee for pursuant to § 1104 of the Bankruptcy Code.

In March and April of 2019, along with four other related chapter 11 cases not pertinent here, the relevant six CAH affiliates, being CAH 2, CAH 3, CAH 6, CAH 7, CAH 12, and CAH

8

16, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Nusbaum and White were the designated officers or control persons for the seven CAH entities responsible for overseeing and compiling the information necessary for filing required bankruptcy schedules and statements and signing various documents necessary to undertake the chapter 11 process.  After determination of venue issues, the chapter 11 cases for these seven CAH entities were retained or brought before this court. The Trustee was duly named and appointed as the chapter 11 trustee in each case. On October 19, 2020, CAH 6 was converted from chapter 11 to chapter 7, and by order, the Trustee continued to serve therein but as the chapter 7 trustee.

On October 19, 2020, CAH 1's proposed chapter 11 amended plan of liquidation was confirmed by Order of Confirmation (Dkt. 1006). The effective date for that plan occurred on November 3, 2020.  On December 7, 2020, separate orders confirming the pending proposed plans of reorganization in the CAH 2, CAH 3, CAH 7, CAH 12, and CAH 16 chapter 11 cases were entered. The effective dates for these plans subsequently occurred on: December 22, 2020, for CAH 7 and CAH 12; February 20, 2021, for CAH 2 and CAH 3; and May 31, 2022, for CAH 16. In each referenced chapter 11 case, the respective confirmed plan contemplates postconfirmation litigation regarding the pre-bankruptcy activities of Perez and actions by others bearing a nexus to fraud. The plans provide that the Litigation Trustee will conduct investigations and file suit where advisable. Authority to pursue the claims was vested solely in him.

Prior to the petition dates, the seven named Debtors owned and operated for-profit, critical access hospitals or medical centers (collectively, the "Hospitals") located in rural areas of North Carolina, Kansas, Missouri, and Oklahoma. A "critical access hospital" is a category of special medical care institutions created by Congress in the Balanced Budget Act of 1997, Publ. Law. 105-

9

33, to ensure the continued viability of medical services in rural, sparsely populated, or economically challenged areas. Critical access hospitals must meet certain regulatory requirements, including: (1) be located in a rural or other special area; (2) provide 24-hour emergency services seven days a week; (3) have 25 or fewer inpatient beds also used for swing bed services; and (4) have an annual average acute inpatient stay of 96 hours or less. Critical access hospitals are reimbursed by insurance companies at higher rates than other hospitals—typically 101 percent of reasonable costs—for most inpatient and outpatient services, including laboratory testing procedures. Each of the Hospitals are or were classified as a critical access hospital. The Debtors also entered into contractual arrangements with private insurers pursuant to which the Hospitals were designated as "in-network" providers who would be reimbursed for qualifying medical services and qualifying patients at higher rates than other "out-of-network" providers. (Am. Compl. ¶ 16-20.)

Nusbaum and White co-owned HMC/CAH Consolidated, Inc. ("HMC/CAH"), which in turn owned 100% of the member and shareholder interests in the Debtors and therefore owned and controlled the Hospitals. At all pertinent times, Nusbaum and White were in a position of authority and exercised control over the Debtors, and consequently the economic aspects of the Hospitals through the Debtors. Additionally, Nusbaum and White owned RCHA, which managed the Hospitals. (Am. Compl. ¶¶ 25—26.)

In 2015, Nusbaum and White, acting through RCHA, directed the Debtors to enter into a billing contract referred to and described in detail in the Amended Complaint as the "Verifi Scheme." The purpose behind the Verifi Scheme was to enable Defendants to obtain more insurance reimbursement work, even when performed off site, at "in-network" rates and at the

10

higher rates afforded critical access hospitals.  By at least early 2017, the Hospitals began facing increasing scrutiny from private insurance companies regarding the Verifi Scheme and whether the work performed was actually within the corresponding Hospital's care area or for its patients. Some insurance companies began requiring additional documentation and heightened review regarding certain claims. At least one major insurer declined to reimburse Washington County Hospital (CAH 1) for its "outreach" labs performed by Verifi.  (Am. Compl. ¶¶ 26—36.)

Meanwhile, in 2016, in an attempt to further extend the higher paying insurance scheme, Nusbaum and White attempted to ensnare the Debtors into an additional lab testing and billing scheme with Dr. Michael Murphy (the "Proposed Murphy Scheme"). Against the advice of legal counsel, Nusbaum and White continued to push the Debtors to participate in the Proposed Murphy Scheme, and it may have been entered but for the fortuitous timing of the filing of an action to recover fraudulent lab billing proceeds for millions of dollars under circumstances similar if not identical to the Proposed Murphy Scheme with other hospitals detailed in *United Health Care Insurance v. Michael Murphy, M.D., et al.* Case No. 5:18-CV-347, United States District Court for the Western District of Texas. (Am. Compl.  ¶¶ 37—43.)[7]

Undeterred by increased scrutiny from insurance companies in the Verifi Scheme and the legal woes of Dr. Murphy, and despite the advice of counsel to the contrary, defendants RCHA, Nusbaum, and White pushed Debtors to enter into another questionable billing scheme, this time with defendant Perez and Empower HMS and its affiliate Empower H.I.S. (collectively "Empower" and referred to by the Trustee as the "Empower Scheme").  When Nusbaum and White

---

[7] Although ultimately not entered into, the Trustee maintains the attempt to enter into the Proposed Murphy Scheme shows the state of mind of the Defendants and is a badge of fraud.

were unsuccessful in convincing the Boards of HMC/CAH to enter the Empower Scheme, they provided written notice that HAC (the special purpose entity formed by Nusbaum and White to hold their ownership in HMC/CAH) would exercise its option to acquire 80% of the member/shareholder interests in the Debtors and thereby control the Hospitals. In early 2017, Debtors' former corporate parents exchanged 80% of its ownership interests in the Debtors and related hospitals to HAC in exchange for the release of outstanding debt owed to HAC under a prior loan agreement. Defendants Nusbaum, White, and HAC used the usurped control to enter the Empower agreement with Perez. Within a month of this transaction, Nusbaum and White sold Perez (including his family members) 50% of HAC. (Am. Compl. ¶¶48—67).

The Verifi Scheme and the Empower Scheme were relatively straightforward. Under the unfettered control of the Defendants, the Debtors entered into the arrangements with third party laboratory testing companies (the "labs") not located in the Hospitals, and often not even in the same state. The labs obtained samples from patients throughout the country, none of whom had received treatments from and were not prior patients of the Hospitals. The lab tests would then be billed to private insurers as if the work had been conducted at the Hospitals for qualified patients in rural service areas. By doing so, the Debtors were able to charge private insurers the higher, in-network reimbursement rates available to critical access hospitals for procedures that, in reality, were out-of-network and should have been charged or reimbursed at normal lower rates.

As owners and managers of the Debtors, and as owners of companies controlling the Hospitals as critical access care facilities, Defendants owed a fiduciary duty to the Debtors. Further, in implementing the Verifi and the Empower Schemes, rather than the Debtors receiving these funds for the benefit of critical access rural hospital services, Defendants, along with others

12

involved in the scheme, pocketed millions of dollars in fees and charges while exposing the Debtors to liability and jeopardizing their relationships with private insurers.

Integral to the Verifi and Empower Schemes, Defendants allowed Empower and Perez to take financial control of the Debtors and Hospitals, including billing systems, bank accounts, and the right to submit insurance claims. Defendants RCHA, Nusbaum, and White gave Perez the title of "Primary Manager" of HAC and authorized him to act on its behalf.  Worse than the Verifi Scheme, the Empower Scheme allowed all the money to be placed in a fund maintained and controlled solely by Empower. As a result, Perez caused Empower to take significant distributions from that account to himself and family members. Those funds belonged to the Debtors for work performed by or at least funneled through the Hospitals.  The fund diversions caused significant financial loss and distress to the Debtors. (Am. Compl. ¶ 61—67.)

The Trustee alleges that all matters related to the Verifi and Empower Schemes occurred with the knowledge and acquiescence of Nusbaum and White in violation of their fiduciary duties to the Debtors, and with sufficient knowledge or scienter due to, among other things, being advised not to undertake and participate in the schemes by counsel.  It is further alleged that Nusbaum and White failed to disclose the true nature of the Verifi and Empower Schemes to management and staff at the Hospitals in violation of their fiduciary duties, and for the purposes of protecting their own financial interests at the cost of those of the Debtors. The Hospitals' staff and management relied on the statements and omissions of Defendants in implementing the Verifi and Empower Schemes and billing practices. (Am. Compl. ¶¶ 68—72.)

The schemes began to unravel when the Office of the Missouri State Auditor issued an audit report of an affiliated non-Debtor hospital that was also involved in the Empower Scheme.

13

Afterwards, other regulators were alerted, and private insurers stopped paying the Debtors for the lab services and made demand or filed lawsuits to recover amounts paid to Debtors under the two schemes. (Am. Compl. ¶¶ 73—79). Meanwhile, Perez and other participants affiliated with Empower were indicted on criminal charges in the Middle District of Florida for a similar if not identical scheme at a Florida hospital system. (Am. Compl. ¶ 80, *see United States v. Jorge Perez, et al.*, 3:20-CR-86 (M.D. Fla.)).[8]

## DISCUSSION

### I.    Standard of Review

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." If a complaint fails to meet this threshold obligation, the action should be dismissed under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In reviewing a motion to dismiss, the court must accept as true all allegations of fact contained in a complaint. *E.I. du Pont de Nemours &Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 440 (4th Cir. 2011).

To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly* 550 U.S. 544, 570; 127 S. Ct. 1955, 1960 (2007). The court must accept all well-pleaded allegations as true but need not accept as true conclusory allegations. "Only a complaint that states a plausible claim for relief survives a

---

[8] The indictment in Florida charged Perez for a similar scheme. On June 27, 2022, he was convicted by a jury of one count of conspiracy to commit health care fraud and wire fraud, five counts of health care fraud, and one count of conspiracy to commit money laundering.  The jury was unable to reach a verdict on three other counts and a retrial on those counts is pending.  Also pending before the Middle District of Florida, is a motion for a new trial based on several reasons, including alleged juror misconduct and undisclosed juror bias.  Because of the pending retrial and motion for new trial, Mr. Perez has not yet been sentenced.

motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009); *see also Adcock v. Freightliner, LLC*, 550 F.3d 369, 374 (4th Cir. 2008) (mere legal conclusions do not warrant automatic assumption of truth by the court). The allegations must be more than a "formulaic recitation of the elements" of a claim. *Id.* at 681.

A claim has facial plausibility when the plaintiff pleads enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 554 (4th Cir. 2013). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678, 129 S. Ct. at 1949. Thus, dismissal under Rule 12(b)(6) is proper when, from the face of the complaint, it is clear that the plaintiff's claims are not supported by law, that one or more facts necessary to assert a plausible claim have not been pled, or that facts exist that necessarily defeat the plaintiff's claims.

"In evaluating a Fed. R. Civ. P. 12(b)(6) motion, a court may rely on documents outside the pleadings if they are integral to the plaintiff's claims and their authenticity is not disputed. The court may also rely on matters subject to judicial notice." *Anderson v. Kimberly-Clark Corp.*, 570 Fed. Appx. 927, 932 (Fed. Cir. 2014) (internal citations omitted).

Additionally, Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff "state with particularity the circumstances constituting fraud or mistake;" while "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. Rule. Civ. P. 9(b). Therefore, all of the Trustee's claims based on fraud must meet the heightened pleading standard of Rule 9(b).

## II.    Analysis

Defendants move to dismiss the Amended Complaint on the following five grounds (1) the court lacks subject matter jurisdiction over the purely state law claims in this postconfirmation setting; (2) the settlement agreements bar all the non-fraud claims in CAH 2, 3, 7, 12, and 16 (but not CAH 1 or CAH 6); (3) the fraudulent transfer claims are inadequately pled; (4) the fraud claims do not meet the heightened pleading standards required under Rule 9 of the Federal Rules of Civil Procedure; and (5) White should be dismissed as a defendant because there is no allegation that he controlled the Debtors or received any money from the Debtors.

### A.    Jurisdiction

Defendants move to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing the Amended Complaint asserts purely state law causes of action for breach of fiduciary duty, active fraud, constructive fraud, and unfair and deceptive trade practices under North Carolina law in the CAH 1 Action (Dkt. 42) over which the bankruptcy court lacks subject matter jurisdiction post confirmation.[9] The Trustee responds that the claims have a sufficiently close nexus to the underlying bankruptcy proceeding to establish "related to" subject matter jurisdiction under 28 U.S.C. § 1334(b).

> The plaintiff has the burden of proving that subject matter jurisdiction exists. *See Richmond, Fredericksburg & Potomac R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir. 1991). When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* The district court should grant the Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

*Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999).

---

[9] This argument does not apply to the claims asserted in CAH 6, which is a chapter 7 case, or to the chapter 5 causes of action for constructive fraudulent transfer and actual fraudulent transfer.

As with all federal courts, United States Bankruptcy Courts are courts of limited jurisdiction. Whether for preconfirmation or postconfirmation time periods, in bankruptcy cases, jurisdiction must be traced to 28 U.S.C. § 1334(b). Under that statute, a federal district court, and the bankruptcy court by reference, only has subject matter jurisdiction over civil proceedings that (i) arise under, (ii) arise in, or (iii) are related to a bankruptcy case. 28 U.S.C. § 1334(b). Claims that "arise in" or "arise under" the Bankruptcy Code are known as "core proceedings." *See* 28 U.S.C. § 157(b)(2). "Related to" jurisdiction is more expansive as it includes non-core claims such as state law claims existing as of the filing of the bankruptcy case, such as the matters presently being challenged. *See In re Avado Brands, Inc.*, 358 B.R. 868 (Bankr. N.D. Tex. 2006).

"[A] bankruptcy court always has an obligation to examine its jurisdiction to hear post-confirmation adversary proceedings." *Valley Historic Ltd. P'ship v. Bank of New York,* 486 F.3d 831, 839 (4th Cir. 2007). In determining whether a non-core matter is "related to" the bankruptcy case pre-petition, the court examines "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1983). Defendants are correct, and the Trustee does not contest, that subject matter jurisdiction for bankruptcy courts is narrowed after plan confirmation. *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 165-66 (3d Cir. 2004) (holding that in the post-plan confirmation context, the bankruptcy court did not have "related to" jurisdiction in adversary proceedings for non-core, state law claims such as breach of contract and tortious interference with contract where the claims had no "close nexus" with the administration of a confirmed chapter 11 bankruptcy plan).

The Third Circuit close nexus test has been adopted by the Fourth Circuit as a "logical

17

corollary of 'related to' jurisdiction" analysis at the post-confirmation stage. *Valley Historic Ltd. P'ship,* at 837 ("Analytically, [the close nexus test] insures that the proceeding serves a bankruptcy administration purpose on the date the bankruptcy court exercises that jurisdiction."). In determining whether a close nexus is presented postconfirmation, the *Avado* court utilized a six-factor test[10]:

> (1) when the claim at issue arose; (2) what provisions in the confirmed plan exist for resolving disputes and whether there are provisions in the plan retaining jurisdiction for trying these suits; (3) whether the plan has been substantially consummated; (4) the nature of the parties involved; (5) whether state law or bankruptcy law applies; and (6) indices of forum shopping.

*Avado*, 358 B.R. at 878 (*citing In re Encompass Services Corp.*, 337 B.R. at 873).

In the present case, the Amended Complaint brings four state law-based causes of action: (1) breach of fiduciary duty; (2) unfair and deceptive trade practices (CAH 1 Action only), (3) fraud, and (4) constructive fraud.[11] In applying the close nexus test to non-core state and common law claims, the circuit courts instruct:

> Whether a matter has a close nexus to a bankruptcy plan or proceeding is particularly relevant to situations involving continuing trusts, like litigation trusts, where the plan has been confirmed, but former creditors are relegated to the trust res for payment on account of their claims. To a certain extent, litigation trusts by their nature maintain a connection to the bankruptcy even after the plan has been confirmed. The question is how close a connection warrants post-confirmation bankruptcy jurisdiction. Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus.

*Resorts Int'l* at 167. S*ee Valley Historic,* 486 F.3d at 836-37.

---

[10] *Avado* cited the six-factor test as originating in *Gilbane Building Co. v. Air Systems, Inc. (In re Encompass Services Corp.)* 337 B.R. 864, 872-873 (Bankr. S.D. Tex. 2006). The same test was used in the postconfirmation jurisdiction context by a bankruptcy court in this circuit In *In re Air Cargo, Inc.*, 401 B.R. 178 (Bankr. D. Md. 2008).

[11] As acknowledged by Defendants, core proceedings brought in the Amended Complaint under Chapter 5 of the Bankruptcy Code are not subject to dismissal for lack of subject matter jurisdiction.

To have the requisite close nexus, the claims must require a court to "interpret a plan or plan documents to resolve a dispute." *In re ACandS Inc.,* 2011 WL 2371243 at *3 (Bankr. D. Del. August 8, 2011). The fact that the action "will affect . . . former creditors as Litigation Trust beneficiaries" or result in a possible recovery to creditors is insufficient. "[I]f the mere possibility of a gain or loss of trust assets sufficed to confer bankruptcy court jurisdiction, any lawsuit involving a continuing trust would fall under the 'related to' grant," which "would widen the scope of bankruptcy court jurisdiction beyond what Congress intended for non-Article III bankruptcy courts." *Resorts Int'l* at 170. Even though these claims existed prepetition (being discovered postpetition), it is not contested that they are "related to" to the bankruptcy case. Defendants instead maintain the bankruptcy court does not have jurisdiction following plan confirmation because these causes of action at issue do not require "interpretation, implementation, consummation, execution, or administration of the confirmed plan." *Valley Historic*, 486 F.3d at 836–37. The litigation trust, Defendants contend, is not a continuation of the bankruptcy estate even though it holds the same assets (the choses in action). A standard retention of jurisdiction provision in a confirmed plan does not confer jurisdiction. Rather, jurisdiction must exist by statute; it cannot be created by consent of the parties or a stand-alone court order. *See New Horizon of N.Y. LLC v. Jacobs,* 231 F.3d 143, 155 (4th Cir. 2000).

The Trustee counters that the confirmed plans in these cases specifically contemplated and reserved bankruptcy court jurisdiction over both core and non-core claims connected to the scheme of Perez to strip the CAH entities of assets in a wrongful or fraudulent manner and commit fraud against the Debtors and private insurance companies.[12] The Trustee points to specific provisions

---

[12] As previously noted, defendant Perez and other participants were indicated in the Middle District of

19

contained in the plans regarding assignment of claims to the Litigation Trust for recovery and distribution of net proceeds to creditors and holders of allowed claims in their relative priority of allowed claims. While conceding that the "close nexus" test applies, he maintains that each claim at issue satisfies its requirement that a "matter affects interpretation, implementation, consummation, execution, or administration of the confirmed plan." *Valley Historic*, 486 F.3d at 836–37.

Considering whether a close nexus exists, the court looks to the six-factor test from *Avado* as a tool. First, in the present case, the subject claims here arose from entirely prepetition activity. In contrast, the malpractice claim at issue in *Resorts Int'l* arose from the postpetiton actions of debtor's accountants.  Second, the plan and the settlement agreement reached between the Trustee and Defendants specified and contemplated that all fraud claims would be retained and pursued in the bankruptcy court.[13] (See Order Confirming Plan, Case No. 19-1230, Dkt. 509.)  Unlike *Resorts Int'l* and *Valley Historic*, but as in *Avado*, Defendants constitute insiders and fiduciaries of the Debtors as the owners, managers, and control persons of the pre-petition management company and the parent company thereof. The claims alleged involve participation in a systematic and illegal medical billing scheme as insiders of the Debtors. In addition, as the signatories to the case schedules and the sworn statement of financial affairs filed in each case, individual defendants Nusbaum and White are fiduciaries not only of the Debtors but to the court as well. If the Trustee's

---

Florida for a similar scheme at a Florida Hospital. (Am. Compl. ¶ 80; *see United States v. Jorge Perez*, et al., 3:20-CR-86 (M.D. Fla.)). This hospital is not connected to the Debtors, but the underlying scheme was similar.

[13] On October 28, 2020, this court entered an *Order Granting Motion to Approve Compromise and Settlement Pursuant to Fed. R. Bankr. P. 9019*, in the cases of CAH 2, 3, 7, 12, and 16. *See* Case No. 19-01230, Dkt. 491; Case No. 19-01180, Dkt. 549; Case No. 19-01298, Dkt. 778; Case No. 19-01697, Dkt. 734; and Case No. 19-01227, Dkt. 686 (collectively, the "Settlement Orders"). Each of the Settlement Orders was substantially identical, and approved a certain settlement agreement between Nusbaum, White, the Trustee, and two other parties (the "Settlement Agreement").  A copy of the Settlement Agreement is attached to the Settlement Orders.

allegations are proven true, the certification of the information provided to the court and creditors as true and accurate under penalty of perjury would be called into question.[14]

As to the third factor, none of the CAH confirmed plans of reorganization have been substantially consummated. Unsecured creditors have not received any payment in any of the CAH cases.  In contrast, in *Valley Historic,* the debtor had paid all its creditors before the adversary proceeding was commenced rendering the plan substantially consummated and creditors unaffected. *Valley Historic,* 486 F.3d at 837.  Accordingly, the *Valley Historic* court found the adversary proceedings served no conceivable bankruptcy case administrative purpose because the plan did not provide that a future adversary proceeding's recovery would be used to satisfy the debtor's obligations where the underlying creditors had already been paid either in full or to the extent permitted in the corresponding confirmed plan. *Id.* Indeed, payments under the Debtors' confirmed plans cannot even begin, much less be substantially consummated, until the issues raised in the Amended Complaint are addressed with finality. The efficacies of the plans are determinative and dependent on the outcome of this matter; priority and general unsecured creditors will likely receive nothing without recoveries in the litigation.[15]

_____

[14] False statements made to the court under penalty of perjury by the personal representatives of a corporate or company debtor can constitute a direct fraud on the court, a claim that may be raised postconfirmation. *See Chmil v. Rulisa Operating Co.* (*In the Matter of Tudor Associates, Ltd*.) 64 B.R. 656 (E.D.N.C. 1986).

[15] Section VII of each of the Debtors' plans establishes the litigation trust. It requires the "Plan shall be interpreted so as to afford, for the benefit of all Holders of Allowed Claims, the greatest opportunity for maximum recovery by the Litigation Trustee on the Assets, Chapter 5 Actions, D&O Claims, Fraud Claims, Tort Claims, and rights in and proceeds of any Insurance Policies. The Proceeds of all Causes of Action are material to the implementation of this Plan and the recoveries to Creditors herein." Section II of each Plan, under "Definitions," defines "Causes of Action" as "any and all causes of action, grievances, arbitrations, suits, demands, demand letters, Claims, complaints, notices of non-compliance or violation, enforcement actions, investigations or proceedings that belong to the Debtor and/or the Estate that are or may be pending on the Effective Date or that may be instituted or prosecuted by the Litigation Trustee on behalf of the Estate against any Person or Entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the Effective Date including,

21

Fourth, the liquidating trustee was placed into office for the specific purpose of pursuing claims such as these. Without his pursuit of these claims, there is no plan. Therefore, these are not "matters collateral to the bankruptcy process" the determination of which would "have only incidental effect on the reorganized debtor." *Resorts Int'l.* at 169.

Fifth, because the proceeding involves both federal bankruptcy fraudulent transfer and related state law (fraud and fraudulent conveyance)—the claims are inextricably intertwined. The federal and state law causes of action arise from the same set of pre-petition facts alleging a scheme to defraud the Debtors and their creditors. *In re Air Cargo, Inc.*, Case No. CCB-08-587, 2008 WL 2415039 (D. Md. June 11, 2008) (applying the *Valley Historic* close nexus test in finding bankruptcy court "related to" jurisdiction survived plan confirmation). Sixth, no party has asserted and there is no indication of forum shopping by any party.

Additionally, and since the hearing of this matter, the Third Circuit has further addressed the question of when the *Resort Int'l* close nexus test controls, ruling that it is not applicable to core proceedings. *Mesabi Metallics Com. LLC v B. Riley FBR Inc. (In re Essar Steel Minnesota, LLC)* __ F.4th __ No. 20-3002, 2022 WL 3652961 (3rd Cir. August 25, 2022). In *Essar*, the debtor and certain affiliates filed a chapter 11 reorganization case in the United States Bankruptcy Court for the District of Delaware. A $16 million restructuring fee dispute arose between the debtor and Riley. Postconfirmation, Riley brought an action to collect the disputed fee in the United States District Court in Minnesota and also filed a parallel arbitration action. The reorganized debtor

without limitation: (i) the right to object to Claims; (ii) all avoidance powers, actions (including all Claims and Causes of Action arising under Chapter 5 of the Bankruptcy Code), rights, remedies or affirmative defenses under the Bankruptcy Code and state law; (iii) all Tort Claims; (iv) all Fraud Claims; (v) all Claims under Insurance Policies applicable to the Debtor; (vi) all D&O Claims. Except as otherwise expressly provided in the Plan, any and all Causes of Action are preserved under the Plan."

sought to have the bankruptcy court in Delaware determine if the confirmed plan of reorganization included and had discharged Riley's breach of contract claim. Riley maintained, as Defendants do here, that the bankruptcy court held no jurisdiction to review a state law-based claim that did not require review and interpretation of the confirmed bankruptcy reorganization plan. The state law breach of contract claim, Riley contended, had no "close nexus" to the plan and the confirmation order, and consequently the prior bankruptcy court jurisdiction was lost. The bankruptcy and district courts agreed with this analysis.

The Third Circuit reversed, ruling that because the breach of contract issue required the bankruptcy court to interpret its prior orders issued in the case, specifically the discharge injunction and order of confirmation, the controversy was a core proceeding "arising in" the bankruptcy case. *Id*. at 6. Further, the Third Circuit independently applied the well-settled principal from, among many other cases *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151, 129 S.Ct. 2195, 2205 (2009), holding that a bankruptcy court retains jurisdiction to interpret, effectuate, and enforce its own orders. Because the discharge injunction and plan confirmation order issued by the bankruptcy court would ultimately determine liability even if a breach of contract had occurred, the bankruptcy court retained subject matter jurisdiction. The close nexus test had no applicability to the case at hand, and the appellate court directed the bankruptcy court to proceed with the matter.

As in *Essar*, the present case requires the bankruptcy court to review and determine if the plan, the order of confirmation, and the Settlement Agreement approved by the court in the CAH 2, 3, 7, 12, and 16 cases (*see, e.g.,* CAH #2, Case No. 19-1230, at Dkt. 491) and referenced and incorporated into the confirmed plan, applies to allow or block certain claims in these adversary proceedings. (Order Confirming Plan, Dkt. 1006). The applicability of the Settlement Agreement

terms is discussed in Section II B below. The court, in its order on Defendant's first motion to dismiss in the CAH 2, 3, 7, 12, and 16 Actions[16] has previously determined that the non-fraud related claims were resolved under and barred by the Settlement Agreement. Those claims were dismissed and are not revived here.

The court now is asked to determine if the Settlement Agreement terms extend to the various claims contained in the Amended Complaint, including whether the fraud carve-out covers allied claims such as breach of fiduciary duty. Like the extent of the discharge injunction in *Essar*, the applicability of the Settlement Agreement, which was approved on motion for compromise and specifically incorporated into the orders on plan confirmation entered in each CAH chapter 11 case, is a key defense question. If some or all of the claims stated in the Amended Complaints are barred by the Settlement Agreement, or conversely not barred and a recovery results, the rights of other allowed unsecured creditors in the CAH cases are significantly affected. Currently, those parties will recover little to nothing; their consequential right to share in recovery proceeds distributable under the plans will change drastically should the Trustee be successful. Because questions of fact and law abound concerning the potential blocking of claims under the Settlement Agreement, or conversely the sustained carveout under the fraud exception provision, in the course of this action the bankruptcy court is called on in this action to interpret its prior orders including plan confirmation and the Settlement Agreement incorporated therein. In fact, the Defendants themselves have asked the court to interpret the Settlement Agreement and related orders by using it as a cornerstone defense to the claims as discussed further below.

---

[16] The court issued a separate order on the first motion to dismiss as to the CAH 1 Action and the CAH 6 Action because no settlement agreements were reached in those two cases.

Under the *Essar* analysis, and in accord with *Travelers*, at the heart of this case the court is required to interpret its prior orders (not just the plan confirmation orders, but also the preconfirmation Settlement Agreement) in order to determine whether the claims are barred or were preserved postconfirmation; therefore the close nexus test is satisfied.[17]  Further, even if the Fourth Circuit declined to modify *Valley Historic* based on the *Essar* holding, the pleaded facts present a close nexus to the confirmed plans and their retained jurisdiction provisions. The Motions to Dismiss for lack of subject matter jurisdiction under Federal Rule of Bankruptcy Procedure 7012 and Rule 12(b)(1) of the Federal Rules of Civil Procedure are therefore denied.

## B.  Settlement Agreement

Illustrating the need for review of prior orders with respect to the corresponding plans in the context of this litigation, Defendants assert that non-fraud causes of action against Nusbaum, White and HAC must be dismissed as barred by the settlement agreements reached and approved in five cases.  On October 28, 2020, the *Order Granting Motion to Approve Compromise and Settlement Pursuant to Fed. R. Bankr. P. 9019* was entered in the CAH 2, 3, 7, 12, and 16 cases. *See* Case No. 19-01230, Dkt. 491; Case No. 19-01180, Dkt. 549; Case No. 19-01298, Dkt. 778; Case No. 19-01697, Dkt. 734; and Case No. 19-01227, Dkt. 686 (collectively, the "Settlement Orders").[18]  The Settlement Orders are substantially identical, and approved the settlement agreements reached between Nusbaum, White, the Trustee, and two other parties (the "Settlement Agreement") regarding the money claims status and amounts asserted by Nusbaum and White in the chapter 11 cases, along with objections and possible counterclaims of the five

---

[17] Under *Essar* and *Travelers*, because of the intertwined nature of the confirmation orders and the Settlement Agreements, the close nexus test likely is not applicable, but the court need not reach that conclusion.
[18] Settlements were not reached in CAH1 and CAH 6, so this defense is not presented in those cases.

25

Debtors. A copy of the Settlement Agreement is attached to the Settlement Orders.

Section 6(a) of the Settlement Agreement provides:

Effective upon the Settlement Effective Date, each Party shall be deemed to have released each other Party (together with such other Party's officers, agents, attorneys, employees, members, shareholders, heirs, executors, administrators, successors, and assigns and, in the case of the Trustee, each of the estates of the Debtors) from any and all liabilities, claims, actions, and causes of action that such Party may have against any other Party and that arise out of or relate to any Party's claims against, liens upon assets of, or payments to such Party by any of the Debtors; provided, however, that the **foregoing release shall not operate to release** (i) any Party from such Party's liabilities and obligations under the Settlement Agreement; (ii) **any Party from a cause of action for fraud by the Trustee based upon a Party's active knowledge, assistance, and/or participation in any fraudulent billing scheme engaged in by the Debtors pre-petition**; or (iii) N/W from any claim that CBSG may have to a security interest in any promissory note that N/W (or any affiliate of N/W) may have obtained directly or indirectly from HAC, other than the Gemino Note. The Trustee represents to each of the other Parties that, as of the date of this Settlement Term Sheet, the Trustee is not aware of any other Party's knowledge of, assistance with, and/or participation in any fraudulent billing scheme engaged in by any Debtor; and the Trustee further represents that any potential claim for any such possible misconduct is being preserved solely because the Trustee has not completed his investigation, through counsel retained by him, of the relevant facts and circumstances.

(Case No. 19-1230, Dkt. 491, Ex A)(emphasis added).

Section 6(b) of the Settlement Agreement provides:

Each Party will be deemed to have covenanted and agreed, effective on the Settlement Effective Date, not to file or continue to pursue any action, suit or other proceeding against another Party or against HAC or any member or manager of HAC in his capacity as such, with the sole exception of (i) any action, suit or other proceeding to enforce the terms of the Settlement Agreement or (ii) **a cause of action for fraud by the Trustee based upon a Party's active knowledge, assistance, and/or participation in any fraudulent billing scheme engaged in by the Debtors pre-petition.**

(Case No. 19-1230, Dkt. 491, Ex A)(emphasis added).

26

As shown in the highlighted language, the Settlement Agreement released all causes of actions against Nusbaum, White, and HAC *except for* causes of action on billing scheme fraud.[19] The Defendants argue the exception should be read strictly as to not apply to claims asserted in the Amended Complaint for breach of fiduciary duty, constructive fraudulent transfer, and fraudulent transfer claims, which would leave only claims for actual fraud. However, the Settlement Agreement does not except just causes of action for "actual fraud," but any additional legally recognizable claims based on "active knowledge, assistance, and/or participation" in a billing scheme tied to fraud. As discussed above, the Trustee alleges the occurrence of at least two materially fraudulent schemes. Whether the additional causes of action are then characterized as active fraud or some other legally recognized claim, is not relevant to a Rule 12 motion to dismiss. Once past Rule 8 and Rule 9 pleading sufficiency (see below) the issue becomes whether Defendants acted with material "knowledge, assistance and/or participation" in the schemes. Here, for the reasons set forth below, questions of fact as to whether the Defendants' conduct reached a level outside of that barred by the Settlement Agreement abound and cannot be determined at the motion to dismiss for failure to state a claim stage of litigation. The Motions are therefore denied with respect to the claims being barred by the Settlement Agreement.

### C. Fraudulent Transfer

Defendants also argue that the fraudulent transfer claims continue to be insufficiently pled in the Amended Complaint. The Amended Complaint asserts fraudulent transfer claims under 11 U.S.C. § 548 and the state law equivalents pursuant to 11 U.S.C. § 544. The claims seek recovery

---

[19] As referenced in the preceding section, the Settlement Agreement was incorporated by reference into the confirmed plans in the CAH 2, 3, 7, 12, and 16 cases.

27

of avoided transfers pursuant to 11 U.S.C. § 550.  The original complaint also asserted these claims against Nusbaum and White but identified no transfers to either individual.  The court dismissed those claims with leave to amend.

With respect to Nusbaum, the Amended Complaint now alleges that HMC/CAH Consolidated, Inc., paid him $360,231.82 during 2015; $184,810.12 during 2016; and $191,963.41 during 2017. Defendants argue there are no allegations in support of adequacy of consideration or discussion of the circumstances of these payments.  Additionally, HMC/CAH Consolidated, Inc., is not a debtor in these actions, and no transfer from any of the Debtors to Nusbaum is identified in the Amended Complaint. With respect to White, Defendants argue the Amended Complaint fails to allege any transfers directly to him from any entity.

Citing *Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g, LLC)*, 587 B.R. 445, 456 (Bankr. D. Del 2018), Defendants argue that to properly allege a fraudulent transfer claim, the Trustee must identify each transfer by (1) the transferor, (ii) the transferee, (iii) the date of the transfer, and (iv) the amount of the transfer.  Additionally, the complaint must also include non-conclusory factual allegations regarding the adequacy of consideration and the solvency of the debtor at the time of the transfer.  *See, e.g., Cook v. Roberts (In re Yahweh Ctr., Inc.)*, Case No. 16-04306-5-JNC, 2019 WL 1325032 (Bankr. E.D.N.C. March 22, 2019).  A claim for avoidance of an actual fraudulent transfer is subject to the heightened pleading standard under Federal Rule of Civil Procedure 9, and the allegations of intent must be supported by specific allegations— typically in the form of alleged "badges of fraud." *See Pennysaver USA*, 587 B.R. at 459-61. However, when an actual fraudulent transfer claim is asserted by a bankruptcy trustee, the Rule 9(b) standard can be "somewhat relaxed." *In re Palm Beach Fin. Partners, L.P.,* 488 B.R. 758,

766 (Bankr. S.D. Fla. 2013) (citation omitted).  This relaxation is based on the fact that a "trustee is an outsider to the transaction who must plead fraud from second-hand knowledge." *In re Marketxt Holdings Corp.*, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) (quoting *In re Park South Securities, LLC,* 326 B.R. 505, 517–18 (Bankr. S.D.N.Y. 2005).

> Thus, when a trustee brings a claim for fraud, Rule 9(b)'s particularity requirement is met "'if the person charged with fraud will have a reasonable opportunity to answer the complaint and has adequate information to frame a response ... or if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations.'" *In re Brandon Overseas,* 2010 WL 2812944, at *5 (quoting *In re Arizen Homes,* 2009 WL 393863, at *2).

*In re Palm Beach Fin. Partners, L.P.*, 488 B.R. 758, 767 (Bankr. S.D. Fla. 2013)

Defendants argue no identified transfers or details of such transfers made by any Debtor to Nusbaum or White, either as an initial or subsequent transferee, are asserted.  Further, they argue there are no allegations related to the adequacy of consideration exchanged for such transfer, the insolvency of each applicable Debtor at the time, or allegations supporting an intent to hinder, delay or defraud creditors. Defendants contend the fraudulent transfer claims against Nusbaum and White individually should therefore be dismissed. As to RCHA and HAC, Defendants acknowledge there are alleged transfers from Debtors to these entities.  However, Defendants argue these should also be dismissed because the Amended Complaint does not allege facts regarding adequacy of consideration, solvency at time of transfer, or badges of fraud.

In response, the Trustee contends the allegations are sufficient to survive a motion under 12(b)(6). This court agrees. The Amended Complaint specifically alleges that (1) Empower received money from the scheme, directly and/or through entities controlled by the individual defendants (Am. Compl. ¶ 136); (2) Empower made specific, identified transfers to HAC's

operating account at US Bank (Am. Compl. ¶ 138); and (3) Nusbaum and White were 50% owners of HAC and received funds from the scheme after money was transferred to HAC's operating account (Am. Compl. ¶ 138). The Amended Complaint alleges the same or similar circumstances with respect to transfers to HMC/CAH Consolidated, Inc. (Am. Compl. ¶ 139-40). As to RCHA, an entity owned by Nusbaum and White, the same allegations are raised under both the Verifi Scheme and the Empower Scheme (Am. Compl. ¶ 135-46). The mere fact that there may have been intermediate transfers before the money reached Nusbaum and/or White does not defeat the claims at this stage. See 11 U.S.C. § 550(a)(2) (authorizing recovery from subsequent transferees). The Trustee also notes that information regarding specific transfers to Defendants is exclusively in Defendants' knowledge and control, therefore allegations of fraud may be based upon information and belief. *In re Palm Beach Fin. Partners, L.P.*, 488 B.R. at 767 (citations omitted). Further, each transfer arising under the two billing schemes is alleged to have created both criminal and civil liability to third parties in an amount no less than the amounts passing through Debtors' billing systems. (Am. Compl. ¶¶ 3, 109, 113, 114).

Viewing the totality of the well-pleaded allegations of the Amended Complaint as a whole, and the relaxed standards applicable to trustees when uncovering a pattern of fraud as alleged here, the alleged facts state a claim for fraudulent transfer against Defendants for wholesale diversion of assets. Therefore, the Motions to dismiss are DENIED as to fraudulent transfer.

### D. Fraud Claims and Rule 9

The Amended Complaint adds claims for fraud and constructive fraud, which are subject to the heightened pleading standard of Rule 9 of the Federal Rules of Civil Procedure. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or

mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9.

Defendants argue the fraud claims do not meet the heightened pleadings requirements of Rule 9, asserting that statements concerning the never entered the Proposed Murphy Scheme are irrelevant to the stated claims; the LabCorp allegations contain no factual statement supporting reasonable reliance; the email to Jim Shaffer of HMC/CAH was not made to the Debtors and constitutes a mere opinion only related to the Proposed Murphy Scheme; that mere opinion is irrelevant; and that all management actions were undertaken in good faith and are supported by the business judgment rule. Without these pillars, they contend the Trustee's case collapses.

The Trustee meanwhile alleges with specific factual support that Nusbaum and White did not believe their statements that the billing schemes complied with applicable law because counsel had told them that the schemes were unlawful; that they overcame resistance to the schemes by taking over the controlling interest in the Debtors for the purpose of continuing the Verifi Scheme and entering into the Empower Scheme; and they used the schemes to obtain significant payments from and divert funds to the Perez group to the detriment of the Debtors, eventually forcing some of the Hospitals to close and all Debtors to file bankruptcy.

In reviewing their contentions, the Defendants would have the court require a perfect, omniscient recitation of facts by the Trustee (a third party) accounting for Nusbaum's and White's inner thoughts and motivations with a lack of fraudulent intent. The argument requires the Trustee read their minds rather than infer a state of mind through actions that imply fraudulent intent—the so called "badges of fraud." While Defendants may certainly maintain attacks on state of mind allegations at a later stage of the litigation, the pleaded facts behind the badge of fraud allegations,

and the state of mind conclusions, must be accepted as true at this stage of the proceedings. The particular allegations describe two fraudulent billing schemes entered into by the Debtors forced on them by the Defendants with background facts supporting badges of fraud logically interpretable to show the requisite state of mind. The points made by Defendants Nusbaum and White do not challenge the actions but instead challenge the conclusion that a state of mind existed. They fail to penetrate the Trustee's central point that fraud is a logical conclusion of the pattern imposed by the two schemes' improper diversions of significant funds of the Debtors through misuse of the Hospitals' status as a special category of health care provider under federal law.

These arguments require a determination and weighing of facts with the proper categorization of a series of actions as badges of fraud or innocent actions resulting in victimhood of the defendants also. It is too early in the process to weigh the probability of the truthfulness and effect of each single allegation; the Defendants essentially are making a summary judgment argument, but this is a motion to dismiss. Rule 9 particularity requirements are met, and the Motions are denied on this basis.

### E. Defendant White

Defendants' final argument asserts that all claims against defendant White alone should be dismissed arguing the Amended Complaint does not allege (1) that White was a member, manager, officer, director, employee, or independent contractor of any of the Debtors or had any position of control or fiduciary duty to Debtors; (2) that there was relationship of trust and confidence between White and Debtors; (3) that White made any statement to any Debtor; (4) and that White ever received any transfer from any of the Debtors or HMC/CAH.

The court has already addressed each of these, and here again finds sufficient allegations

32

against each of the Defendants, including White, in the Amended Complaint to survive Defendants' motions to dismiss, even considering the heightened pleading requirements on the fraud claims. As to the assertion that no allegation of holding a position of trust and confidence with the Debtors, the Amended Complaint extensively alleges that White was an owner of the Debtors' holding companies with only one other person, his business partner Nusbaum, and nothing indicates or even hints that White was a silent, nonacting investor. To the contrary, according to the pleadings, as an owner of the Debtors' management company, White was involved in and acted to effectuate participated in the option exercise takeover of the Debtors for the purpose of implementing the Empower Scheme, showing control over the Debtors.

Taken as a whole, the particular pleadings provide a more than adequate showing of a series of badges of fraud actions by White whether individually or in concert with Nusbaum. Whether there will be evidence to support these claims against him at a later stage of the litigation remains to be seen. To the extent the Motions seek to dismiss claims against White alone as the lesser investor or controlling person, it is denied.

## **CONCLUSION**

For the foregoing reasons, the Motions are DENIED in all respects as to all claims and in each adversary proceeding. All Defendants other than Perez must file their respective answers and other responsive pleadings in each of adversary proceeding by and including October 24, 2022, unless otherwise extended.

END OF DOCUMENT